# Exhibit C

**SMITHAMUNDSEN, LLC**
**Case No. 07 CV4278**
**File No. 3005889**
**Attention: Mr. David A. Johnson**
**150 North Michigan Avenue, Suite 3300**
**Chicago, Illinois 60601**

# JOLIET REFINERY PIPING LEAK

**Joliet Refinery**
**Joliet, Illinois**
**Date of Loss: July 30, 2005**

S·E·A

7349 Worthington-Galena Road
Columbus, Ohio 43085
614.888.4160 • 800.782.6851
Fax 614.885.8014
www.SEAlimited.com

EXHIBIT
100
PENGAD 800-631-6989

S-E-A

# TABLE OF CONTENTS

**SECTION** **PAGE**

I. Project Summary ........ 1
Project Assignment ........ 1
Scope of Project ........ 1
Conclusions ........ 1

II. Procedures ........ 3

III. Discussion ........ 8
Incident ........ 8
Background ........ 8
Standards ........ 8
Design ........ 9
Hydrotest Pressures ........ 13
Inherent Variability ........ 14
Qualification and Bonding ........ 15
Examination ........ 16
Inspection ........ 18
Risk Assessment ........ 19
Responsibility ........ 19
Analysis ........ 20

IV. Signatures ........ 22

# I. PROJECT SUMMARY

## PROJECT ASSIGNMENT

On March 6, 2009, Mr. David Johnson of SmithAmundsen, LLC, requested that SEA, Ltd. review documents and testimony associated with a July 30, 2005 piping leak in a temporary cooling line at ExxonMobil's Joliet Refinery. This investigation was conducted by SEA Technical Consultant Nicholas E. Biery, Ph.D., as SEA Project 150905.

## SCOPE OF PROJECT

SEA was requested to render, if possible, a professional opinion regarding the adequacy of the overall design, construction, and inspection for the temporary cooling line and its role in the July 30, 2005 leak.

## CONCLUSIONS

- **ExxonMobil's failure to (1) establish adequate examination and in-process monitoring requirements, (2) set acceptance criteria for the fusions or bonds, and (3) assign an inspector to ensure the ASME B31.3 requirements for examination and testing of the high-density polyethylene (HDPE) piping were met resulted in a defective weld entering service and was, therefore, a key cause of the July 30, 2005 failure.**
- **The use of thinner HDPE pipe than that required by ASME B31.3 contributed to the failure by reducing the margin of safety in the pipe joint that leaked.**
- **A pipe joint with the wall thickness required by ASME B31.3 would have been subject to lower stresses and would most likely have had a longer life.**
- **Ambitech's piping design used an incorrect wall thickness.**
- **Ambitech used a lower design temperature for the HDPE line than for the steel line, without justifying the difference in the design basis.**
- **ExxonMobil reviewed and approved the design basis without correcting or requiring explanation of the lower design temperature for the HDPE line.**
- **ExxonMobil reviewed the design basis and did not check that the wall thickness calculation for the HDPE pipe was correct.**
- **ISCO provided guidance regarding pressure capacity and wall thickness that did not match the requirements of ASME B31.3.**
- **ExxonMobil selected and is responsible for the inadequacies and deficiencies of the Bonding Procedure Specification (BPS).**

- **ExxonMobil arranged for qualification of the AMEX bonding operators that did not meet the requirements of ASME B31.3.**
- **ISCO provided and is also responsible for the inadequacies and deficiences of the Bonding Procedure Specification (BPS), training for the AMEX bonding operators, and qualification of the AMEX bonding operators.**
- **The AMEX bonding operators conducted butt fusion of the HDPE piping according to their training, with a joint defect rate that is comparable to other projects.**
- **ExxonMobil's selection of a preoperational hydrotest pressure below that stipulated by ASME B31.3 for normal service piping reduced the likelihood of finding the weld that eventually ruptured.**
- **ExxonMobil did not take steps to minimize the consequence of a potential HDPE leak or rupture.**

# II. PROCEDURES

SEA, Ltd. reviewed the following documents provided by SmithAmundsen, LLC, or were obtained directly by SEA:

1. Depositions from the following ExxonMobil personnel (including exhibits and materials referenced in these depositions):
   - Ray Bojarczuk (March 11, 2009)
   - Monica Chauviere (March 11, 2009)
   - Wayne Dailey (February 4, 2009)
   - Victor Elias (April 29, 2009)
   - Rick Enlow (November 4, 2008)
   - John Fitzpatrick (February 11, 2009)
   - Ira Hanan (April 29, 2009)
   - Lonnie McCollum (February 11, 2009)
   - Steve Penteris (October 23, 2008)
   - Jeff Pritz (February 4, 2009)
   - Mark Zeller (April 29, 2009)
2. Depositions from the following ISCO personnel (including exhibits and materials referenced in these depositions):
   - Dudley Burwell (November 18, 2009)
   - Ricky Knapczyk (February 23, 2009)
   - Mike Montgomery (November 18 and 19, 2008)
3. Depositions from the following Ambitech personnel (including exhibits and materials referenced in these depositions):
   - Gary Bell (February 26, 2009)
   - Bernard Gunn (November 13, 2008; February 16, 2009)
   - Gregg Rodway (February 26, 2009)
   - Elizabeth Wenzel (February 16, 2009)
4. Depositions from the following AMEX personnel (including exhibits and materials referenced in these depositions):
   - Robert Dalrymple (December 18, 2008)
   - Don Hammermeister (December 18, 2008)
   - James Hannon (January 28, 2009)
   - Gregory Harper (January 28, 2009)
   - Tom Pumnea (December 17, 2008)
   - Pat Daly (March 20, 2009)
5. Relevant sections of ASME B31.3-2004 (Chapter VII is Exhibit 27 and the first page of Chapter VI is Exhibit 32, but other sections were also reviewed)
6. ASTM F 1545 and F 2620

7. OSHA 29 CFR 1910.6

8. Scope of work titled, "Cooling Water Line Replacement," dated October 29, 2004, and marked, "Issued For Construction November 2, 2004" (Exhibit 5)

9. Two different versions of ExxonMobil's Global Practice GP 03-10-04; one dated November 2001 (Exhibits 7 and 57) and the second dated February 2007 (Exhibit 87)

10. An undated ExxonMobil presentation titled, "Cooling Water Return Bypass Failure: 7/30/2005 HDPE Weld Failure" (Exhibit 18)

11. An ExxonMobil Service Requisition Form (No. 12564787) referencing Ambitech's "Engineering Proposal – General Cooling Tower Water Return Line Replacement Project," dated September 21, 2004, and the attached Ambitech proposal (Exhibit 9; Ambitech proposal also Exhibit 62), as well as a "General Services Agreement Principal Document," between Ambitech and ExxonMobil (Exhibit 85)

12. The following letters from Dudley Burwell of ISCO to Bernie Gunn at Exxon-Mobil's Joliet Refinery:
    - April 21, 2004, titled, "Reference: Flow Calculations for Above Ground HDPE Bypass Line" (Exhibit 30; also part of Exhibit 35)
    - August 5, 2005, titled, "Reference: Weld Failure in Cooling Water Return Line Project" (part of Exhibit 35 and Exhibit 71)

13. Typed and/or handwritten forms from interviews conducted by ExxonMobil of Mike Montgomery (August 5, 2005), Wayne Dailey (August 7, 2005), Don Hammermeister (August 3 and 5, 2005), Bob Dalrymple (August 5, 2005), and Pat Daly (August 3 and 7, 2005) (Exhibits 22 and 23)

14. An ExxonMobil document titled, "Risk Assessment Documentation for Approval to Continue Operation Until Resolution," dated August 4, 2005 (Exhibits 17 and 61)

15. A proposal from Jim Hannon of AMEX Construction Co., Inc. to Bernie Gunn at ExxonMobil titled, "Re: New Cooling Water Piping, Amex Proposal No. 04-5421," dated March 5, 2004 (Exhibit 44)

16. A letter from Jim Hannon of AMEX Construction Co., Inc. to Bernie Gunn at ExxonMobil titled, "Re: Cooling Water Replacement Project, Breakout Pricing for Amex Proposal No. 04-5421," dated September 15, 2004 (Exhibit 43)

17. Documents titled, "Design Specification Covering General Cooling Tower Return Line Replacement Joliet Refinery," numbered EJ#018-03 and dated August 13, 2004 (Exhibit 60) and September 7, 2004 (Exhibit 78)

18. A letter from Betty Wenzel to Victor Elias dated September 27, 2004, titled, "General Cooling Tower Return Line Replacement Process Design Specification" (Exhibit 82)

19. A document that appears to be an approval page for the September 7, 2004, version of EJ#018-03 (Exhibit 78) titled, "Design Specification Covering General Cooling Tower Return Line Replacement" and dated September 7, 2004 (Exhibit 83)

20. Isometric Sketches for the HDPE piping (Exhibit 48; 018-03-A-1 through 018-03-A-13)

21. A routing plan for the HDPE piping (part of Exhibits 13 and 44; 018-02-E-1)
22. "Cooling Water Return (illegible) Replacement Project Scope Sketch" (Exhibit 14)
23. Performance Pipe Bulletin PP-750 (April 2004 and April 2007)
24. The following Plastic Pipe Institute, Inc. documents:
    - The Second Edition Handbook of PE Pipe (undated, version reviewed at http://plasticpipe.org/publications/pe_handbook.html)
    - TR-4 "PPI Listing of Hydrostatic Design Basis (HDB), Strength Design Basis (SDB), Pressure Design Basis (PDB) and Minimum Inspections, Test, and Safety Considerations"; 2004 and 2009 versions
    - TR-9 "Recommended Design Factors for Pressure Applications of Thermoplastic Pipe Materials" 2003
    - "Above Ground Applications for Polyethylene Pipe" (EMAC00001615-EMAC00001644) dated 1998, with notes (appears to have been part of or is now integrated into the latest version of the Handbook of PE Pipe)
25. The ISCO HDPE Fusion Manual, Version 2.0, dated 2004 (Exhibit 26)
26. The PolyPipe® "Design and Engineering Guide for Polyethylene Piping," dated September 2008
27. A facsimile from Rick Knapczyk to Bernie Gunn dated March 30, 2004, listing the pressure rating for PolyPipe® at different temperatures, diameter ratios, and service lives (Exhibit 38)
28. An ExxonMobil PowerPoint chart with "ASME B31.3 Section VII" at the top (Exhibit 8)
29. An ExxonMobil checklist titled, "Cooling Water Return Line Replacement Reliability and Maintenance Checklist" (EMAC00002485 through EMAC00002488)
30. Various weld quality control forms, including forms WQCF-205-0762 for the HDPE reinforcement (part of Exhibit 28) and WQCF-204-674 (Exhibit 64), WQCF-205-706, WQCF-205-714, WQCF-205-767, WQCF-205-768, and Exhibit 39 for carbon steel welding
31. Prints of ExxonMobil Management of Change –Action, MOC# 200409007, Actions, Temporary HDPE Cooling Water Return Lines, "Complete all actions required for startup and document" and "Field walk & ensure construction-equipment are per design-inspection requirements specs" (EMAC00000006-EMAC00000011)
32. Photographs of the HDPE piping in the ExxonMobil discovery documents, including EMAC00001289 and EMAC00001186 (Exhibit 20)
33. Photographs of one side of the weld that leaked on July 30, 2005, and of the HDPE pipe in the storage yard after the piping was removed from service, provided by SmithAmundsen and identified as Files 14250017.jpg, 14250018.jpg, 14250019.jpg, 14250023.jpg, 14250024.jpg, 14250027.jpg, 14250028.jpg,

14250029.jpg, 14250054.jpg, 14250056.jpg, 14250061.jpg, 14250065.jpg, 14250075.jpg, and 14250078.jpg

34. Photographs of the weld that failed included in Exhibit 66

35. Copies of Ambitech Piping Bill of Materials for the HDPE piping (Exhibit 81; EMAC00003128-3131)

36. Copies of the Continuing Services Agreement Principal Document C63027 between ExxonMobil and AMEX (Exhibit 5), and Service Order 4505539602, released against that agreement (Exhibit 45)

37. A document titled, "Cooling Water Line Failure Investigation – Draft, Summary of Findings by ICH" (Exhibit 89; ICH is Ira C. Hanan of ExxonMobil)

38. Package containing printouts from CAESAR II runs performed for Ambitech or a contractor to Ambitech (PSI), dated September 27, 2004, an Ambitech Engineering Corporation Layout Review Document, dated October 8, 2004, and a Fax Transmission cover sheet from Gary Bell of Ambitech to Rick Enlow of ExxonMobil

39. Copies of undated ISCO certificates stating that the following AMEX Construction personnel have "attended a Heat Fusion Demonstration" and have "demonstrated proper Heat Fusion Principles and Fundamentals of High Density Polyethylene Pipe and Fittings. Fusion procedures covered include: Butt Fusion while using: McElroy 1648 Machine" (Exhibit 36)

    - Tom Pumnea, Jr.
    - Chris Allen
    - Robert Dalymple
    - Patrick L. Daly, Jr.
    - John Noe

40. A "Heat Fusion Evaluation Form," dated February 10, 2005, but with signatures, dated February 11, 2005, listing Tom Pumnea, Jr., Chris Allen, Roberty Dalrymple, Patrick Daly, Jr., and John Noe (ISCO 95)

41. A fax transmission from Gary Bell to Rick Enlow, dated August 9, 2005, with the subject, "Stress Review Information" and other documents, including CAESAR II printouts provided to Attorney Dave Johnson of SmithAmundsen by Doug Palandech of Foran, Glennon, Palandech & Ponzi, PC, on May 5, 2009, in an email titled "PSI Documentation"

42. Notes which appear to have been taken by Wayne Dailey, dated January 5, 2005, through June 17, 2005 (EMAC00000231 through EMAC00000342)

43. ExxonMobil's submission to the Illinois Environmental Protection Agency (IEPA) after the pipe leak and resulting environmental release (EMAC00001088-EMAC00001110)

44. A report titled, "Inspection and Assessment of Failed HDPE Butt Fused Joint, ExxonMobil Oil Corporation vs. Amex Construction Company, Inc.," by James R. Perrault and dated March 10, 2009

45. A document titled, "P3237 API Effluent and River Water Line Replacement, Revision 2, 09/21/06," dated September 20, 2006, and with File No. 2006ESC26
46. A two-page document titled, "Mitigation Measures for HDPE Piping," dated August 7, 2005, on the second page (Exhibit 16)
47. A handwritten statement signed by Tom Pumnea and apparently requested or witnessed by Dave Dunne of ExxonMobile (Exhibit 40)
48. ExxonMobil's GEMS documents, G1U-4 and G12U-2 (Exhibit 49)
49. A copy of a page from Patrick Daly's notebook (Exhibit 88)
50. The article, "Welding Polyethylene Pipes with Confidence," in the July-August 2001 issue of Connect: The Magazine of TWI
51. The following ExxonMobil emails (i-v. appears to be a single "thread" in Exhibit 86):
    - August 8, 2005, from Duncan L. Hutcheon to Ira C. Hannon, "Re: Fw: Critical water service"
    - February 20, 2004, from Don Kimbril to John B. White, "Definition of SHE Risk"
    - August 8, 2005, from Ira C. Hannon to Duncan L. Hutcheon, "Fw: Critical water service"
    - February 10, 2005, from Duncan L. Hutcheon to Raphael M. Bojarczuk, "Fw: Critical water service"
    - February 10, 2005, from Raphael M. Bojarczuk to Duncan L. Hutcheonand and Kenneth J. Reinman, "Critical water service"
    - August 2, 2005, from Jack G. E. Stover to Bernard J. Gunn and Steven G. Penteris, "CW line"
    - August 2, 2005, from Steven G. Penteris to Thomas B. Chesebro, "Re: FIR 05019 Investigation Meeting Tomorrow"
    - August 1, 2005, from Thomas B. Chesebro to Bernard J. Gunn, Steven G. Penteris, Richard L. Enlow, John J. Sprafka, and Brent D. Freeman, "FIR 05019 Investigation Meeting Tomorrow"
    - August 15, 2005, from Michael J. Reuther to Thomas B. Chesebro, John J. Sprafka, Daniel L. Mosier, and Larry L. Readle, "Last bit of information on HDPE," with forwarded emails dated August 10, 2005; August 10, 2005; August 9, 2005; and August 5, 2005, addressed to all or a subset of the final recipients (EMAC00001178-EMAC00001181).

# III. DISCUSSION

## INCIDENT

On July 30, 2005, a 36"-diameter high-density polyethylene (HDPE) temporary waterline at ExxonMobil's Joliet Refinery ruptured, resulting in a loss of cooling water to some units of the refinery. Due to the loss of cooling water, ExxonMobil shut down portions of the refinery for more than a day. The leak occurred at a weld or fusion between two adjacent pieces (joints) of HDPE pipe.

## BACKGROUND

After experiencing several failures with a reinforced concrete cooling water return line, ExxonMobil investigated options for line repair or replacement. After evaluating the options, ExxonMobil elected to replace this line by a permanent steel line. Temporary HDPE bypass piping was installed to minimize interruption to the operation of the refinery during construction of the permanent carbon steel piping. Exxon-Mobil contracted Ambitech to design both the permanent carbon steel piping and the temporary HDPE piping. AMEX was the contractor selected to conduct installation of the permanent carbon steel line, including fabrication and dismantling of the temporary HDPE bypass lines. ISCO supplied the HDPE pipe and fittings, supplied the bonding machines, and trained the AMEX personnel to conduct butt fusion of the HDPE piping.

## STANDARDS

Of the various codes, standards, and guidelines referenced in the scope of work prepared by Ambitech, only ExxonMobil's Global Practice (GP) 03-10-04, ExxonMobil's GEMS 2-21-1.2 Material Class G12U-2, and ASME B31.3 appear to apply to the HDPE line. The version of GP 03-10-04 in effect at the time of construction (dated November 2001) references ASTM D 3035, which is a standard specification for polyethylene pipe, and ASTM F 1545, which is a specification for plastic-lined metallic pipe that is not relevant to the HDPE pipe used.

Although cited by Ambitech on the isometric drawings of the HDPE pipe (Exhibit 48) and on a Weld Quality Control Form (WQCF) produced by ExxonMobil for the pipe reinforcement after the leak (part of Exhibit 28), the GEMS specification does not actually include the HDPE pipe used in this application, as it is limited to underground piping [also noted by Ray Bojarczuk (ExxonMobil) according to Exhibit 89], refers to 2" to 24" outside diameter (OD) pipe, and only references Class 200 pipe – Class 200 pipe is intended to have a pressure capacity of 200 psi at room temperature. This HDPE piping was aboveground, and most of it was 30" or 36" Standard Dimension Ratio (SDR or DR) 17 pipe, which has a standard pressure capacity of 100 psi at room temperature. Based on the testimony of Mr. Bojarczuk, it appears that adherence to the GEMS specifications is not required for temporary piping, and that the materials listed in the GEMS specs may be extended to other sizes if stress calculations and other engineering work is performed.

Several of the depositions, and a draft internal ExxonMobil "Cooling Water Line Failure Investigation, Summary of Findings" by Ira C. Hanan (Exhibit 89), note that the use of HDPE for this application may not be consistent with the version of GP 03-10-04 in effect at the time, and it is certainly not consistent with the revised version that was reviewed. The key issue is whether or not this line should have been considered "critical water service," which is prohibited by the 2001 version of GP 03-10-04 in effect at the time the piping was constructed. Several ExxonMobil emails reveal that there is a lack of an internal consensus on whether this line qualified as "critical water service" under the 2001 Standard (Exhibit 86). The 2007 version distinguishes between Safety, Health, Environmental, or "SHE critical" and "reliability critical" service. Given economic losses that can result from the loss of cooling water and resulting shutdown of the refinery that are claimed to be greater than $1,000,000, the line is clearly "reliability critical" per the terms of the 2007 GP 03-10-04 and ExxonMobil's risk matrix as provided in the risk assessment of the post July 30, 2005 startup (Exhibits 17 and 61). Based on the answer provided by Betty Wenzel to Ira Hannon in Exhibit 89, it appears that Betty Wenzel would have considered use of HDPE to conflict with the GP, if she had read this document prior to preparing the process design specification (EJ#018-03; Exhibits 60 and 78). The inconsistencies in these documents and the failure to identify or resolve them prior to construction indicates a lack of due care in the design of the temporary HDPE piping.

## DESIGN

ASME B31.3 defines the engineering design as "the detailed design governing a piping system, developed from process and mechanical requirements, conforming to Code requirements, and including all necessary specifications, drawings, and supporting documents." Based on the deposition testimony and the contract documents reviewed, Ambitech was responsible for the mechanical design, including the design drawings for both the carbon steel and temporary HDPE piping and the contractor scope of work (Exhibit 6).

The testimony from Monica Chauviere (ExxonMobil) and Ray Bojarczuk (ExxonMobil), is not completely consistent regarding ExxonMobil practice and the design of this project. Ms. Chauviere's testimony indicated that she would ensure that the designer of a HDPE line would have or have had access to expertise in the properties of plastic materials (which was not the case for this line according to the deposition of Gary Bell of Ambitech), that she insisted on qualification of bonding operators in previous projects, and that she would typically require the services of a third-party inspector.
Mr. Bojarczuk's testimony indicated that QA/QC procedures were included in industry standards and did not need to be in the design documents and that no special consideration was needed for the use of HDPE. This disparity shows that design practice varies considerably within ExxonMobil; such differences in approach likely contributed to the shortcomings in the design of the Joliet Refinery temporary HDPE piping.

There are discrepancies between the design conditions for the HDPE line in the various documents reviewed. The Design Specification (EJ# 018-03, Exhibit 78) developed by

Betty Wenzel (Ambitech) indicates that the design pressure for the steel line was 105 psi and the design temperature was 140°F. The same document specifies different design conditions for the HDPE line (106 psi and 125°F) without a change in operating conditions. The design temperature and pressure are likely set by the outlet conditions of equipment and should therefore be the same for either material. It may be that the higher design temperature used for the steel line provides extra margin for upset conditions or for future equipment changes, but this is not discussed or addressed in the design basis. The Design Specification (EJ# 018-03, Exhibit 78) was reviewed by ten people (Exhibit 83), including materials, plant, and safety engineers for ExxonMobil, without any apparent changes to the design conditions. Communications (Exhibits 30 and 37) between Bernie Gunn (Ambitech) and Dudley Burwell (ISCO) correlate with the lower numbers, but Mr. Burwell's response mentions a design pressure of 72 psi and a surge pressure allowance of 36 psi. Surge pressure is also used in the Design Specification. However, ASME B31.3 does not allow for pressures above the design pressure. Instead, the most severe coincident pressure and temperature must be used (A302.2.4). A communication from Rick Knapczyk (ISCO) to Bernie Gunn (Ambitech; Exhibit 38) gives pressure ratings based on both temperature and design life, and 72 psi is the rating provided for DR 17 pipe at 125°F for 1 year. ASME B31.3 does not provide different design stresses based on the length of use—the hydrostatic design stress is based on long-term service. A design using a surge pressure allowance or a reduced design life is flawed because it does not meet the requirements of ASME B31.3.

The front page of the Piping Bill of Material for the HDPE pipe (part of Exhibit 81, EMAC00003128) conflicts with the Design Specification (EJ 018-03, Exhibit 78) and indicates that the design temperature and pressure for the HDPE pipe were 105 psi and 140°F. WQCFs for some of the carbon steel piping (Exhibit 39 or EMAC00003508, EMAC00003520, EMAC00003523, WQCF#204-0674) and for the post-leak reinforcement procedure (WQCF#205-0762, part of Exhibit 18) for HDPE welds with Time of Flight Diffraction (TOFD) indications list the design conditions as 105 psi and 145°F. These latter conditions also appear on the isometric drawings for the carbon steel line, and many of these documents reference 38 psi and 120°F as the operating temperature of the piping. The discrepancies between these documents are not large for the carbon steel line, but are important for HDPE pipe due to reductions in design strength as temperature increases in this range. The Plastic Pipe Institute's design guide, Chapter 8, states that "as a general rule, PE pipe for pressure applications can be safely used at temperatures as low as –40°F and as high as 140°F," which is below the 145°F design temperature listed in some of these documents. Using HDPE for pressure piping with a design temperature of 145°F is not consistent with industry practice.

The line was designed with a wall thickness below that required by ASME B31.3. ASME does not list a hydrostatic design stress (HDS) for ASTM D 3035 pipe at 140°F; however, it does list the HDS at 100°F as 500 psi. Using A304.2.1 equation 26a, the thickness of 36" outer diameter pipe, with a design pressure of 105 psi at 100°F, should be:

$$t = \frac{PD}{2S+P} = \frac{105\,psi \times 36\,inches}{2 \times 500\,psi + 105\,psi} = 3.43\,inches$$

versus the 2.118" wall specified [P is the design pressure, S is the hydrostatic design stress (HDS), and D is the outside diameter]. Although ASME does not list a hydrostatic design stress for PE-3408 (the grade used in this application) at 125°F or 140°F, the Plastic Pipe Institute does publish a technical report (TR-4) that lists the Hydrostatic Design Basis (HDB) for various pipe grades. The HDS for water service is 50% of the HDB. In the 2009 version of this report, the only HDB listed for a PE-3408 material at 140°F is 500 psi, which would give an HDS of 250 psi. The 2004 version of the report listed
materials with HDB values at 140°F between 500 and 1000 psi, or HDS between 250 and 500 psi. The pipe used on this project was PolyPipe according to Rick Knapczyk's (ISCO) deposition. A search of the PolyPipe website shows that the current comparable materials produced by this manufacturer are rated as PE-3608, indicating they also meet the requirements for PE-3408, and they all have an HDB of 800 psi at 140°F. Using the equation above results in a pipe thickness of 4.18", intermediate between the 6.25" required for the pipe with the lowest HDB value and 3.43" for the pipe with the highest HDB. Interpolating the design stress at 125°F based on the 73°F and 140°F values for the current PolyPipe gives a design stress of approximately 480 psi, which would result in a wall thickness of 3.54". All of these calculations result in a greater wall thickness than that selected for the 36" Joliet Refinery line. The HDPE pipe used in this design was not thick enough to meet the requirements of ASME B31.3.

Reducing the wall thickness is equivalent to increasing the hydrostatic design stress for the piping. Using the ASME B31.3 equation above to solve for the HDS which produces a Standard Dimension Ratio (SDR) 17 pipe results in an HDS of approximately 840 psi (36" SDR pipe has a wall thickness of 2.118") – this is 5% above the ASME B31.3 value for a 73°F line, 68% higher than the value stipulated by ASME B31.3 for a 100°F line, 110% higher than for a 140°F line using the current PolyPipe PE-3608 HDB, 74% higher than for an interpolated 125°F strength for the current PolyPipe, and up to 236% more than that for a 140°F design using the material with the lowest HDB in TR-4 2004. In other words, the stresses in the pipe were 68% to 236%, and most likely 110%, higher in this line than they would have been if designed to the correct HDS for the pipe at 140°F. It should be noted that increasing the wall (designing at lower stress) would be expected to result in an increase in pipe cost that is roughly proportional to the increase in weight per linear foot. Another issue is that it may have been difficult to obtain DR7 or DR9 pipe in a 36" or 42" OD, as indicated in EMAC00003068. The reduced wall thickness increased stresses in the pipe joints and made the HDPE line more susceptible to failure.

The report titled, "P3237 API Effluent and River Water Line Replacement Revision 2 09/21/06," (document 40) contains information on two HDPE lines planned by ExxonMobil/Imperial Oil's Strathcona Refinery using HDPE pipe supplied by a different vendor (KWH Sclairpipe instead of PolyPipe). The first was a 24" OD line with a design pressure of 160 psi and a design temperature of 100°F. The second was a 36" OD line with a design pressure that was listed as either atmospheric or 36 psi and a design temperature of 140°F. The wall thickness of 2.67" for the 24" line corresponds to a HDS of 640 psi, above the 500 psi specified by ASME B31.3 for HDPE at that temperature, but significantly below the 840 psi HDS apparently applied by ExxonMobil at the Joliet Refinery for a higher temperature line. This value is close to the 627 psi that would be interpolated using the Interpolation Equation on page 97 of the Second Edition Handbook of PE Pipe and the properties at 73°F and 140°F for the lower property KWH Sclairpipe

listed in TR-4; some KWH Sclairpipe listed in TR-4 has a higher design strength at 140°F. Using the higher properties of these pipes results in an interpolated design strength of 670 psi and a thickness of 2.56". The wall thickness specified for the 36" OD line was 1.72"; this corresponds to an HDS of approximately 360 psi, which is lower than the value in TR-4 for any KWH Sclairpipe PE-3608 HDPE. Given that pipe is available in fixed diameter ratios, these variations in the wall thicknesses selected may be due to the limited choice in pipe sizes. It appears that the wall thicknesses selected for the Strathcona Refinery were either closer to or met the requirements of ASME B31.3 and reflect a thorough and consistent design.

One of the documents provided by ExxonMobil ("Above Ground Applications for Polyethylene Pipe," EMAC00001615-EMAC00001644, note on EMAC00001620) shows a calculation of the pressure capability in the margin. Although the calculation has an error (it uses 2.38" vs. 2.118" for the pipe wall thickness), it suggests that someone at ExxonMobil performed a calculation to determine the pressure capacity of the pipe. Plugging the HDB into this equation and using the temperature factor for 140°F service on the next page (EMAC00001621), that person would have calculated a pressure capacity for the line of 0.071 x 1600 x 0.5 = 56.8 psi—only 54% of the design pressure for this line (this is a bit higher than the 50 psi that results from the correct wall thickness, which is only 48% of the design pressure). Plugging an interpolated 125°F design factor would improve the situation slightly, but still results in a pressure capacity of only 68 psi for the incorrect pipe wall thickness and 60 psi for the correct one. Even more simply, PE 3408 DR 17 pipe is also known as Class 100 pipe because its pressure capacity for water at 73°F is 100 psi. It is surprising that several people at ExxonMobil and Ambitech elected to use pipe rated for 100 psi at room temperature for a line with a design pressure over 100 psi and a design temperature well above room temperature. ExxonMobil's GEMS document has a note at the bottom indicating that the piping referenced (Class 200 or DR 9, much thicker than the DR 17 pipe used in this project) is rated for 228 psi at 50°F and only 100 psi at 140°F (Exhibit 49). These latter conditions are slightly below (less severe than) the design conditions for the permanent steel piping.

A fax or email from Dudley Burwell (ISCO) to Bernie Gunn (Ambitech) (Exhibit 30) states the DR 17 pipe would be adequate for the application. However, Mr. Burwell (ISCO) states in his deposition that he was not aware that ASME B31.3 was being applied to this project. In any case, it appears that the line was designed at a much higher stress than is permitted by ASME B31.3, which increases the likelihood of a failure such as occurred on July 30, 2005. If the line were designed using the ASME B31.3 allowable stress, the stress on the joint in question would have been reduced by approximately one-half due to the increased wall thickness. It is instructive to examine the chart provided by Rick Knapczyk to Bernie Gunn in Exhibit 38. If design at 125°F for DR 17 pipe is considered, a reduction in pressure from 72 psi to 62 psi extends the design life from 1 to 50 years on this chart. In terms of stresses, reducing the stress by 14% extends the design service life by a factor of 50; the impact of halving the stresses would be greater. Although the situation becomes more complicated when a defect with irregular geometry and an unknown loading history is considered, a pipe joint that was twice as thick with the same lack of fusion defect would be expected to survive longer due to the lower stresses on the joint.

Analysis of the longitudinal stress in the system appears to have been conducted by Ambitech or a contractor for Ambitech (PSI). Printouts from CAESAR II (a piping analysis package) indicate that stress checks were performed; however, the only documents available for review indicate that some stress checks were failed in the September 27, 2004 analyses. It appears that some design changes were required in a layout review document dated October 8, 2004; however, it is unclear whether the September 27, 2004 analyses were the only runs performed or if there were subsequent runs that confirmed that a revised design met the required stress limits. A review of the CAESAR II printouts shows that the properties used for HDPE do not match the recommended properties for long-term loading conditions suggested by the "Second Edition Handbook of PE Pipe," and that they appear to be solely for room temperature conditions. Additionally, the allowable stress that was input appears to be the room temperature yield stress instead of the design stress provided in Appendix B of ASME B31.3. The documents reviewed, including August 9, 2005 emails, also suggest that Jack Schultz of Ambitech/PSI was uncertain how to conduct a stress analysis of the HDPE pipe after the July 30, 2005 leak. Based on the available documentation, it is unclear how the original longitudinal stress analysis was performed and whether it was performed correctly. This indicates a lack of due care in the design of the temporary HDPE piping.

## HYDROTEST PRESSURES

As with the design pressure, there are discrepancies between the various hydrotest pressures in the documents examined. Robert Dalrymple testified in his deposition that he recalled the original hydrotest pressure as "one and a half times" or "225 pounds." 225 psi is not 1.5 times either the design or operating pressure for the line. Furthermore, he indicated that the pipe was under the hydrotest pressure while they walked the line and found an initial leak in a T-fitting purchased from ISCO. However, Wayne Dailey's (ExxonMobil) notes indicate on EMAC00000326 that the T leaked at 100 (presumably psi), which is less than the design pressure and less than three times the operating pressures most frequently mentioned in the documents (35 and 38 psi). Mr. Dailey's deposition testimony indicated the line was tested at three times the operating pressure according to his recollection; however, Mr. Dailey also indicated that typical hydrotesting is done at 1.5 times the operating pressure when ASME requires that it is performed at 1.5 times the design pressure. Several documents list the hydrotest pressure after the leak as either 120 psi or 3 times operating pressure; however, if operating pressure was 35 psi, then three times that pressure would be 105 psi. 120 psi is close to three times 38 psi (116 psi), which is listed on multiple WQCFs as the operating pressure. Exhibits 16 and 17 list a hammer test at 1.5 times the design pressure as a mitigation measure, but 1.5 times 105 psi would be 157.5 psi, not 120 psi. Finally, a submission to the Illinois Environmental Protection Agency (IEPA; EMAC00001088-EMAC00001110) states that the line was hydrotested at ~120 psi. Given that the response to the IEPA seems to have been related to the initial failure, this is presumed to be the correct original hydrotest pressure.

ASME B31.3 requires that the hydrostatic leak test or hydrotest be conducted at a pressure that is no less than 1.5 times the design pressure. Additionally, the test pressure

is increased when the design temperature is above the leak test pressure. The equation to be used is ASME B31.3 2004 Equation 24:

$$P_T = \frac{1.5PS_T}{S} = \frac{1.5 \times 105psi \times 800psi}{400\,psi} = 315psi$$

where $P_T$ is the test pressure, P is the design pressure, $S_T$ is the design stress at the test temperature, and S is the design stress at the design temperature (values for the current PolyPipe products at 140°F and 73°F are used here). This equation means that an ASME B31.3 compliant hydrotest of this HDPE piping system should be conducted at three times the design pressure (3 x 105 psi – 315 psi).

ASME B31.3 permits the owner to instead conduct an initial service leak test at the operating pressure if the piping is for Category D service. ExxonMobil could select any pressure at or above the operation pressure of 35 psi up to the hydrostatic leak test pressure if the piping was considered Category D service. However, the Strathcona Refinery report P3237 concludes that although water piping would normally be Category D, the risk warrants the steps recommended for Normal Service, including a temperature corrected hydrostatic leak test. Using a lower pressure reduces the probability that a large defect will leak during the test and be detected. ExxonMobil's selection of a hydrotest pressure below 315 psi (see above) reduced the likelihood of finding the defect that resulted in the July 30, 2005 leak prior to putting the HDPE piping into service.

## INHERENT VARIABILITY

All bonding and/or welding operations are subject to human error, machine malfunction, and other variables that can result in bond or weld imperfections. The Welding Institute (TWI) states on page 7 of their article, "Welding Polyethylene Pipes with Confidence," in the July-August 2001 issue of Connect: The Magazine of TWI, that "Even with good site practice, it is impossible to eliminate all possible flaws in butt fusion welds in polyethylene." This is recognized by industry codes, such as ASME B31.3, and industry practice and is the driver behind the extensive inspection and examination requirements set forth in those codes and used by industry. ASME B31.3 attempts to limit variability through qualification of bonding or welding procedures and operators (A328.2), and it attempts to ensure that process deviations and imperfect bonds/welds are identified and corrected by establishing requirements for examination and documentation (A341 and 346/A346), as well as by establishing the role of Inspector (340/A340).

In the aftermath of the piping leak, ExxonMobil was able to obtain statistics from RTD Group (now ApplusRTD Group) regarding the rate of defective welds for other projects (EMAC00001178-EMAC0001181). These rates apparently ranged up to 16% (with 10% "severe"), but the rate was more typically 1% to 2% when hundreds of welds were involved. Two of 66, 36" welds inspected were found to have lack of fusion defects that were of concern, which is a rate of approximately 3%—this is an indication that the workmanship of these welds was consistent with other industry projects. Additionally, it should be noted that all of the welds produced by AMEX survived the hydrotest intact,

while one of the ISCO-supplied factory-manufactured fittings leaked—this is further evidence of the variability of the process and the quality of the AMEX welds versus the ISCO factory welds.

A review of the Continuing Service Agreement between ExxonMobil and AMEX (CSA #C63027; Exhibit 5) lists a series of Key Performance Indicators (KPIs) to be tracked by the contractor and reviewed with ExxonMobil at quarterly meetings, or more frequently when requested. One of these KPIs is "Weld Failures," and an "Initial Team Goal" of 2.5% is specified. A goal above 0% makes it clear that ExxonMobil understands the variability inherent in welding and joining processes. This is why ExonMobil should have had a rigorous testing and examination process for the HDPE line.

## QUALIFICATION AND BONDING

ExxonMobil selected the bonding procedure and accepted this procedure by contracting ISCO to instruct the AMEX welders as bonding operators (for the equipment selected and provided by ExxonMobil) according to the ISCO fusion manual. AMEX's acceptance of ISCO's procedure (taught to the AMEX bonding Operators during training funded and required by ExxonMobil) would seem to meet the intent of ASME B31.3, Paragraph A328.2.2 (Procedure Qualification by Others). The Strathcona Refinery report P3237 concluded, based on a review of the codes and their experience with HDPE, that the BPS and Bonding Operators should be qualified per the ASME B31.3 and ASTM D 2657 requirements by the installation contractor and not by others as is permitted by ASME B31.3.

ExxonMobil, through contracting ISCO to train and conduct qualification of welders employed by AMEX as bonding operators, set the qualification requirements and qualified the bonding operators to these requirements. None of the welds made by the AMEX welders/bonding operators were subjected to pressure tests required by ASME B31.3, Paragraph A328.2.5, and they were not subjected to the tensile impact or other tests recommended in the Strathcona Refinery report P3237. Although the qualification criteria applied by ExxonMobil and ISCO did not meet the requirements of ASME B31.3, it is not reasonable to expect AMEX to retrain or requalify its bonding operators to a different standard than that applied by the piping owner and the piping owner's agent. AMEX's acceptance of qualifications performed by ISCO (funded and required by ExxonMobil) would seem to meet the intent of ASME B31.3, Paragraph A328.2.3 (Performance Qualification by Others). AMEX employed experienced union welders to conduct the bonding operations on this project, ones who had been trained by ExxonMobil's agent, ISCO. This is consistent with the intent of ASME B31.3 and industry practice to require trained and qualified personnel.

The testimony of both Tom Pumnea (AMEX) and Pat Daly (AMEX) calls into question whether the training and qualification provided by ISCO was completely consistent with the ISCO fusion manual (Exhibit 26). In particular, the specification of a "cook time" or "soak time" does not appear to match well with the ISCO manual—it is much more consistent with the procedure that Pat Daly claims he was taught (a high temperature hold time after the bead reached the required size). The fusion procedure developed by

Wolseley for ExxonMobil/Imperial Oil and included in the Strathcona Refinery report P3237 also varies from the TR-33 standardized procedure and ASTM D 2657 by heating under pressure during bead formation followed by a heat "soak" of 60-90 seconds similar to the method which appears to have been applied by AMEX. This section is reproduced here for clarity:

" 4) Move pipe ends against heater plate; apply required hydraulic pressure to ensure that gauge reading includes both:

a) recommended heating pressure (from Table 1) plus
b) pressure due to friction (measured before each joint)

5) Maintain a constant pressure, in PSI (kg/cm$^2$) watch for the formation of a continuous small bead around the pipe circumference. At this point, remove pressure completely and allow heat to "soak" for an additional 90 seconds

| Pipe Size | Approximate Melt Bead |
|---|---|
| 2" and less | 1/16" |
| 3" to 5" | 1/8" |
| 6" to 12" | 3/16" |
| 13" to 22" | 1/4" to 5/16" |
| 24" to 63" (1600 mm) | 5/16" to 7/16" |

**NOTE:** For normal weather conditions, a 60 second "soak" time is adequate but for cold weather conditions (less than 0°C) utilize maximum 90 second time."

The Strathcona Refinery report indicates that subsequent to an initial trial using this procedure, the main refinement was to increase the soak time by a factor of approximately 4, which would bring it close to the 4.5 minutes related by Pat Daly (AMEX) in his deposition testimony and listed in his notes (Exhibit 88) for 36" pipe. This report also includes a requirement that each operator will perform a qualification fusion that is to be inspected using TOFD and destructively tested, and that each day onsite, the operator will complete a test fusion that is sent offsite for destructive testing and visual inspection.

To the extent that the training did not match the manual, and that the procedure taught or as applied resulted in an increased likelihood of weld defects, it is the fault of the training provided by ISCO as an agent of ExxonMobil, and not of the AMEX employees being trained.

## EXAMINATION

ASME B31.3 defines examination (in paragraph 341.1) as, "quality control functions performed by the manufacturer (for components only), fabricator, or erector." The inspector is defined by the assignment of responsibility in Paragraphs 300 and 340.2: "It is the owner's responsibility, exercised through the owner's Inspector, to verify that all required examinations and testing have been completed and to inspect the piping to the extent necessary to be satisfied that it conforms to all applicable examination

requirements of the Code and of the engineering design." According to ASME B31.3, paragraph 300, the owner is responsible for establishing the requirements for examination.

ASME B31.3-2004 contains extensive guidance regarding the design, fabrication, examination, and inspection of piping. This guidance is intended to establish a set of minimum criteria necessary to maintain safety and there are different fluid service categories (Category D, Category M, High Pressure and Normal), depending on the hazards associated with the contents of the piping. The Code assumes normal service, but includes more stringent requirements for High Pressure and Category M Fluid Service, and a few less stringent requirements for Category D Service. This is relevant in this case because the piping in question met the definition of Category D Fluid Service in ASME B31.3; it carried river water, the design pressure was less than 150 psi, and the design temperature was above –20°F and below 366°F. In order for these less stringent requirements to apply, the owner must designate the piping as Category D Fluid Service. However, no reference to Fluid Service was found in the scope of work or on the design drawings reviewed. In the deposition of Richard Enlow (ExxonMobil), Mr. Enlow indicated that the cooling water was Category D, implying that ExxonMobil and the other parties involved considered the piping to be Category D service. The lack of requirement for through-wall or in-process examination on many of the carbon steel WQCFs examined (such as EMAC00003520 and EMAC00003523) is also consistent with classification as Category D piping.

As noted above, the examination requirements established by ASME B31.3 depend on Fluid Service. According to A341.4.2, if the Fluid Service in this case was indeed Category D, the following applies:

> "**A341.4.2 Examination – Category D Fluid Service.** Piping and piping elements for Category D Fluid Service as designated in the engineering design shall be visually examined to the extent necessary to satisfy the examiner that components, materials, and workmanship conform to the requirements of this Code and the engineering design."

In this case, it appears that the only requirements for examination established by the owner (ExxonMobil) for the HDPE piping were those provided during training of the bonding operators. Based on the testimony of Pat Daly (AMEX) and Tom Pumnea (AMEX), these steps appear to have consisted of:

1. Checking misalignment between pipe ends after facing (to be less than 3/8").
2. Visual examination of the ends of the pipe for damage or a concave appearance after heating prior to joining.
3. Post-weld evaluation of the approximate bead size in 4 to 6 locations around the pipe.

A review of the available literature indicates that these steps alone are not sufficient to locate all defective welds in HDPE piping. However, there are alternative methods that can be used to provide additional assurance that welds placed in-service are sufficiently robust. Ultrasonic time-of-flight diffraction (TOFD) was applied by ExxonMobil after the incident to identify and quantify the extent of weld defects in several suspect welds

that were subjected to additional scrutiny. Although this technique is not able to detect all defective welds, the fact that it locates many of them will reduce the likelihood of a failure such as the July 30, 2005 leak. An additional method is to monitor the procedure followed when the weld is made, either through requiring in-process examination as defined by ASME B31.3, Paragraph 344.7, or through the use of data loggers, which monitor the bonding machine and record the operating parameters and operating sequence.

The expert report prepared by Mr. James Perrault notes that the following are required for quality assurance: "a) quality equipment, b) a trained operator, c) an approved procedure, d) some form of data logging to insure the procedure was followed, d) and visual inspection." In this case, ExxonMobil rented the equipment, trained the operators, selected the procedure, elected not to rent data loggers (which were available), and specified minimal visual inspection criteria that were only transmitted in the training and fusion manual provided by ISCO.

The Strathcona Refinery report P3237 includes a specification for the fusion procedure, testing, and inspection that stipulates logging of the process conditions for bonding, the use of a data logger, and application of TOFD for inspection of the line (10% of the fusions) and the bonder and procedure qualification welds. The report notes that TOFD was proven capable of locating lack of fusion defects at the Joliet Refinery subsequent to the July 30, 2005 leak. Additionally, the procedure provides a set of acceptance criteria for the TOFD inspections.

Deposition testimony provided by James Hannon (AMEX) and Don Hammermeister (AMEX) makes it clear that it was common practice for AMEX to rely on ExxonMobil's Weld Quality Control Forms (WQCFs) for information regarding the applicable codes and required examination for piping at ExxonMobil's Joliet Refinery. Deposition testimony provided by Rick Enlow (ExxonMobil) and Gary Bell (Ambitech) indicates that these forms were not developed for the HDPE piping. ExxonMobil also had a checklist indicating that nondestructive examination (NDE) requirements must be listed on the isometric drawings (titled "Cooling Water Return Line Replacement Reliability and Maintenance Checklist," EMAC00002485 through EMAC00002488). However, no NDE requirements were listed on the isometric drawings for the HDPE pipe (Exhibit 20). The lack of WQCFs or isometric drawings with NDE requirements indicated to the AMEX personnel that no examination was required other than the steps taught as part of the Bonding Operator training provided by ISCO.

## INSPECTION

As noted above regarding ASME B31.3 and in the deposition of Monica Chauvier (ExxonMobil), it is the responsibility of the owner to assign an inspector who is responsible for ensuring compliance with examination, inspection, and testing requirements of the code and engineering design. According to Exhibit 8, no inspector was assigned to the Joliet Refinery temporary HDPE piping. This contrasts with the specification for the fusion procedure, testing, and inspection that is included in the Strathcona Refinery report P3237, which requires that the Quality Control Inspector

confirm that appropriate records are kept, including a HDPE fusion log that records the conditions recorded for each heat fusion, that a data logger be used, and a printed log recorded and kept with the other fusion records, and that the Inspector check these records for compliance with the specifications.

Although ExxonMobil did not assign an inspector to the Joliet Refinery HDPE piping, it appears that ExxonMobil marked as complete an item under the eMOC process identified as "Field walk & ensure construction-equipment are per design-inspection requirement spec's." This activity would seem to be the responsibility of an Inspector – in any case, it suggests that AMEX complied with all of ExxonMobil's communicated requirements with respect to design and examination.

## RISK ASSESSMENT

ExxonMobil understood the significance of a piping rupture after having experienced more than one previous failure in the concrete line being replaced (also see Exhibit 38, which states that ExxonMobil could "lose the refinery" during commissioning of the HDPE pipe). However, it appears that the "catastrophic failure mechanism of the High Density Polyethylene (HDPE) pipe was not sufficiently understood or anticipated" by ExxonMobil (Exhibit 18). ExxonMobil was able to assemble data soon after the failure, including emails produced by Michael Reuther (ExxonMobil, EMAC00001178-EMAC00001181) and literature from both the Plastic Pipe Institute, Inc. ("Handbook of PE Pipe") and Performance Pipe (Bulletin PP-750, "Heat Fusion Joining Procedures and Qualfication Guide"), indicating that other users of this type of pipe are aware of complete pipe ruptures, that they specify additional inspection requirements including the use of data loggers to ensure that procedures are followed, and that most large projects inspected by ApplusRTD Group show that 1% to 2% of welds have sufficient imperfections to be of concern.

Additionally, ExxonMobil did not take the measures necessary to provide an alternate source of cooling water, or a means for repair, in the event of a piping leak in the temporary HDPE line even after the leak of a fitting during hydrotest, and despite believing that there were no examination techniques available which could conclusively assess weld quality. Although not all portions of the refinery were able to receive sufficient cooling from the firewater system, having this system in place may have reduced the damage that resulted from the July 30, 2005 leak. Similarly, if ExxonMobil had prepared for the potential repair of the HDPE pipe prior to the rupture it could have minimized refinery downtime and potentially averted the final rupture if used in conjunction with more frequent inspection of the pipe for leaks during operation.

## RESPONSIBILITY

In ASME B31.3, Paragraph 300, the responsibilities for various aspects of the process piping are assigned to the owner, designer, manufacturer, fabricator, erector, and owner's inspector. The first part of this section is reproduced here:

"*(b) Responsibilities*

1) *Owner:* The owner of a piping installation shall have overall responsibility for compliance with this Code, and for establishing the requirements for design, construction, examination, inspection, and testing which will govern the entire fluid handling or process installation of which the piping is a part. The owner is also responsible for designating piping in certain fluid services and for determining if a specific Quality System is to be employed [See paras. 300(d)(4), (d)(5), (e), and Appendix Q.]

2) *Designer.* The designer is responsible to the owner for assurance that the engineering design of piping complies with the requirements of this Code and with any additional requirements established by the owner.

3) *Manufacturer, Fabricator, and Erector.* The manufacturer, fabricator, and erector of piping are responsible for providing materials, components, and workmanship in compliance with the requirements of this Code and of the engineering design.

4) *Owner's Inspector.* The owner's inspector (see para. 340) is responsible to the owner for ensuring that the requirements of this Code for inspection, examination, and testing are met. If a Quality System is specified by the owner to be employed, the owner's inspector is responsible for verifying that it is implemented."

In other words, the designer is responsible for ensuring that the piping is designed according to ASME B31.3 (including wall thickness), the owner is responsible for determining which examination, inspection, and testing criteria will be used and for setting the overall requirements for the design, and the manufacturer is responsible for providing materials and workmanship compliant with the Code.

## ANALYSIS

Joining of plastic pipe, like joining of metal pipe, is subject to variability. It is not surprising that defects can occur that are not obvious when subjected to visual inspection. This is supported by industry code requirements for examination and inspection (9 pages in Chapter VI and VII of ASME B31.8 2004), by industry articles, and by the results obtained by vendors when they examine HDPE lines. It is the responsibility of the piping owner to ensure that adequate examination and inspection measures are in place to prevent these defects from entering service. In this case, the use of in-process examination, as defined by ASME B31.3, Paragraph 344.7, would have been appropriate and could have reduced the likelihood of a defect provided the observer had been trained to the appropriate bonding procedure. Additionally, the use of ultrasonic TOFD inspection would likely have found the defect that caused the July 30, 2005 leak, given that it found other defects in the line after this leak. Finally, ExxonMobil's hydrotest of the line at a pressure below three times the design pressure, as required by ASME B31.3 2004 for normal service, reduced the likelihood of finding the defective welds prior to placing the pipe in service.

It was the responsibility of the designer, Ambitech, to develop a piping design that met all of the requirements of ASME B31.3. It appears that the wall thickness required for the line was either calculated using an approach other than that required by ASME B31.3 or was performed incorrectly. It is unclear whether the longitudinal stress analyses performed by Ambitech/PSI prior to the July 30, 2005 leak were performed correctly, examined all of the service conditions that should have been examined, or used the correct material properties or allowable stresses. In any event, the use of HDPE piping with a wall thickness below that required by ASME B31.3 increased the stresses in the joint that eventually failed, likely shortening the service life of the line.

Betty Wenzel (Ambitech) circulated the Design Specification (EJ#018-03; Exhibit 78) to ExxonMobil engineers, including Materials and Safety Engineers (Exhibit 83). Adequate information was provided for the ExxonMobil engineers to confirm that the material at the wall thickness selected was sufficient to meet the service conditions at the design temperature and pressure, and that the service conditions were correct, but it does not appear that any of the ExxonMobil engineers made this check before approving the document. This failure to check the design resulted in construction and use of temporary HDPE piping that did not meet the requirements of ASME B31.3.

ISCO should not have provided guidance regarding the suitability of the DR 17 pipe for this service without understanding what design codes were being applied, or should have characterized their advice appropriately by noting the design codes they applied. ExxonMobil should not have requested information regarding the appropriate pipe for the Joliet Refinery piping without discussing the design code to be applied. Additionally, the design conditions supplied to ISCO by ExxonMobil do not match those for the steel line and may have underestimated the potential service conditions, resulting in the recommendation and use of a thinner pipe.

Although there were shortcomings in the bonding procedures as applied in the field, and in the procedures followed to qualify the bonding operators, these steps were shepherded by ExxonMobil and ISCO. ExxonMobil selected the pipe, bonding equipment, bonding procedure, and training, and required that the AMEX personnel be trained in this fashion. ISCO supplied the bonding procedure and conducted both the training in the bonding procedure and the qualification of the bonding operators. ExxonMobil does not appear to have informed ISCO of any of the requirements of ASME B31.3 and does not appear to have applied the requirements of B31.3 regarding documentation of bonding or qualification of personnel. To the extent that these aspects of the project contributed to the July 30, 2005 failure, ExxonMobil and ISCO are responsible.

# IV. SIGNATURES

SEA, Ltd. hereby certifies the expressed opinions and conclusions have been formulated within a reasonable degree of professional certainty. They are based upon all of the information known by SEA, Ltd. at the time this report was issued, as well as knowledge, skill, experience, training, and/or education.

Report Prepared By:

Nicolas E. Biery, Ph.D.
Technical Consultant

Report Reviewed By:

Robert S. Carbonara, Ph.D.
Senior Analyst

NEB:sc

S-E-A

# ADDENDUM

- **Attachment 1 – Curriculum Vitae**
  **Nicholas E. Biery, Ph.D.**
- **Attachment 2 – Federal Rule 26 Testimony**
  **Nicholas E. Biery, Ph.D.**
- **Attachment 3 – Fee Schedule**
  **Nicholas E. Biery, Ph.D.**
- **Attachment 4 – Published Articles**
  **Nicholas E. Biery, Ph.D.**

SEA

**Attachment 1**

**Curriculum Vitae**
**Nicholas E. Biery, Ph.D.**

# PROFESSIONAL RESUME OF NICHOLAS E. BIERY, Ph.D.

September 2008

## I. General Information

Technical Consultant
SEA, Ltd.
7349 Worthington-Galena Road
Columbus, Ohio 43085
(614) 888-4160
nbiery@sealimited.com

## II. Education

Doctor of Philosophy
Materials Science & Engineering
Carnegie Mellon University
Pittsburgh, Pennsylvania
December 2000

Master of Science
Materials Science & Engineering
Carnegie Mellon University
Pittsburgh, Pennsylvania
May 1996

Bachelor of Science
Materials Science & Engineering
University of Tennessee
Knoxville, Tennessee
May 1995

## III. Professional Summary

August 2008 to Present
Technical Consultant
SEA, Ltd.
Columbus, Ohio

Investigation of materials failures and other aspects of materials performance. Duties include performing and supervising the testing of samples, analysis of test results, collection and preparation of written reports of findings. Expert testimony provided, as required.

March 2008 to August 2008
Senior Engineering Specialist, Materials & Fabrication Group Lead
ExxonMobil Upstream Research Company
Houston, Texas

Coordinated materials research and project support, with focus on pipeline welding research. Duties included research planning and stewardship, project support for materials and welding, allocation of personnel and budget, development and maintenance of interfaces with other ExxonMobil upstream companies and affiliates, and presentation of group activities.

February 2007 to February 2008
Senior Engineering Specialist, Pipelines Group Lead
ExxonMobil Upstream Research Company
Houston, Texas

Responsibilities included coordination of pipeline research activities and pipeline project support. Responsible for technical support of ExxonMobil pipeline projects. Coordinated research company efforts to resolve key technical issues for major arctic pipeline project. Lead technical interface for qualification of high-strength pipeline materials.

January 2005 to January 2007
Engineering Specialist
ExxonMobil Upstream Research Company
Houston, Texas

Research company lead for high-strength linepipe qualification. Duties included oversight of contractors (fabrication, large-scale testing, analytical studies, and computational modeling), evaluation of incentives for the use of high-strength linepipe, and maintaining relationships with steel pipe mills.

February 2001 to December 2004
Senior Research Engineer
ExxonMobil Upstream Research Company
Houston, Texas

Technical lead for development of high-strength cryogenic steel plate. Responsibilities included being the primary contact for plate mill interactions, lead for external programs on low-temperature biaxial testing and neutron diffraction measurement of residual stresses, analysis and presentation of program results and test data.

August 1995 to December 2001
Graduate Research Assistant
Carnegie Mellon University
Pittsburgh, Pennsylvania

Development of software and experimental techniques for measurement of small strains in titanium aluminides. Set up new in-SEM tensile testing stage, designed and manufactured wedge-action grips, and conducted tensile tests of titanium aluminide samples. Applied statistical methods to characterize variability in cast gamma-TiAl.

IV. Publications

W.C. Kan, M. Weir, M.M. Zhang, D.B. Lillig, S.T. Barbas, M.L. Macia, and N.E. Biery, "Strain-Based Pipelines: Design Consideration Overview," in Proceedings of the Eighteenth International Offshore and Polar Engineering Conference, 2008, pp. 174-180.

D.P. Fairchild, W. Cheng, S.J. Ford, K. Minnaar, N.E. Biery, A. Kumar, and N.E. Nissley, "Recent Advances in Curved Wide Plate Testing and Implications for Strain-Based Design," International Journal of Offshore and Polar Engineering, 2008, pp. 161-170.

K. Minnaar, P. Gioielli, M. Macia, F. Bardi, N. Biery, W. Kan, "Pressure Effects on Strain Concentration and Constraint for Strain-Based Design," in Proceedings of the Seventeenth International Offshore and Polar Engineering Conference, 2007, pp. 3114-3120.

D.P. Fairchild, W. Cheng, S.J. Ford, K. Minnaar, N.E. Biery, A. Kumar, and N.E. Nissley, "Large-Scale Testing Methodology to Measure the Influence of Pressure on Tensile Strain Capacity of a Pipeline," Ibid., pp. 3013-3022.

A. Fonzo, A. Meleddu, M. DiBiagio, G. Mannucci, G. Demofonti, C.W. Peterson, N.E. Biery, "Crack Propagation Modeling and Crack Arrestor Design for X120," in Proceedings of the 6th International Pipeline Conference, ASME, New York, New York, 2006, IPC2006-10397.

A. Lucci, G. Mannucci, G. Malatesta, N.E. Biery, "Evaluation of the Resistance of X120 Pipe to Mechanical Damage," in Proceedings of the 6th International Conference, ASME, New York, New York, 2006, IPC2006.

N. Biery, M. Macia, R. Appleby, D. Fairchild, D. Hoyt, D. Dorling, D. Horsley, "Godin Lake Trial: X120 Field Welding," in Proceedings of the 6th International Conference, ASME, New York, New York, 2006, IPC2006.

D.P. Fairchild, P.P. Smith, N.E. Biery, A.M. Farah, D.B. Lillig, T.S. Jackson, W.J. Sisak, "Pressurized LNG: Prototype Container Fabrication," in Proceedings of the Fifteenth International Offshore and Polar Engineering Conference (Jin S. Chung, et al, eds.), ISOPE, Cupertino, CA, 2006, pp. 109-118.

N. Biery, M. DeGraef, and T.M. Pollock, "A method for measuring strain on a microstructural scale using an SEM equipped with an in-situ tensile substage: Application to gamma-TiAl alloys," Metallurgical and Materials Transactions A, V34, 2003, pp. 2301-2313.

N. Biery, M. DeGraef, R. Raban, A. Elliot, C. Austin, and T.M. Pollock, "Use of Weibull Statistics to Quantify Property Variability in TiAl Alloys," Metallurgical and Materials Transactions A, V33, 2002, pp. 3127-3136.

J.G. Milke, J.L. Beuth, N.E. Biery, and H. Tang, "The Effect of Constraint-Induced Normal Stress on the Failure of Notched TiAl Components," Metallurgical and Materials Transactions A, V33A, 2002, pp. 417-426.

N. Biery, M. DeGraef, and T.M. Pollock, "Influence of Microstructure and Strain Distribution on Failure Properties in Intermetallic TiAl-Based Alloys," Materials Science and Engineering A, V319, 2001, pp. 613-617.

N. Biery, M. DeGraef, and T.M. Pollock, "Study of Localized Strain at Notches in Gamma-TiAl Alloys Using Displacement Mapping and Microstructural Characterization," in Gamma Titanium Aluminides (Y-W. Kim, et al, eds.), TMS, Warrendale, Pennsylvania, 1999, pp. 557-564.

M. DeGraef, N. Biery, L. Rishel, T.M. Pollock, and A. Cramb, "On the Relation Between Cooling Rate and Solidification Microstructure in As-Cast Titanium Aluminides," Ibid., 1999, pp. 247-254.

N. Biery, T.M. Pollock, N.T. Nuhfer, and M. DeGraef, "Displacement Mapping During in-situ Straining in the SEM," Microscopy and Microanalysis, V5, 1999, pp. 334-335.

L. Rishel, N.E. Biery, R. Raban, V.Z. Gandelsman, T.M. Pollock, and A.W. Cramb, "Cast Structure and Property Variability in Gamma Titanium Aluminides," Intermetallics, V6, 1998, pp. 629-636.

C.R. Brooks, N.E. Biery, L. Zhaohui, X. Xiande, and Z. Datong, "Surface Morphology of Iron Dendrites in the Yanzhuang H6 Meteorite," Materials Characterization, V35, 1995, p. 165.

**Attachment 2**

**Federal Rule 26 Testimony**
**Nicholas E. Biery, Ph.D.**

**Federal Rule 26**
**Nicholas E. Biery, Ph.D.**
**See Attached Report**

**Attachment 3**

**Fee Schedule**
**Nicholas E. Biery, Ph.D.**

**Nicholas E. Biery, Ph.D.:**
**$275 per hour, plus expenses**

**Attachment 4**

**Published Articles**
**Nicholas E. Biery, Ph.D.**

# Published Articles, Nicholas E. Biery, Ph.D.

W.C. Kan, M. Weir, M.M. Zhang, D.B. Lillig, S.T. Barbas, M.L. Macia, and N.E. Biery, "Strain-Based Pipelines: Design Consideration Overview," in Proceedings of the Eighteenth International Offshore and Polar Engineering Conference, 2008, pp. 174-180.

D.P. Fairchild, W. Cheng, S.J. Ford, K. Minnaar, N.E. Biery, A. Kumar, and N.E. Nissley, "Recent Advances in Curved Wide Plate Testing and Implications for Strain-Based Design," International Journal of Offshore and Polar Engineering, 2008, pp. 161-170.

K. Minnaar, P. Gioielli, M. Macia, F. Bardi, N. Biery, W. Kan, "Pressure Effects on Strain Concentration and Constraint for Strain-Based Design," in Proceedings of the Seventeenth International Offshore and Polar Engineering Conference, 2007, pp. 3114-3120.

D.P. Fairchild, W. Cheng, S.J. Ford, K. Minnaar, N.E. Biery, A. Kumar, and N.E. Nissley, "Large-Scale Testing Methodology to Measure the Influence of Pressure on Tensile Strain Capacity of a Pipeline," Ibid., pp. 3013-3022.

A. Fonzo, A. Meleddu, M. DiBiagio, G. Mannucci, G. Demofonti, C.W. Peterson, N.E. Biery, "Crack Propagation Modeling and Crack Arrestor Design for X120," in Proceedings of the 6th International Pipeline Conference, ASME, New York, New York, 2006, IPC2006-10397.

A. Lucci, G. Mannucci, G. Malatesta, N.E. Biery, "Evaluation of the Resistance of X120 Pipe to Mechanical Damage," in Proceedings of the 6th International Conference, ASME, New York, New York, 2006, IPC2006.

N. Biery, M. Macia, R. Appleby, D. Fairchild, D. Hoyt, D. Dorling, D. Horsley, "Godin Lake Trial: X120 Field Welding," in Proceedings of the 6th International Conference, ASME, New York, New York, 2006, IPC2006.

D.P. Fairchild, P.P. Smith, N.E. Biery, A.M. Farah, D.B. Lillig, T.S. Jackson, W.J. Sisak, "Pressurized LNG: Prototype Container Fabrication," in Proceedings of the Fifteenth International Offshore and Polar Engineering Conference (Jin S. Chung, et al, eds.), ISOPE, Cupertino, CA, 2006, pp. 109-118.

N. Biery, M. DeGraef, and T.M. Pollock, "A method for measuring strain on a microstructural scale using an SEM equipped with an in-situ tensile substage: Application to gamma-TiAl alloys," Metallurgical and Materials Transactions A, V34, 2003, pp. 2301-2313.

N. Biery, M. DeGraef, R. Raban, A. Elliot, C. Austin, and T.M. Pollock, "Use of Weibull Statistics to Quantify Property Variability in TiAl Alloys," Metallurgical and Materials Transactions A, V33, 2002, pp. 3127-3136.

J.G. Milke, J.L. Beuth, N.E. Biery, and H. Tang, "The Effect of Constraint-Induced Normal Stress on the Failure of Notched TiAl Components," Metallurgical and Materials Transactions A, V33A, 2002, pp. 417-426.

N. Biery, M. DeGraef, and T.M. Pollock, "Influence of Microstructure and Strain Distribution on Failure Properties in Intermetallic TiAl-Based Alloys," Materials Science and Engineering A, V319, 2001, pp. 613-617.

N. Biery, M. DeGraef, and T.M. Pollock, "Study of Localized Strain at Notches in Gamma-TiAl Alloys Using Displacement Mapping and Microstructural Characterization," in Gamma Titanium Aluminides (Y-W. Kim, et al, eds.), TMS, Warrendale, Pennsylvania, 1999, pp. 557-564.

M. DeGraef, N. Biery, L. Rishel, T.M. Pollock, and A. Cramb, "On the Relation Between Cooling Rate and Solidification Microstructure in As-Cast Titanium Aluminides," Ibid., 1999, pp. 247-254.

N. Biery, T.M. Pollock, N.T. Nuhfer, and M. DeGraef, "Displacement Mapping During in-situ Straining in the SEM," Microscopy and Microanalysis, V5, 1999, pp. 334-335.

L. Rishel, N.E. Biery, R. Raban, V.Z. Gandelsman, T.M. Pollock, and A.W. Cramb, "Cast Structure and Property Variability in Gamma Titanium Aluminides," Intermetallics, V6, 1998, pp. 629-636.

C.R. Brooks, N.E. Biery, L. Zhaohui, X. Xiande, and Z. Datong, "Surface Morphology of Iron Dendrites in the Yanzhuang H6 Meteorite," Materials Characterization, V35, 1995, p. 165.