IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EXXONMOBIL OIL CORP.,            )
                                 )
              Plaintiff,         )
       v.                        )        Case No. 07 C 4278
                                 )
AMEX CONSTRUCTION CO., INC.,     )        Judge Virginia M. Kendall
                                 )
       Defendant/Third Party Plaintiff, )
                                 )
       v.                        )
                                 )
ISCO INDUSTRIES, LLC., and       )
AMBITECH ENGINEERING CORP.,      )
                                 )
              Third Party Defendants.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff ExxonMobil Oil Corporation ("Exxon") filed suit against Defendant Amex

Construction Co., Inc. ("Amex") alleging breach of warranty and negligence after a High Density

Polyethylene ("HDPE") pipe installed by Amex burst at an Exxon refinery.  Amex later filed a

Third-Party Complaint seeking contribution against ISCO Industries, LLC ("ISCO"), the supplier

of the defective pipe, and Ambitech Engineering Corporation ("Ambitech"), the pipe designer.

Exxon, Amex, Ambitech, and ISCO have filed eight motions for summary judgment on various

claims and defenses.

For the reasons stated below, this Court grants Exxon's Motion for Summary Judgment as

to the breach of General Warranty component of Count I and as to Count II, and denies its Motion

with respect to the Warranty of Competence component of Count I.  The Court grants Amex's

Motion for Summary Judgment on Count I with respect to the Warranty of Competence component

1

and its Motion for Summary Judgment on its Fifteenth Affirmative Defense with respect to negligence; the Court denies Amex's Motions for Summary Judgment on the General Warranty component of Count I, Count II, and the breach of warranty component of its Fifteenth Affirmative Defense. The Court denies ISCO's Motion for Summary Judgment. Finally, the Court grants Ambitech's Motion for Summary Judgment, rendering moot its Motion for Summary Determination regarding the applicability of the Moorman Doctrine. The Court further finds that even if it had denied Ambitech's Motion for Summary Judgment, Ambitech would be entitled to partial summary judgment on its Borrowed Servant Affirmative Defense as to its employee Elizabeth Wenzel.

## **STATEMENT OF UNDISPUTED FACTS**[1]

---

[1] Throughout this opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: Amex's Response to Exxon's Statement of Material Facts in support of its Motion for Summary Judgment have been abbreviated to "AM 56.1 Resp. Exxon ¶ __."; citations to Amex's Statement of Additional Material Facts relied upon in its Response to Exxon's Motion for Summary Judgment (to which Exxon filed no response) have been abbreviated to "AM 56.1 Resp. Exxon Add. Facts ¶ __."; citations to Exxon's Response to Amex's Statement of Material Facts in support of its Motion for Summary Judgment as to Count I have been abbreviated to "EX 56.1 Resp. Count I ¶ __."; citations to Amex's Response to Exxon's Statement of Additional Material Facts relied upon in its Response to Amex's Motion for Summary Judgment as to Count I have been abbreviated to "AM 56.1 Resp. Add. Facts Count I ¶ __."; citations to Exxon's Response to Amex's Statement of Material Facts in support of its Motion for Summary Judgment as to Count II have been abbreviated to "EX 56.1 Resp. Count II ¶ __."; citations to Amex's Response to Exxon's Statement of Additional Material Facts relied upon in its Response to Amex's Motion for Summary Judgment as to Count II have been abbreviated to "AM 56.1 Resp. Add. Facts Count II ¶ __."; citations to Exxon's Response to Amex's Statement of Material Facts in support of its Motion for Summary Judgment as to its Fifteenth Affirmative Defense have been abbreviated to "EX 56.1 Resp. 15th Aff. Def. ¶ __."; citations to Amex's Response to Exxon's Statement of Additional Material Facts relied upon in its Response to Exxon's Motion for Summary Judgment as to its Fifteenth Affirmative Defense have been abbreviated to "AM 56.1 Resp. Add. Facts 15th Aff. Def. ¶ __."; citations to Amex's and Exxon's Responses to ISCO's Statement of Material Facts in support of its Motion for Summary Judgment have been abbreviated to "AM, EX 56.1 Resp. ISCO ¶ __."; citations to Amex's Statement of Additional Material Facts relied upon in its Response to ISCO's Motion for Summary Judgment (to which ISCO filed no response) have been abbreviated to "AM 56.1 Resp. ISCO Add. Facts ¶ __."; citations to Amex's and Exxon's Response to Ambitech's Statement of Material Facts in support of its Motion for Summary Judgment have been abbreviated to "AM, EX 56.1 Resp. AT ¶ __."; citations to Ambitech's Responses to Amex's Statement of Additional Material Facts relied upon in its Response to Ambitech's Motion for Summary Judgment have been abbreviated to "AT 56.1 Resp. Add. Facts AM ¶ __."; citations to Amex's and Exxon's Response to Ambitech's Statement of Material Facts in support of its Motion for Summary Determination on the Availability of Economic Damages have been abbreviated to "AM, EX 56.1 Resp. AT Economic Damages ¶ __."; citations to Ambitech's Responses to Amex's Statement of Additional Material Facts relied upon in its Response to Ambitech's Motion for Summary Determination on the Availability of Economic Damages have been abbreviated to "AT 56.1 Resp. Add. Facts AM Economic Damages ¶ __."; citations to Amex's and Exxon's Response to Ambitech's Statement of Material Facts in support of its Motion for Partial Summary Judgment on the Borrowed Servant Doctrine have been abbreviated to "AM, EX 56.1 Resp. AT Borrowed Servant ¶ __."; citations to Ambitech's Responses to Amex's Statement of Additional Material Facts relied upon in its Response to Ambitech's Motion for Partial Summary Judgment on the Borrowed Servant Doctrine have been abbreviated to "AT 56.1 Resp. Add.

## I.  The HDPE Project

Exxon owns and operates a petroleum refinery in Joliet, Illinois (hereinafter "the Refinery"). (AM 56.1 Resp. Exxon ¶ 2.)  Amex is a union industrial field piping company that provides process piping fabrication and related industrial services.  (AM 56.1 Resp. Exxon ¶ 2.)  Third Party Defendant Ambitech provides professional engineering services to Exxon and other clients.  (AM 56.1 Resp. Exxon ¶ 2.)  Third Party Defendant ISCO provides materials, supplies, and training related to HDPE pipe, and is an authorized distributor of McElroy Manufacturing butt fusion equipment.  (AM 56.1 Resp. Exxon ¶ 2.)

After a cooling water line failed at the Refinery in February 2002, Exxon made plans to replace its underground cooling water return lines with carbon steel piping.  (AM 56.1 Resp. Exxon ¶ 3.)  The Refinery uses these lines to cool liquid petroleum gases back to a liquid state, and also to cool various generators and mechanical equipment.  (AM 56.1 Resp. Exxon ¶ 4.)  The lines continually draw water from the Des Plaines River to account for evaporation.  (AM 56.1 Resp. Exxon ¶ 5.)  Exxon awarded Amex the installation contract and Ambitech the engineering contract for the carbon steel replacement project ("the Carbon Steel Project").  (AM 56.1 Resp. Exxon ¶ 3.)

On March 5, 2004, in order to keep the Refinery functioning during the execution of the Carbon Steel Project, Amex submitted a proposal to Exxon for the installation of temporary, above-ground HDPE pipes to be used for water cooling ("the HDPE Project").  (EX 56.1 Resp. Count II ¶ 8(b); AM 56.1 Resp. Exxon ¶ 6.)  The temporary pipes would carry water from the Refinery process units back to the cooling tower and heat exchangers until the carbon steel lines were installed.  (AM 56.1 Resp. Exxon ¶ 6.)  The original plan called for these temporary pipes to be in

---

Facts AM Borrowed Servant ¶ __."

service for three to four months.  (AM 56.1 Resp. Exxon ¶ 6.)  On September 15, 2004, Amex submitted a breakout pricing proposal to Exxon for the HDPE Project.  (EX 56.1 Resp. Count I ¶ 14.)  On September 30, 2004, Exxon accepted Amex's proposal and placed a Service Order for the installation of the HDPE pipe and related services.  (EX 56.1 Resp. to Amex Count II ¶ 8(c); EX 56.1 Resp. 15ᵗʰ Aff. Def. ¶ 14; AM, EX 56.1 Resp. AT ¶ 12; AM, EX 56.1 Resp. AT Economic Damages ¶ 12.)  The Service Order describes "[m]obilization, labor and supervision for the pipe fabrication for the cooling water return line replacement project in accordance with Amex Proposal 04-5421 dated 9/15/04."  (EX 56.1 Resp. Count I ¶ 12.)

### A.  Training by ISCO

In November 2004, Amex began work on the HDPE Project at the Refinery.  (EX 56.1 Resp. Count I ¶ 16; EX 56.1 Resp. to Amex Count II ¶ 8(d); EX 56.1 Resp. 15ᵗʰ Aff. Def. ¶ 15; AM, EX 56.1 Resp. AT ¶ 13; EX, AM 56.1 Resp. AT Borrowed Servant ¶ 13; AM, EX 56.1 Resp. AT Economic Damages ¶ 13.)  Exxon was aware that Amex operators had no experience fusing HDPE pipe, so it retained ISCO to provide training in HDPE hydraulic butt fusion.  (AM 56.1 Resp. Exxon ¶¶ 9, 51; AM 56.1 Resp. Exxon Add. Facts ¶ 50.)[2]  ISCO held itself out as having knowledge, expertise, and experience in the proper heat fusion procedures for HDPE pipe and Exxon identified ISCO as having such knowledge and expertise.  (AM 56.1 Resp. Exxon Add. Facts ¶¶ 52-53.)  ISCO also sold Exxon the HDPE pipe, provided the bonding procedure specification and qualification for bonding operators, determined which fusion machine would be used, and rented the fusion machine to Exxon for the HDPE Project.  (AM 56.1 Resp. Exxon ¶ 9; AM 56.1 Resp. Exxon Add. Facts ¶

---

[2] Exxon failed to respond to Amex's Additional Facts set forth in its Response to Exxon's Statement of Undisputed Material Facts.  Pursuant to Local Rule 56.1, "all material facts set forth in the statement [of additional facts] filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party."  LR 56.1.  Thus, Amex's Additional Facts are deemed admitted.

56; AM 56.1 Resp. Add. Facts ISCO ¶¶ 78-79, 82.)[3]  The pipe manufacturer, McElroy Manufacturing, gave ISCO copyright permission to use McElroy instruction manuals for its hydraulic butt fusion training.  (AM 56.1 Resp. Exxon ¶ 8.)

Amex then chose certain of its pipefitters to attend a one-week training on HDPE fusion using a McElroy fusion machine.  (AM 56.1 Resp. Exxon ¶¶ 9-10.)  ISCO employee David Holman ("Holman") performed this training.  (EX, AM 56.1 Resp. ISCO ¶ 65.)  Both ISCO and McElroy originally trained and certified Holman, who subsequently trained approximately 100 other individuals in HDPE fusion over the course of 10 years.  (EX, AM 56.1 Resp. ISCO ¶¶ 62, 64.)  Part of Holman's initial training consisted of going through the steps set forth in the ISCO Heat Fusion Manual ("Heat Fusion Manual").  (EX, AM 56.1 Resp. ISCO ¶ 65.)

As part of its training, ISCO provided Amex pipefitters with the Heat Fusion Manual, along with a weather resistant instruction manual with instructions and illustrations of HDPE fusion.  (AM 56.1 Resp. Exxon ¶ 10.)  The portion of the Heat Fusion Manual pertaining to hydraulic butt fusion is 16 pages in length and contains multiple illustrations of the fusion process.  (AM 56.1 Resp. Exxon ¶ 10.)  The Heat Fusion Manual specifically instructs not to heat HDPE pipe under pressure. (AM 56.1 Resp. Exxon ¶ 10.)  Indeed, one of the basic parts of HDPE fusion is not to heat the pipe under pressure.  (AM 56.1 Resp. Exxon ¶ 8.)  In this regard, Exxon's expert, James Perrault ("Perrault") of McElroy Manufacturing, explained that when HDPE pipe is heated, the molecular structure is transformed into an amorphous condition, and when fusion pressure is applied, the

---

[3] ISCO did not file a response to Amex's Additional Undisputed Facts not Asserted in ISCO's Undisputed Statement of Facts, but Relied upon by Amex in its Response to ISCO's Motion.  Because "all material facts set forth in the statement [of additional facts] pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party," L.R. 56.1, the Court deems these facts admitted to the extent that they do not contain opinions by Amex expert Nicolas Biery that the Court excluded in its ruling on Ambitech's and ISCO's Motion to Bar the Testimony of Biery.  *See* R. 309; *see also Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 612 (7th Cir. 1993) (noting that expert testimony must be admissible to be considered in a motion for summary judgment).

molecules from each pipe end mix.  (AM 56.1 Resp. Exxon ¶ 7.)  Once the pipe joint cools, the pipe ends become one homogeneous pipe and the joint is as strong or stronger than the original pipe itself.  (AM 56.1 Resp. Exxon ¶ 7.)  If an operator applies excessive pressure to HDPE pipe while it is being heated, however, this will result in cold fusion, a condition that substantially weakens the pipe by creating gasps where the two pipe ends are not fused.  (AM 56.1 Resp. Exxon ¶ 8.)

After four to five days of training, Holman issued certificates of training to Amex pipefitters Tom Pumnea ("Pumnea") and Patrick Daly Jr. ("Daly") among others, indicating that they had demonstrated proper heat fusion principles and techniques for fusing HDPE pipe on a McElroy machine.  (AM 56.1 Resp. Exxon Add. Facts ¶ 38; EX, AM 56.1 Resp. ISCO ¶¶ 47, 61.)  To the best of Holman's recollection, Pumnea and Daly each performed five to six welds with Holman watching over their shoulders.  (AM 56.1 Resp. Exxon Add. Facts ¶ 42.)  Holman only issued certificates of training to pipefitters whom he actually observed performing welds, and he felt confident that the individuals he trained understood how to perform HDPE fusion.  (AM 56.1 Resp. Exxon Add. Facts ¶¶ 40-41.)  He recommended Daly and Pumnea to run the McElroy machine because they showed the most interest in running it, picked up on their duties quickly, and did not deviate from the procedures he taught them when performing welds.  (AM 56.1 Resp. Exxon Add. Facts ¶¶ 43-44.)  Holman felt that Pumnea's and Daly's training with him sufficiently prepared them to perform welds, and was confident that they understood what they were doing.  (AM 56.1 Resp. Exxon Add. Facts ¶ 45; EX, AM 56.1 Resp. ISCO ¶ 70.)

On February 10, 2005, Holman filled out ISCO Heat Fusion Evaluation Form 95 with respect to both Daly and Pumnea, which he would not have filled out if he did not believe them to have the level of understanding necessary to operate the McElroy machine.  (AM 56.1 Resp. to Exxon Add.

Facts ¶¶ 47-48.)  The form required Holman to circle ten items, which Daly admits that he learned in his training.  (EX, AM 56.1 Resp. ISCO ¶ 54.)  Through this form, ISCO certified that Pumnea and Daly demonstrated the proper heat fusion principles and techniques for HDPE pipe on a McElroy machine.  (AM 56.1 Resp. Exxon Add. Facts ¶ 55.) John McKinney ("McKinney"), Ambitech's expert, later confirmed that Daly and Pumnea were qualified and competent to perform HDPE butt fusion.  (AM 56.1 Resp. Exxon Add. Facts ¶ 58.)

### B. Fusion of HDPE Pipe

Throughout the course of the HDPE Project, Daly and Pumnea were the two Amex employees primarily responsible for fusing the HDPE pipe.  (AM 56.1 Resp. Exxon ¶ 12.)  Prior to the HDPE Project, Daly had 10 years of pipefitting experience fusing primarily metal pipe, but no experience with HDPE pipe.  (EX, AM 56.1 Resp. ISCO ¶¶ 45, 53)  When he fused the HDPE pipe at the Refinery, Daly sat "on the heating pressure [] waiting for the bead and then heat soak[ed] it." (AM 56.1 Resp. Exxon ¶ 12; EX 56.1 Tab H, 59: 17 – 59: 24.)

Daly testified that Holman trained him to heat the pipe under pressure in contravention of the Heat Fusion Manual, further explaining that heating HDPE pipe under pressure is "inconsistent with the [ISCO] manual, obviously, otherwise we wouldn't be here."  (EX, AM 56.1 Resp. ISCO ¶ 49, 57; ISCO 56.1 Exhibit 4, p. 34.)  More specifically, Daly testified that Holman instructed him to heat the pipe ends under fusion pressure until reaching a 9/16-inch bead size, and then to heat soak the pipe ends for four and a half minutes before pushing them together.  (AM 56.1 Resp. Exxon Add. Facts ¶ 35.)  Holman offered contradictory testimony in this regard, admitting at one point that he instructed Amex pipefitters to heat the HDPE pipe under pressure until they noticed the "first indication of a melt" and then to reduce the pressure to zero, and later stating that he trained them

to heat the pipe under zero pressure until a 7/16 to 9/16-inch bead formed. (EX, AM 56.1 Resp. ISCO ¶¶ 66-67.) Holman trained the pipefitters to next remove the HDPE pipe from the heating plate, make a visual inspection to check for concavity, redo the weld if they saw a concave appearance, and then fuse the pipe under pressure until it cooled. (EX, AM 56.1 Resp. ISCO ¶¶ 60, 68-69.)

Daly read the Heat Fusion Manual during training and knew at the time he was fusing the pipe that Holman's training deviated from the manual with respect to heating the pipe under pressure. (EX, AM 56.1 Resp. ISCO ¶¶ 51, 59.) Daly followed Holman's instructions rather than the Heat Fusion Manual, however, because he decided that his trainer knew best, and because in his experience, manuals do not always apply to real world situations. (AM 56.1 Resp. to Exxon Add. Facts ¶¶ 35-36.) During a later water reclamation project following the filing of this lawsuit, Daly "went back to the book" and performed the fusion "more by the book." (AM 56.1 Resp. Exxon ¶ 12; EX 56.1 Tab H, 58: 20 – 59: 21, 61:11 – 14.) Daly now reduces the pressure on the fusion machine to zero as soon as he "get[s] the bead started" while fusing HDPE pipe. (EX, AM 56.1 Resp. ISCO ¶ 56; ISCO 56.1 Exhibit 4, pp. 150, 152.)

### C. Completion of the HDPE Project

Amex pipefitters pre-fused the pipe joint that eventually failed in advance of its installation, and then transported the pre-fused joint to its actual location before fusing the final segments. (AM 56.1 Resp. Exxon ¶ 11.) Before Amex and Exxon placed the HDPE pipe into service, it was subject to hydrotesting, which consisted of filling the pipe with water to 1.5 times the operating pressure and testing for leaks. (AM 56.1 Resp. Exxon ¶ 14.) Exxon employees signed off on the pipe after it passed the hydrotest. (AM 56.1 Resp. Exxon ¶ 14.) On June 2, 2005, Amex completed the

installation and Exxon placed the pipe into service. (AM 56.1 Resp. Exxon ¶ 14; AM, EX 56.1 Resp. to AT Economic Damages ¶ 14; AM, EX 56.1 Resp. AT ¶ 14.)

**II. HDPE Pipe Failure**

At approximately 8:20 PM on July 30, 2005, eight weeks after the installation of the HDPE pipe, a weld holding a thirty-six inch section of the pipe failed, causing the pipe to decouple. (AM 56.1 Resp. Exxon ¶ 15; AM, EX 56.1 Resp. AT ¶ 15; AM, EX 56.1 Resp. AT Economic Damages ¶ 15.) A process technician for the Refinery's coker unit, Nick Coba ("Coba"), noticed the leak while walking by the HDPE pipe. (EX 56.1 Resp. Count II ¶ 10(d-e); AM 56.1 Resp. Exxon ¶ 15.) He alerted Night Superintendent Lonnie McCollum ("McCollum"), who had worked at the Refinery since 1979 and was in charge of the Refinery on the night of July 30, 2005. (EX 56.1 Resp. Count II ¶ 10(d-e); AM 56.1 Resp. Exxon ¶ 15.) Coba did not seem out of breath or excited when he entered the control room to speak to McCollum. (EX 56.1 Resp. Count II ¶ 10(f); EX, AM 56.1 Resp. ISCO ¶ 9.) McCollum then put on his hard hat and went to examine the site. (EX 56.1 Resp. Count II ¶ 10(d).)

When McCollom first arrived at the site of the leak, two to three minutes after Coba informed him of it, he observed a six to eight inch hairline-sized leak in the pipe with water spraying from it. (EX 56.1 Resp. Count II ¶ 10(g, j); EX, AM 56.1 Resp. ISCO ¶ 11.) At that point, water was "just barely spraying out," and the leak neither alarmed him nor did he believe it to be dangerous. (EX 56.1 Resp. Count II ¶ 10(g, j); EX, AM 56.1 Resp. ISCO ¶¶ 12-14.) McCollom informed Coba that he would call maintenance to come take a look, but during this conversation, the leaking area began growing around the circumference of the pipe, after which the pipe "unzipped" and decoupled. (EX 56.1 Resp. Count II ¶ 10(h); EX, AM 56.1 Resp. ISCO ¶ 16.)

McCollom was standing next to the pipe when it decoupled and testified that he does not believe that anyone was in danger of being hurt at the time. (EX 56.1 Resp. Count II ¶ 10(i); AM 56.1 Resp. ISCO ¶ 16; EX 56.1 Resp. ISCO Exhibit 1 60:1-8; 68 1-20.) Indeed, a person standing nearby when the pipe decoupled may have gotten wet but would not have been injured. (EX, AM 56.1 Resp. ISCO ¶ 24.)

Once the pipe decoupled, the water pushed its ends apart at least 2 to 3 feet and there was a significant amount of water on the ground, so McCollum radioed the general cooling tower and said "prepare for—start shutting down, emergency shutdown." (AM 56.1 Resp. Exxon ¶ 15; EX 56.1 Exhibit N 61: 18 – 24; 62: 1 – 2; EX, AM 56.1 Resp. ISCO ¶ 17.). Exxon performed an emergency shut-down of the Refinery within the next twenty to thirty minutes. (EX, AM 56.1 Resp. ISCO ¶ 19.) McCollum ordered the shutdown to prevent unit equipment from overheating and for safety reasons because the cooling water system had become inoperative. (AM 56.1 Resp. Exxon ¶ 16.) Exxon employee Steven Penteris ("Penteris"), the mechanical engineering group leader responsible for supervising mechanical engineers, testified that without cooling water, vapor pressure rises, risking explosion or atmospheric release. (AM 56.1 Resp. Exxon ¶ 16; EX, AM 56.1 Resp. ISCO ¶ 22.) In order to prevent this type of "catastrophic failure," the Refinery burned all of the hydrocarbon it had in production at the time. (AM 56.1 Resp. to Exxon ¶ 16.) Once Exxon shut down the water pipes, there was some residual water flowing from the pipe. (EX, AM 56.1 Resp. ISCO ¶ 20.) Maintenance attempted to clamp the broken section of HDPE pipe or push it together with a fork lift, but could not fix it. (EX, AM 56.1 Resp. ISCO ¶ 21.)

### III. Post-Failure Analysis

The HDPE pipe that decoupled was not constructed in a manner that rendered it fit for its intended purpose. (AM 56.1 Resp. Exxon ¶ 32.)[4] Indeed, a post-failure analysis of the pipe conducted by Perrault revealed that the "joint ha[d] very clearly been heated under pressure because of th[e] concave appearance of th[e] melt, and the fact that the two ends never actually fused together." (AM 56.1 Resp. Exxon ¶ 13; EX 56.1 Exhibit L, 62: 9 -12.) Perrault further opined that "the operator of the fusion equipment failed to properly fuse the joint." (AM 56.1 Resp. Exxon ¶ 13; EX 56.1 Tab L, 69: 15-17.) Amex's expert Nicloas Biery ("Biery") confirmed that "if there were no defect in the joint . . . then my opinion is it most likely would not have failed." (AM 56.1 Resp. Exxon ¶ 13; EX 56.1 Exhibit M, 38: 7-16.) With respect to the reasons he believed the pipeline failed, Biery opined that: "there was a fusion with the defect in it, and there were operating stresses on that defect. And that defect was large enough that when those operating stresses operated on the defect that the defect grew until it was large enough to cause a failure in the line, a leak and a failure." (AM, EX 56.1 Resp. AT ¶ 22.) Frank Volgstadt ("Volgstadt"), ISCO's expert, however, testified that although Holman was wrong if he taught Daly to deviate from the ISCO Fusion Manual, using the procedure Holman taught him would not result in defective cold fusion–"no it would not, absolutely not." (AM 56.1 Resp. to Exxon Add. Facts ¶ 60.)

Biery's report further concluded that Ambitech's HDPE piping design used a thinner-walled pipe than required by American Society of Mechanical Engineers B31.3 ("ASME B31.3") standards,

---

[4] The Court deems this fact admitted by operation of law because Amex failed to answer to Exxon's Federal Rule of Civil Procedure 36 Request to Admit by May 29, 2009, as Magistrate Judge Brown ordered it to do on May 28, 2009. (*See* R. 126.) Although Amex claims that it denied this fact, there is no record of its ever filing such a denial. Indeed, Amex cites as evidence of this denial the September 30, 2004 Service Order placed by Exxon with Amex, which in no way addresses whether the HDPE pipe at issue was constructed in a way that rendered it fit for its intended purpose. (*See* AM 56.1 Resp. Exxon ¶ 32; AM 56.1 Resp. Exxon Ex. A.)

which applied to the work performed on the HDPE Project. (AM, EX 56.1 Resp. AT ¶ 17, 19; AT 56.1 Resp. Add. Facts AM ¶¶ 24, 27.) ASME B31.3 uses the design pressure, hydrostatic design stress, and outside diameter of a pipe to determine its proper wall-thickness. (AT 56.1 Resp. Add. Facts AM ¶ 26.) Neither the guidance provided by to Ambitech by ISCO regarding wall thickness and pressure capacity of the HDPE pipe nor the pipe recommended to Ambitech by ISCO satisfied the requirements of ASME B31.3. (AM 56.1 Resp. Add. Facts ISCO ¶¶ 77-80). Biery's report also concluded that Ambitech used a lesser design temperature for HDPE pipe than for steel lines without justifying the difference. (AM, EX 56.1 Resp. AT ¶¶ 20-21.) However, Beiry admitted that he did not know the actual operating conditions of the pipe at the time of failure or have any information that would lead him to believe that it was experiencing temperatures that exceeded its capacities. (AM, EX 56.1 Resp. AT ¶¶ 20-21.)

The parties took several additional depositions in this case of witnesses who opined as to the credibility of the pipe's mode of failure and as to whether the damages incurred by the pipe failure were of the type reasonably expected. Clifton Hene ("Hene"), Exxon's Optimization Supervisory at the Refinery, testified that all damages incurred by Exxon were the damages one would reasonably expect as a consequence of the loss of the Refinery's cooling water return line. (EX 56.1 Resp. Count II ¶ 12.) Penteris interpreted the sentence in a welding quality control form, "the catastrophic failure mechanism of the high density polyethylene, HDPE, pipe was not sufficiently understood or anticipated" to mean that "this pipe can be fused enough to pass a hydro but the creep properties after being in service for a couple of months allowed it then to fail at a later date." (EX 56.1 Resp. Count II Exhibit 2 199: 16 – 200: 3; AM 56.1 Resp. Add. Facts Count II ¶ 2.) Penteris then affirmed that this creep was "one of the root causes of the failure." (EX 56.1 Resp. Count II

Exhibit 2 200: 2–3; AM 56.1 Resp. Add. Facts Count II ¶ 2.) Exxon employee Raphael Bojarczuk ("Bojarczuk") similarly testified that he does not "believe that having a pipe fail catastrophically by failing entirely through the joint is a credible mode of failure if properly installed." (EX 56.1 Resp. Count II Exhibit 4 105: 6–10; AM 56.1 Resp. Add. Facts Count II ¶ 2.) Bojarczuk further interprets the sentence "the catastrophic failure mechanism of the high density polyethylene pipe was not sufficiently understood or anticipated" to mean that "no one imagined that the joint could fail catastrophically like that, if properly assembled." (EX 56.1 Resp. Count II Exhibit 4 117: 1-20; AM 56.1 Resp. Add. Facts Count II ¶ 2.)

### IV. The Continuing Services Agreement between Exxon and Amex

On May 29, 2003, Exxon entered into a Continuing Services Agreement ("CSA") with Amex. (AM 56.1 Resp. to Exxon ¶¶ 28–29; EX 56.1 Resp. Count I ¶ 11; AM, EX 56.1 Resp. AT Economic Damages ¶ 11; AM, EX 56.1 Resp. AT ¶ 11.) The CSA governed all work performed by Amex for Exxon at the Refinery, including the work at issue in this case. (EX 56.1 Resp. 15th Aff. Def. ¶ 13; EX 56.1 Resp. Count I ¶ 12.) Throughout the CSA, Amex is identified as "Contractor" and Exxon as "User." (EX 56.1 Resp. 15th Aff. Def. ¶ 16; EX 56.1 Resp. Count I ¶ 17.)

The CSA allowed the Refinery to issue work orders to Amex on a pre-approved and ongoing contractual basis. (AM 56.1 Resp. Exxon ¶ 28.) A work order

> means the document or documents issued by User incorporating the terms of this Agreement and specifying the Services to be performed using the form set out in Exhibit B or any other form User may provide whether labeled as a Work Order or by other labels including, but not limited to, 'release,' 'work release,' 'letter of special agreement,' 'work order agreement,' 'work authorization' or 'letter of authorization' provided that such form is executed and accepted as provided in this Agreement. A Work Order may take the form of an oral request by User.

(AM 56.1 Resp. Exxon ¶ 29; EX 56.1 Tab V, Ex. A, Art. 1, No. 15; EX 56.1 Resp. Count I ¶ 22.)

Article 4 of the CSA provides that: "[e]ach accepted Work Order shall constitute a legal contract

between User and Contractor separate and distinct from either any other Work Order or this Agreement. Each Work Order shall, nonetheless, be deemed to incorporate the provisions of this Agreement." (AM 56.1 Resp. Exxon ¶ 30.)

The Service Order placed with Amex on September 30, 2004 for the HDPE Project functioned as a Work Order pursuant to the CSA. (EX 56.1 Resp. Count I ¶¶ 24-25.) Some of the services identified in this Service Order for "[m]obilization, labor and supervision for the pipe fabrication for the cooling water return line replacement project in accordance with Amex Proposal 04-5421 dated 9/15/04" were not completed or accepted as of July 30, 2005 when the HDPE pipe decoupled. (EX 56.1 Resp. Count I ¶¶ 28-29.)[5] More specifically, the following services delineated in Amex Proposal 04-5421 were not completed or accepted on or before July 30, 2005: (1) installation of the 48'' underground carbon steel E/W run; (2) installation of the new 48''/42 N/S carbon steel header to units including branch piping; (3) energizing the new U/G carbon steel piping and demo of the temporary HDPE piping and supports. (EX 56.1 Resp. Count I ¶ 30-35.)

---

[5] In Exxon's Responses to Amex's Statements of Fact numbered 28 and 29 in its Motion for Summary Judgment on Count I, Exxon first "admits that each and every contracted service" was not "completed" or "accepted by July 30, 2005." (EX 56.1 Resp. Count I ¶ 28-29.) Exxon then "further adds" many statements of fact about the pricing breakout in Amex Proposal 04-5421 and expounds the legal argument that "[t]otal completion or acceptance of all contract terms was not required before the warranty in Article 10.3 of the CSA commenced." (EX 56.1 Resp. Count I ¶ 28-29.) The Court disregards Exxon's additional factual statements as they are not set forth in a Statement of Additional Undisputed Facts as required under Local Rule 56.1(b)(3)(C). *See* LR 56.1(b)(3)(C) (explaining that the opposing party's response must contain a separate statement "of any additional facts that require the denial of summary judgment"). The Court further strikes all legal argument in Exxon's responses as improper under Local Rule 56.1(b). LR 56.1(b) (explaining that an opposing party may file a "supporting memorandum of law" but its responses must consist of *facts* referring to "affidavits, parts of the record, and other supporting materials relied upon"); *see also See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" do not comply with the Local Rules).

Amex also sets forth "Additional Facts Relied Upon in its Reply to Exxon's Response to Amex's Motion[s] for Summary Judgment" on both Counts I and II. Because the Court has stricken Exxon's additional facts set forth in its 56.1 Response to Count I, it also strikes Amex's response to those facts. Moreover, Local Rule 56.1 does not allow additional statements of fact by the movant in its reply to a non-movant's statement of additional facts. Local Rule 56.1 simply allows a party opposing summary judgment to file a concise response to the movant's Statement of Facts including: 1) a response to each of the movant's statements of fact; and 2) no more than forty statements of additional facts. *See* L.R. 56.1(b)(3)(B) & (C). If the party opposing summary judgment submits additional facts, the moving party may submit a concise response to those facts, but *not* additional facts. *See* L.R. 56.1(a).

## A. Warranty Provisions in the Continuing Services Agreement

Article 10 of the CSA contains descriptions of several warranties, including Section 10.1's "Contractor's Representations and Warranties" providing that Contractor: "(a) has the Competence to perform the Services; . . . (c) shall maintain and use all tools and equipment in accordance with manufacturer's specifications and recommendations and good engineering and operational practices; . . . (f) shall perform all Services in good faith, promptly, with due diligence and Competence; (g) fully comprehends the requirements and contingencies prior to performing services." (AM 56.1 Resp. Exxon ¶ 30, AM 56.1 Resp. Add. Facts 15th Aff. Def. ¶ 1.) The CSA defines "Competence" as having "the expertise, experience, capability and specialized knowledge to perform Services in a good and workmanlike manner and within all accepted standards for the industry." (AM 56.1 Resp. Exxon ¶ 30; AM 56.1 Resp. Add. Facts 15th Aff. Def. ¶ 1.)

Section 10.3 goes on to provide a general Contractor's Warranty (the "General Warranty"):

> Without limiting the rights that User may otherwise have at law or equity and in addition to the other warranties granted, Contractor guarantees and warrants that all Services performed and any materials and equipment provided in connection with the Services shall be free from defect or deficiency for one (1) year from the date of completion or acceptance of the Services, whichever occurs last . . . ." (AM 56.1 Resp. Exxon ¶ 30; AM 56.1 Resp. Add. Facts 15th Aff. Def. ¶ 1.)

The CSA defines "Services" as "the services described in Exhibit A and each applicable work order." (AM 56.1 Resp. Exxon ¶ 30; EX 56.1 Resp. Count I ¶ 20.) Exhibit A is not specific to the HDPE Project; rather, Exhibit A describes the general kind of piping work to be performed by Amex at the Refinery. (EX 56.1 Resp. Count I ¶ 21.)

## B. Damage Cap Provisions in the Continuing Services Agreement and the Service Order

The CSA also contains a provision addressing the damages available to Exxon under certain circumstances. Article 12.1 of the CSA states, in relevant part:

> Contractor shall compensate User for loss or damage to User's existing property which is in reasonable proximity to the Work Site which results from the negligence of the Contractor and/or for any resulting consequential, special or indirect damages, or loss of anticipate profits sustained by User; however, Contractor's responsibility shall not exceed the amount recoverable by Contractor or its Subcontractors under the valid and collectible insurance carried by the Contractor or Subcontractors, or the amount which would have been recoverable under that insurance if all conditions, requirements and warranties imposed on the insured by the insurer are being or had been met. User shall release Contractor and hold Contractor free and harmless from liability to User for such loss or damage and/or for any resulting consequential, special or indirect damages, or loss of anticipated profits sustained by User exceeding amounts so recovered, even if the loss or damage results from Contractor's negligence; however, Contractor's responsibility shall include the value of any deductible or self-insured retention applicable under that instance. (EX 56.1 Resp. 15th Aff. Def. ¶ 17; AM 56.1 Resp. Exxon ¶ 31.)

Article 11(c) of the Service Order for the HDPE pipe installation contains identical language, merely substituting the word "Supplier" for "Contractor" and the word "Purchaser" for "User." (EX 56.1 Resp. 15th Aff. Def. ¶¶ 18-19; EX 56.1 Resp. Count I ¶ 18.)

Article 12 explains that "[t]he term 'negligence' in this Agreement shall include active or passive negligence." (AM 56.1 Resp. Exxon ¶ 31.) Article 12 goes on to clarify that each party shall bear full responsibility for any "Gross Negligence or Willful Misconduct attributable to its managerial and senior supervisory personnel," and to define gross negligence and willful misconduct. (AM 56.1 Resp. Add. Facts 15th Aff. Def. ¶¶ 2, 3.)

**V. Damages**

Exxon claims a total of $14,913,656 in losses due to its emergency shut-down and costs associated with start-up. (AM 56.1 Resp. Exxon ¶ 17.) Specifically, Exxon alleges: (1) $10,390,000 in lost margin due to its inability to process 233,700 barrels of crude oil for two days at a loss of $26.08 per barrel; (2) $650,000 in flare loss when the refinery burned its hydrocarbon to prevent catastrophic failure; (3) $28,000 for four broken seal pumps resulting from the failure; (4) $8,740 for cooling water chemicals placed into the system to prevent equipment fouling; (5) $1,959,516 in lost product capability due to fouled heat exchangers; (6) $18,000 for the loss of ten tons of catalyst, a sand-like material used to refine oil that is lost during an emergency shut-down; (7) $122,000 in additional fuel costs to meet the Refinery's needs during shut-down; (8) $1,400,000 in distressed crude sales, where Exxon sold crude at a discount because the Refinery had limited storage capacity; and (9) $1,037,400 in distressed gas and diesel purchases to meet Exxon's contractual obligations during shut-down. (AM 56.1 Resp. to Exxon ¶ 17, 19-27.) Exxon assigned two days worth of lost margin to the shut-down because the Refinery did not start back on-line until August 7, 2005, with repairs taking a half of a day and start-up taking a day and a half. (AM 56.1 Resp. Exxon ¶ 18.) Exxon's total non-economic damages amount to $928,000. (AM, EX 56.1 Resp. AT Economic Damages ¶¶ 17-18.)

## VI. Ambitech Employees Bernard Gunn and Elizabeth Wenzel

Bernard Gunn ("Gunn") served as a Project Manager for Ambitech during and after the HDPE pipe failure. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 17.) In 2002, Gunn began working full-time at the Refinery, where he had a permanent office and worked almost exclusively for Exxon until December 17, 2008. (EX, AM 56.1 Resp. AT Borrowed Servant ¶¶ 18-20.) Pursuant to a proposal for Gunn's services accepted by Exxon, Gunn was classified as a Category

II Employee working under Exxon's supervision. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 27.) According to the Labor Billing Rules for Category II Employees, "Ambitech will bear no liability for work performed under Exxon's direct supervision and control." (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 28.) Unless he was on an Exxon-related business trip, Gunn would go directly to his office at the Refinery in the morning and depart from there at the end of the day. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 23.) During his time at the Refinery, Gunn was assigned an Exxon email address, and was required to follow the rules, policies, and procedures of Exxon. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 25.)

Gunn first became involved in the HDPE Project in late 2003 or early 2004. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 19.) He reported directly to Exxon employee Ernie Rossi ("Rossi") with any questions or instructions relating to the HDPE Project, and Rossi had full power to direct and control the details of Gunn's work. (EX, AM 56.1 Resp. AT Borrowed Servant ¶¶ 21, 24.) Gunn never reported to the Ambitech offices and rarely reported to any Ambitech employee during the course of the HDPE Project. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 22.) Ambitech Project Manager Gary Bell ("Bell") testified that Gunn did, however, report to him at the time of the HDPE project. (AT Resp. to AM Borrowed Servant ¶¶ 41-43; AM 56.1 Resp. Borrowed Servant Ex. 1, p. 14.)

Ambitech hired Elizabeth Wenzel ("Wenzel") in 1989. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 29.) In October 2000, Wenzel began working full-time at the Refinery, where she has since maintained a permanent office. (EX, AM 56.1 Resp. AT Borrowed Servant ¶¶ 31-32.) At the time of the pipe failure, Wenzel was the process design engineer for the HDPE Project. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 30.) Like Gunn, Wenzel reported directly to Rossi with any

questions or instructions relating to the HDPE Project, and would not seek such information from an Ambitech employee. (EX, AM 56.1 Resp. AT Borrowed Servant ¶¶ 34, 36.) Although Bell confirmed that Wenzel reported directly to Rossi, he also testified that Welzel reported to him at the time of the HDPE project. (AT Resp. to AM Borrowed Servant ¶¶ 41-43; AM 56.1 Resp. Borrowed Servant Ex. 1, p. 14.)

Wenzel was required to abide by Exxon's rules, policies, and procedures while working at the Refinery, and was assigned an Exxon email address. (EX, AM 56.1 Resp. AT Borrowed Servant ¶¶ 37-38.) Similarly to Gunn, she was classified as a Category II employee working under Exxon's supervisions pursuant to two proposals accepted by Exxon. (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 39.) As such, the Labor Billing Rules provided that Ambitech would bear no liability for her work performed under Exxon's "direct supervision and control." (EX, AM 56.1 Resp. AT Borrowed Servant ¶ 31.) Except between October and December 2005 when Wenzel worked at the Ambitech office four days per week, she rarely reported to the Ambitech offices, instead reporting directly to the Refinery in the morning and leaving from there at the end of the day. (EX, AM 56.1 Resp. AT Borrowed Servant ¶¶ 34-35.)

Although Exxon did not directly pay for either Gunn's or Wenzel's services, Exxon indirectly paid the salary of Wenzel at the time of the HDPE Project via Ambitech's "billing of her services" to Exxon. (AT 56.1 Resp. AM Borrowed Servant ¶¶ 44-45; AM 56.1 Resp. Borrowed Servant, Ex. 1, p. 104.) During the HDPE Project, Ambitech could terminate Gunn and Wenzel from Ambitech, and Exxon could also terminate Wenzel's services through Ambitech. (AT 56.1 Resp. AM Borrowed Servant ¶¶ 46-47; AM 56.1 Resp. Borrowed Servant, Ex. 1, p. 104.)

The Engineering Services Agreement between Exxon and Ambitech provides:

> Contractor will at all times act as an independent contractor, and nothing stated or implied in this Agreement shall be construed to make Contractor, nor shall Contractor in any way represent Contractor to be, an employee or agent of User, Exxon Oil Corporation, or any affiliated company of Exxon Oil Corporation. While Contractor's Services shall meet with User's approval, User is interested in the results to be achieved and, accordingly, the detail, manner, and method of performing Services shall be the responsibility of and under the supervision and control of Contractor.

(AT 56.1 Resp. EX Borrowed Servant ¶ 25.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P 56(c). When determining if a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'"). On cross-motions for summary

judgment, each movant must satisfy Federal Rule of Civil Procedure 56's requirements. *See Cont'l Cos. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

<h2 style="text-align:center"><u>DISCUSSION</u></h2>

As an initial matter, none of the parties "contends that Illinois's choice of law rules require us to apply the substantive law of another state." *See Southern Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co*., 302 F.3d 667, 672 (7th Cir. 2002) (internal citations omitted). Because the installation of the HDPE pipe and its subsequent failure occurred in Illinois, "there is a reasonable relation between the dispute and the forum whose law has been selected" such that it is appropriate to "apply Illinois law in this case." *See id.* More specifically, the Court will "apply the law that [it] believe[s] the Supreme Court of Illinois would apply if the case were before that tribunal rather than before this court." *See, e.g.*, *Help at Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001).

**I.      Exxon's and Amex's Cross-Motions for Summary Judgment on Count I**

Exxon and Amex have filed Cross-Motions for Summary Judgment on Count I, which alleges breach of warranty under the CSA. "To succeed on a claim for breach of contract, a plaintiff must plead and prove (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach." *Roberts v. Adkins*, __ N.E.2d __, 2010 WL 114967, at *7 (Ill. App. Ct. Jan. 7, 2010). Neither Amex nor Exxon disputes that the CSA formed a binding contract between them and that Exxon performed the CSA's conditions. Thus, the remaining issues for the Court are whether Amex breached the CSA and whether Exxon suffered damages proximately caused by that breach. Exxon argues that undisputed facts show that Amex breached both the CSA's General Warranty and its Warranty of Competence.

Amex counters that the General Warranty was not in effect at the time of the pipe burst on July 30, 2005 and that Exxon failed to adequately plead a breach of the Warranty of Competence pursuant to Federal Rule of Civil Procedure 8(a)(2).

## A. General Warranty

The General Warranty provision of the CSA guarantees that "all Services performed and any materials and equipment provided in connection with the Services shall be free from defect or deficiency for one (1) year from the date of completion or acceptance of the Services, whichever occurs last." It is undisputed that the installation of the HDPE pipe constituted a "Service" within the meaning of this General Warranty. It is also undisputed that some of the "Services" identified in the parties' September 30, 2004 Service Order and Amex's corresponding Proposal 04-5421 were not completed or accepted before the pipe burst on July 30, 2005.

Exxon's and Amex's differing interpretations of the General Warranty hinge on their understandings of the phrase "the Services." Exxon contends that "the Services" means each and every service, such that each service covered by the CSA is entitled to its own warranty period beginning on the latter of the completion or acceptance of that service. Amex, on the other hand, interprets "the Services" to mean all services, such that every service included within the larger Carbon Steel Project had to be completed or accepted before the General Warranty began to run.

The Court's primary objective in construing a contract is to give effect to the parties' intent. *See Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 713 (7th Cir. 1993). "Under Illinois's 'four corners' rule, if a written agreement is unambiguous, then the scope of the parties' obligations must be determined from the contract language without reference to extrinsic evidence." *SMG Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 372 (7th Cir. 2009); *see also*

*Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 993 (7th Cir. 2007). "[I]nterpretation of the terms of an unambiguous contract is traditionally a question of law and is particularly suited to disposition on summary judgment." *Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002). If, however, a contract's language "is susceptible to more than one interpretation," *SMG Demag Aktiengesellschft*, 747 F.3d at 372, then it is deemed ambiguous and "its construction is a question of fact," where "parol evidence is admissible to explain and ascertain what the parties intended." *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (internal citation omitted).

Here, the language "all Services performed . . . shall be free from defect or deficiency," viewed in insolation, is somewhat ambiguous. It could either be interpreted to demonstrate the parties' intent that the General Warranty apply to all services separately, or to indicate that "the Services" refers to a bundle of "all Services" collectively. Looking to the CSA as a whole, however, supports Exxon's position that the parties intended each service to be separately covered under the General Warranty. *See Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others. The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself."). As its name indicates, the "Continuing Services Agreement" functioned as an agreement for multiple "services" in connection with a phased industrial construction project. In light of the fact that "great weight is to be given to the principal, apparent purpose and intention of the parties at the time that they entered into the contract," *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 193 (Ill. App. Ct. 2004), it seems unlikely that the parties intended Exxon to wait until Amex provided all of or a group of the "continuing services" before a defect or deficiency warranty was activated. Indeed, if

interpreted as Amex advocates, many short-term services provided by Amex would not be covered until the completion or acceptance of a larger contract many years later, or perhaps (in the case of temporary services like the installation of the HDPE pipe) until they were taken down and replaced with permanent equipment. Such a result seems inconsistent with the language in the General Warranty that "all Services" and the materials and equipment provided in connection with them will be free of defect or deficiency for one year.

Moreover, Amex's interpretation that all services within the larger Carbon Steel Project contract needed to be completed before the General Warranty began running adds terms to the CSA that are not provided or implied on its face. "There is a strong presumption against provisions that easily could have been included in the contract but were not." *Wright v. Chicago Title Ins. Co.*, 554 N.E.2d 511, 514 (Ill. App. Ct. 1990). Nowhere does the CSA purport to bundle some "services" based on specific project contracts or require that groups of services be completed or accepted as a unit. *See Intersport, Inc. v. Nat. Collegiate Athletic Ass'n*, 885 N.E.2d 532, 543 (Ill. App. Ct. 2008) (rejecting an interpretation that "would essentially amount to adding [certain] terms . . . to the contract"). Indeed, the provision in the CSA explaining that "Services means the services described in Exhibit A and each applicable Work Order" demonstrates that there are multiple "services" within each work order. It makes no suggestion that these services should be grouped according to the larger contract they are a part of for purposes of the CSA's warranty provisions. *See INEOS Polymers Inc. v. BASF Catalysts*, 553 F.3d 491, 500 (7th Cir. 2009) (courts should interpret contracts to give "meaning and effect to every part of the contract including all its terms and provisions").

Although Amex argues that from a practical standpoint the parties could not have intended multiple warranty periods for each individual service because these periods would be difficult for courts to untangle, most litigation implicating the General Warranty would likely, as in this case, involve only one service or a small number of services provided by Amex that ended up having a defect or deficiency.  Thus, the Court finds that according to the unambiguous terms of the CSA, each "Service" performed by Amex was subject to the one-year General Warranty from the date of its completion or acceptance, whichever was later.  Because Amex admits that the construction of the HDPE pipe was a "service" within the meaning of the CSA, does not dispute that the HDPE pipe was completed and accepted before its failure on July 30, 2005, and does not dispute that this failure occurred within one year of its completion and acceptance, the Court finds that the HDPE pipe was covered by the General Warranty at the time of its failure.

The question then becomes whether there was a "defect or deficiency" in the HDPE pipe so as to violate the terms of this General Warranty, and if so, whether any damages caused by that defect or deficiency are rightly attributed to Amex so as to satisfy the element of proximate causation.  According to the undisputed testimony of both Exxon's expert Perrault and Amex's expert Biery, there was a defect in the joint of the HDPE pipe that decoupled.  Perrault opined that "the operator of the fusion equipment failed to properly fuse the joint."  Biery confirmed that "if there were no defect in the joint . . . then my opinion is it most likely would not have failed."  Neither party disputes that Amex pipefitters fused the pipe that eventually failed.  Moreover, Amex admitted that the HDPE pipe at issue was not constructed in a manner that rendered it fit for its intended purpose.  These facts conclusively establish that there was a defect in the HDPE pipe, which constitutes a breach of the terms of the General Warranty.

With respect to causation, "[t]he term 'proximate cause' [under Illinois law] encompasses two distinct requirements: cause in fact and legal cause." *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004). In determining whether a plaintiff has established cause in fact, the Court asks "whether the injury would have occurred absent the defendant's conduct." *Id.* "The second requirement, legal cause, is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Id.* (internal citation omitted). Here, Perrault testified that the "joint ha[d] very clearly been heated under pressure" and that "the operator of the fusion equipment failed to properly fuse the joint." Amex admits that two of its pipefitters performed the fusion of the HDPE pipe for the temporary line, and that one of those pipefitters, Daly, fused the pipe under pressure. Amex further admits that if an operator applies excessive pressure to HDPE pipe while it is being heated, this will result in cold fusion, a condition that substantially weakens the pipe by creating gasps where the two pipe ends are not fused. These facts sufficiently demonstrate both that the failure of the HDPE pipe would not have occurred but for Amex's employees' actions in heating the pipe under pressure, and that heating under pressure caused a defect (cold fusion) that was closely tied to the pipe's eventual decoupling. *See id.*

Although Amex contests that Exxon has adequately shown proximate causation, Amex fails to set forth any alternative theory of causation or point to expert testimony positing a different causal theory. *See* Fed. R. Civ. P. 56(e) (once the moving party meets its burden of production, the nonmoving party must "set forth specific facts showing there is a genuine issue [of material fact] for trial"); *see also Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) (the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial"). Furthermore, in light of its admission that heating HDPE pipe under pressure will result in

cold fusion, Amex cannot rely on ISCO expert Volkstadt's testimony in response to a hypothetical question that heating the pipe under pressure would not result in cold fusion to defeat summary judgment—especially without offering an alternative causal theory. *See, e.g.*, *Blommer Chocolate Co. v. Bongard's Creameries, Inc.*, 635 F. Supp. 919, 925 (N.D. Ill. 1986) ("Without some alternative theory which could explain where the samonella came from and some evidence to support it . . . there was simply no triable issue of fact on the question" of caustion); *Beatty v. LaFountaine*, 896 N.E.2d 16, 20 (Ind. App. Ct. 2008) ("mere speculation cannot create questions of fact" and "[o]pinions expressing a mere possibility with regard to a hypothetical situation are insufficient to establish a genuine issue of material fact").

Finally, "damages are an essential element of a breach of warranty claim." *Shoop v. DaimlerChrysler Corp.*, 864 N.E.2d 785, 788 (Ill. App. Ct. 2007). Exxon has sufficiently alleged damages caused by Amex's breach of warranty in the amount of $14,913,656. *See TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007) (when moving for summary judgment on a breach of contract claim "under Illinois law, it is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages"); *see also Valenti v. Mitsubishi Motor Sales of Am., Inc.*, 773 N.E.2d 1199, 1202-03 (Ill. App. Ct. 2002) (stating that plaintiff was "only required to allege that she suffered damages with enough specificity to survive a motion for summary judgment" of her breach of warranty claim). Thus, the Court grants Exxon's Motion for Summary Judgment and denies Amex's Motion for Summary Judgment with respect to the General Warranty component of Count I.

**B. Warranty of Competence**

Exxon's Motion for Summary Judgment also argues that Amex breached the Warranty of Competence contained in the CSA through its failure to properly fuse the HDPE pipe. Amex disputes, however, that Exxon adequately pled a breach of the CSA's Warranty of Competence. Count I of Exxon's Second Amended Complaint alleges that the CSA contained "certain warranties, representations and guarantees," "including, but not limited to, the following, viz:" and then quotes the General Warranty. Because "viz" is a synonym for "namely," this language indicates that although the CSA contains many warranties, Count I intends specifically to implicate the General Warranty. Such an inference is further supported by the fact that the Second Amended Complaint quotes the General Warranty in its entirety, but does not quote any part of any other warranty.

Although the Second Amended Complaint states that the "failure of HDPE pipe weld after installation . . . constitutes a breach of the warranties, terms and conditions," plural, of the CSA, nowhere does Count I state the word "Competence." No part of the Second Amended Complaint put Amex on notice that Exxon was claiming a breach of that particular warranty. Exxon's Second Amended Complaint thus fails to meet the notice pleading standard set forth in Federal Rule of Civil Procedure 8(a)(2) with respect to a breach of the Warranty of Competence. *See* Fed.R.Civ.P. 8(a)(2) (a pleading must contain "a short and plain statement of the claims showing that the pleader is entitled to relief"); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (a complaint must provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests"); *see also, e.g.*, *Sawmill Prods. Inc. v. Cicero*, 477 F. Supp. 636, 641 (N.D. Ill. 1979) (plaintiff must provide a "clear, concise statement sufficient to notify the defendant of the legal theory underlying plaintiff's claims and groups which support them"). Because a plaintiff may not amend

its complaint through arguments in a summary judgment brief, *see Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 664 (7th Cir. 1998), Exxon may not now add a claim for breach of the Warranty of Competence when that warranty was not adequately pled in its Second Amended Complaint. For that reason, the Court denies Exxon's Motion for Summary Judgment and grants Amex's Motion for Summary Judgment with respect to the Warranty of Competence component of Count I.

## II.    Exxon's and Amex's Cross-Motions for Summary Judgment on Count II

Exxon and Amex have also filed Cross-Motions for Summary Judgment on the issue of Amex's negligence alleged in Count II of Exxon's Second Amended Complaint. "To establish a valid claim for negligence in the state of Illinois, a party must demonstrate that the defendant owed him a duty, that the defendant breached this duty, and that he suffered an injury that was proximately caused by the defendant's breach." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see also Sobczak v. General Motors Corp.*, 871 N.E.2d 82, 94 (Ill. App. Ct. 2007) (in a product liability case involving an allegation of negligence, a plaintiff must establish the existence of a duty owed to the plaintiff by the defendant, a breach of that duty, an injury proximately and actually caused by that breach, and damages). Both the defendant's fault and the product's condition are relevant to this inquiry. *Sobczak*, 871 N.E.2d at 94. Exxon claims that the undisputed facts show that Amex was negligent in welding the HDPE pipe, while Amex argues that the question of its negligence is irrelevant because any recovery by Exxon is barred by the Illinois Supreme Court's decision in *Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443, 449 (Ill. 1982) ("the Moorman Doctrine"). Alternatively, Amex argues that genuine issues of material fact preclude a finding of summary judgment in favor of Exxon on this Count.

## A. Applicability of the Moorman Doctrine

As an initial matter, although Amex claims in its Motion for Summary Judgment as to Count II that the Moorman Doctrine completely bars Exxon's recovery for its negligence claim, in actuality that doctrine would only serve to *limit* Exxon's recovery for negligence if the Court found it applicable here. Under the Moorman Doctrine, plaintiffs cannot recover "economic loss," or "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property," under the tort theories of strict liability, negligence, or innocent misrepresentation. *See Moorman*, 435 N.E.2d at 449, 453. It is undisputed among Exxon, Amex, and Ambitech that Exxon suffered $928,000 in non-economic damages. Thus, even if the Court found the Moorman Doctrine applicable here, its only effect would be to limit Exxon's potential recovery for negligence to that amount.

Exxon first argues that Amex waived any right that it had to invoke the Moorman Doctrine when it contracted for limited negligence damages in the CSA. Article 12 of the CSA provides that Amex "shall compensate" Exxon "for loss or damage to [Exxon's] existing property which is in reasonable proximity to the work site which results from the negligence of [Amex] and/or for any resulting consequential, special or indirect damages, or loss of anticipated profits sustained by [Exxon]," but that such recovery will be limited to Amex's "valid and collectible" insurance.[6] On its face, this provision seems intended to allow Exxon to recover limited economic damages (like

---

[6] Amex claims that because Exxon does not attach a copy of the CSA to its statement of facts relied upon in support of its Motion for Summary Judgment, it has waived its right to use this provision as factual support for its assertions under Local Rule 56.1. However, by citing to the Exhibit in its Second Amended Complaint that contains the CSA and is part of the record in this case, Exxon has satisfied its burden of "including within each paragraph specific references to the affidavits, parts of the record, and other supporting memoranda." L.R. 56.1. Moreover, in Amex's Response to Exxon's Motion for Summary Judgment it admits the text of each of the provisions of the CSA cited by Exxon.

lost profits) resulting from Amex's negligence. Nowhere, however, does the CSA provide an explicit waiver of the Moorman Doctrine. Moreover, Exxon cites no case-law for the proposition that a party may waive its right to invoke the Moorman Doctrine. Indeed, aside from the instances where exceptions to it apply, the Moorman Doctrine purports to limit the recovery of economic damages precisely in cases like this, where the parties have "allocate[d] their risks" for damages arising from disappointed commercial expectations through agreements like the CSA. *See, e.g.*, *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428, 434 (Ill. App. Ct. 2002) (the Moorman Doctrine is founded on the premise that "parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover damages caused by a breach of contract"); *Mutual Service Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 615, 618 (7th Cir. 2001) (noting that "*Moorman* held that recovery for a loss that is solely economic in nature must be had in contract rather than tort"); *Moorman*, 535 N.E.2d at 450 ("Tort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence. . . . The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract."). Thus, the Court cannot conclude as a matter of law that Amex waived its right to invoke the Moorman Doctrine.

There are, however, three exceptions to the Moorman Doctrine: "(1) where the plaintiff sustained damage, i.e. personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, i.e. fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance

of others in their business transactions." *In re Chicago Flood Litigation*, 680 N.E.2d 265, 275 (Ill. 1997). Because Exxon does not allege false or negligent representations by Amex, only the first exception for property damage resulting from a sudden or dangerous occurrence arguably applies here.

The Court will consider in turn the two elements of the sudden and dangerous occurrence exception to the economic loss rule: (1) that the event at issue constituted a sudden and dangerous occurrence; and (2) that the damage sustained constituted "property damage." *See Mars*, 763 N.E.2d at 435 (describing the inquiry into the sudden and dangerous occurrence exception to economic loss rule as "necessarily bipartite"). A sudden and dangerous occurrence has somewhat circularly been defined as an occurrence that is "highly dangerous and presents the likelihood of personal injury or injury to other property." *Id.* (internal citation omitted). "[The *Moorman*] court had in mind fires, explosions, or other calamitous occurrences due to the product and the resulting risk of harm to persons or property." *Loman v. Freeman*, 890 N.E.2d 446, 452 (Ill. 2008). Amex argues that the evidence establishes as a matter of law that the decoupling of the HDPE pipe was not a sudden and dangerous occurrence so as to fall within this exception.

With respect to dangerousness, Amex relies heavily on the testimony of Exxon's night superintendent McCollom. McCollom testified that when Coba first observed the leak, he reported it to McCollom but did not seem out of breath or excited. He further explains that at the time the pipe unzipped and decoupled, he did not believe anyone was in danger of being hurt by the water flowing from the pipe. Although these facts show that McCollom did not think that the pipe failure posed a risk to any *persons* standing nearby, once the pipe decoupled, McCollom radioed the general cooling tower and said "prepare for—start shutting down, emergency shutdown" in order to prevent

unit equipment from overheating for safety reasons. In other words, McCollom was concerned about damage to property due to the overheating of equipment without the cooling system functioning. By ordering "emergency shutdown," McCollom demonstrated the seriousness of this concern. Exxon's mechanical engineering group leader Penteris further testified that without cooling water, vapor pressure rises, risking explosion or atmospheric release. He explained that in order to prevent this type of "catastrophic failure," the Refinery burned all of the hydrocarbon it had in production at the time. Penteris' testimony, coupled with McCollom's emergency response to the decoupling, are sufficient to establish a genuine issue of material fact as to the dangerousness of the pipe failure.

Turning to the suddenness of the failure, unlike in *Moorman* where the non-sudden damage resulted from the deterioration of food in a refrigerator, *Moorman*, 435 N.E.2d at 455, here McCollom testified that within a short period of time after he arrived at the site, the HDPE pipe "unzipped" and caused emergency shutdown of the Refinery. "When characterizing an event as sudden and calamitous the focus is upon the suddenness of the *occurrence of the event* . . . rather than the suddenness or the length of time within which the *defect or cause of the occurrence* develops." *American Xyrofin, Inc. v. Allis-Chalmers Corp.*, 595 N.E.2d 650, 657 (Ill. App. Ct. 1992). Thus, although Perrault testified that the weld at issue ultimately failed due to a gradual creep or expansion of the defect, the length of time over which the leak developed before the time when it decoupled is inconsequential; what matters is the suddenness of the decoupling itself. This suddenness is emphasized by McCollom's quick transition from stating that he would call maintenance to initiating emergency shutdown. *Compare NBD Bank v. Krueger Ringier, Inc.*, 686 N.E.2d 704, 708 (Ill. App. Ct. 1997) (petroleum gradually leaking through underground storage

tanks and into soil was not a sudden occurrence) *with United Airlines, Inc. v. CEI Indus. of Illinois, Inc.*, 499 N.E.2d 558, 562 (Ill. App. Ct. 1986) (even though collapse of roof was caused by water leaks accumulating over time, the collapse of the roof was a sudden and dangerous occurrence).

The Court further notes that as a general matter, the decoupling of the HDPE pipe resembles events that courts applying Illinois law have found to be "sudden, dangerous, or calamitous." *See, e.g.*, *In re Chicago Flood.*, 680 N.E.2d at 275-76 (underground flood); *MCI Worldcom Network Servs., Inc. v. Big John's Sewer Contractors, Inc.*, No. 03 C 4991, 2003 WL 22532804, at *3 (N.D. Ill. Nov. 7, 2003) (Castillo, J.) (excavation in violation of statutes); *Mars*, 763 N.E.2d at 436 (thunderstorm); *Elecs. Group. Inc. v. Cent. Roofing Co.*, 518 N.E.2d 369, 371 (Ill. App. Ct. 1987) (significant water leaking through roof in single day); *United Airlines*, 499 N.E.2d at 562-63 (roof collapse). The Court, therefore, finds the evidence in this case sufficient to create a genuine issue of material fact as to whether the pipe burst was a sudden and dangerous occurrence.

Alternatively, however, Amex argues that the facts in this case do not satisfy the second requirement of personal injury or property damage. *See In re Chicago Flood*, 680 N.E.2d at 275 (a sudden and dangerous event, "by itself, does not constitute an exception to the economic loss rule. Rather, the exception is composed of a sudden, dangerous, or calamitous event *coupled* with personal injury or property damage"). Mere damage to any property is not sufficient; instead, the property must be "other property," extrinsic from the product itself. *See Mars*, 763 N.E.2d at 436. Here, Exxon claims property damage to crude oil and hydrocarbons in various stages of production, heat exchangers, pump seals, and other mechanical devices. Exxon's claimed property damage thus goes far beyond mere damage the HDPE pipe itself. *See id.* Unlike in *Trans States v. Pratt & Whitney Canada, Inc.*, where the court held that damage to an airframe after an engine failed did not

constitute damage to "other property" because it was "the type of damage one would foreseeably expect as a direct consequence of the failure of the" engine, 682 N.E.2d 45, 58 (Ill. 1997), the property damage reported by Exxon was not a direct consequence of the failure of the pipe. Although Amex capitalizes on the "foreseeable" language from this case, emphasizing that Exxon's Optimization Supervisor Hene testified that the damages incurred by Exxon were of the type that could be reasonably expected as a failure of the HDPE pipe, the issue in *Trans States* was whether a "component part" like an airframe could constitute "other property." *See id.* The court held that the airframe damaged was part of the product bargained for and so foreseeable damages to it were not recoverable in tort. *See id.* Here, on the other hand, the resulting property damaged (hydrocarbons, heat exchangers, pump seals, and mechanical devices) were not component parts bargained for in the HDPE Project, and therefore damage to them could not have been foreseen as a direct consequence of any failure of the HDPE pipe. *See id.*

Thus, the Court finds the evidence sufficient to create a genuine issue of material fact as to whether the sudden and dangerous exception to the Moorman Doctrine applies to allow Exxon recovery of economic damages for its negligence claim.[7]

### B. Negligence

Although Exxon's negligence claim sounds in tort, the CSA establishes the duty of care owed by Exxon to Amex. *See Eickengreen v. Rollins*, 757 N.E.2d 952, 959 (Ill. App. Ct. 2001) ("An allegation of negligence based upon a contractual obligation, although sounding in tort rather than contract, is nonetheless defined by the contract . . . . Thus, the scope of the duty is determined by

---

[7] The Court notes that Exxon in its Motion for Summary Judgment claimed only that Amex waive the right to raise the Moorman Doctrine, and not that it is entitled to summary judgment on the applicability of the sudden and dangerous exception. Thus, the parties did not cross-move for summary judgment on this issue, and the availability of economic damages for negligence will be a question of fact for resolution by the jury.

the terms of the contract."); *see also Melchers v. Total Elec. Const.*, 723 N.E.2d 815, 818 (Ill. App. Ct. 1999) ("[W]hen an allegation of negligence is based upon a contractual obligation, the scope of the duty is determined by the terms of the contract."); *see also, e.g.*, *Sompo Japan Ins., Inc. v. Alarm Detection Systems*, No. 03 C 2322, 2003 WL 21877615 (N.D. Ill. August 6, 2003) ("Allegations of common law tort theories based upon contractual obligations, although sounding in tort rather than contract, are nonetheless defined by contract.") (Coar, J.). Here, the CSA sets forth a duty to perform work in a "competent" manner, which it defines as having "the expertise, experience, capability and specialized knowledge to perform Services in a good and workmanlike manner and within all accepted standards for the industry."

Amex does not dispute that its employee Daly had a duty, as defined under the CSA, to perform his work in a competent manner and comply with all accepted industry standards. Instead, it contends that a material fact remains as to whether Daly breached that duty in his fusion of the HDPE pipe. Exxon's position is fairly simple—it argues that Daly breached the duty of competence because he did not follow the industry standard as defined in the Heat Fusion Manual not to heat the pipe under pressure. Indeed, Daly admits that he heat-soaked the HDPE pipe at issue before applying pressure during the welding process, in direct contravention of the Heat Fusion Manual.

The issue, then, becomes whether there are genuine issues of material fact as to the accepted industry standard governing welding HDPE pipe under pressure. Amex argues that ISCO trainer Holman's supervision and approval of Daly's welding procedures creates a genuine issue of material fact as to whether Daly complied with accepted industry standards. Although Holman's approval of Daly's welding procedures leads to the inference that Daly followed instructions taught to all his fellow Amex pipefitters, it does create a genuine issue of material fact as to the proper industry

standard. Indeed, Amex provides no evidence of a different industry standard in the form of expert testimony or a contradictory fusion manual. *See Keri*, 458 F.3d at 628 (the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial").

Even looking beyond the standard set forth in the ISCO Fusion Manual, Exxon argues that Daly did not act in a generally competent manner when heating the pipe under pressure.[8] Amex points to the fact that Holman issued a certificate of training to both Daly and Pumnea, recommended them to run the McElroy machine because they did not deviate from the procedures he taught them, and was confident that they understood what they were doing. Ambitech expert McKinney also testified that Pumnea and Daly were qualified and competent to perform butt fusion. Again, although these facts provide circumstantial evidence of the welders' general competence and go to the issue of ISCO's contributory negligence, they do not contradict Amex's factual admission that the welding procedure used by its employee was incorrect. Amex admits that "[o]ne of the basic parts of HDPE fusion is not to heat the pipe under pressure." In light of Amex's further admission that Daly heated the pipe under pressure, Amex cannot assert that Daly acted competently. Because the welding procedures used by Amex's employee did not comport with "one of the basic parts of HDPE fusion" mandated by the ISCO Fusion Manual, the Court finds that Amex breached its duty of care as defined by the CSA.

Breached a duty of care is not, however, the only element required to prove negligence in a products liability action. Just as for breach of warranty, Exxon must show that it suffered an injury

---

[8] The Court notes that Amex's emphasis on the fact that Daly believed that he was performing his work in a competent manner because his work met with the Holman's approval is misplaced. Because "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable . . . to come up to the specified standard of care," *Beck v. Dubrowski*, 559 F.3d 680, 681 (7th Cir. 2009), it is not relevant to a determination of Amex's negligence that Daly believed that he was correct to follow Holman's instructions. Indeed, the CSA specifies that the term negligence includes both active or passive negligence.

proximately caused by Amex's breach of its duty. *See Lewis*, 561 F.3d at 702. Under Illinois law, "[t]he term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause." *Beretta*, 821 N.E.2d at 1127. In deciding whether a plaintiff has established cause in fact, the Court asks "whether the injury would have occurred absent the defendant's conduct." *Id.* "The second requirement, legal cause, is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Id.* (internal citation omitted).

Here, Exxon's expert Perrault testified that the defective "joint ha[d] very clearly been heated under pressure" and that "the operator of the fusion equipment failed to properly fuse the joint." Biery, Amex's expert, confirmed that if the joint had been properly fused, it most likely would not have failed. Amex further admits that if an operator applies excessive pressure to HDPE pipe while it is being heated, this will result in cold fusion, a condition that substantially weakens the pipe by creating gasps where the two pipe ends are not fused. (AM 56.1 Resp. Exxon ¶ 8.) Again, although Amex contests that Exxon has adequately shown proximate causation, Amex fails to set forth any alternative theory of causation or to point to expert testimony positing a different causal theory. *See* Fed. R. Civ. P. 56(e) (once the moving party meets its burden of production, the nonmoving party must "set forth specific facts showing there is a genuine issue [of material fact] for trial"); *see also Keri*, 458 F.3d at 628 (the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial"); *see also, e.g.*, *Blommer*, 635 F. Supp. at 925 ("Without some alternative theory which could explain where the salmonella came from and some evidence to support it . . . there was simply no triable issue of fact on the question" of causation).

Finally, Exxon has sufficiently claimed damages suffered as a result of Amex's negligence—the final element of a negligence claim. *See Lewis*, 561 F.3d at 702. Although the

38

parties have not moved for summary judgment on the issue of damages, Exxon alleges, and Amex offers nothing to dispute, $14,913,656 in losses due to the emergency shut-down and costs associated with start-up. Thus, the Court grants Exxon's Motion for Summary Judgment on the issue of negligence (Count II), and denies Amex's Motion for Summary Judgment on the applicability of the Moorman Doctrine to bar Exxon's recovery of economic damages.

### III. Amex's Motion for Summary Judgment on its Fifteenth Affirmative Defense

As its Fifteenth Affirmative Defense to Exxon's Second Amended Complaint, Amex asserts:

> The damages recoverable from Amex, by Exxon, regardless of nature, type or cause of action, are limited to, and shall not exceed, Amex's valid and collectible insurance at the time of the occurrence alleged in the pleadings, pursuant to the contract and agreement between Exxon and Amex at the time of the occurrence, including Article 12.1(c) of the Exxon/Amex Continuing Services Agreement and Article II(c) of the General Terms and Conditions of Exxon's Service Order.

Amex argues in its Motion for Summary Judgment on its Fifteenth Affirmative Defense that under the CSA and the General Terms and Conditions of the Service Order, any recovery by Exxon should be limited to Amex's valid and collectible insurance in place at the time of the pipe burst.

The Court's "primary objective in construing a contract is to give effect to the intent of the parties." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). A contract must be interpreted to give "meaning and effect to every part of the contract including all its terms and provisions." *INEOS Polymers*, 553 F.3d at 500 (quoting *Coles-Moultrie Elec. Co-op. v. City of Sullivan*, 709 N.E.2d 249, 253 (Ill. App. Ct. 1999)). When considering a contract provision on a motion for summary judgment, the Court must determine whether the provision is ambiguous, or "obscure in meaning, through indefiniteness of expression, or having a double meaning." *See Hampton*, 561 F.3d at 714 (quoting *Whitting Stoker Co. v. Chi. Stoker Corp.*, 171 F.2d 248, 250-51 (7th Cir. 1948)). A contract is not rendered ambiguous simply because the parties disagree as to

how it should be understood. *See id.* Instead, to be ambiguous, the terms of the contract must be susceptible to more than one reasonable interpretation. *See id.* If a contract is ambiguous, then "its construction is a question of fact" and "parol evidence is admissible to explain and ascertain what the parties intended." *Curia*, 587 F.3d at 829 (internal citation omitted)

Here, Amex's argument turns on the interpretation of two identical damages limitation provisions—Article 12.1 of the CSA and Article 11(c) of the Service Order. Although Exxon disputes the favorability of damages limitations clauses like these, such clauses are enforceable if the "agreement so states and no public policy bar exists." *Rayner Covering Sys., Inc. v. Danvers Farmers Elevator Co.*, 589 N.E.2d 1034, 1037 (Ill. App. Ct. 1992). Especially in "nonregulated areas" like the private business arena, "the decisions of this court and those of other jurisdictions reflect a widespread policy of permitting competent parties to contractually allocate business risk as they see fit." *McClure Eng'g Associates, Inc. v. Reuben H. Donnelley Corp.*, 447 N.E.2d 400, 402-03 (Ill. 1983); *see also, e.g.*, *Village of Rosemont v. Lentin Lumber Co.*, 144 Ill. App. 3d 651, 661 (Ill. App. Ct. 1986) (granting summary judgment in favor of the contractor upon a finding that the parties had expressly waived all rights against each other for damages covered by an insurance policy); *Federated Dept. Stores v. M.J. Clark, Inc.*, No. 04-879, 2007 WL 2088581, at *6 (N.D. Ill. July 17, 2007) (Marovich, J.) (granting summary judgment in a case involving a sprinkler leak at Bloomingdale's upon a finding that Bloomingdale's had waived its right to recover more than its insurance entitlement). Thus, the Court finds the damages limitation provisions at issue valid and enforceable.

Exxon also makes a preliminary argument that the applicability of the damages limitation provisions is not ripe for adjudication at the summary judgment stage because its relevance is

contingent upon an initial finding of Amex's liability. However, courts may decide claims about damages waiver alongside breach of contract and negligence claims on motions for summary judgment. *See e.g.*, *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 2009 WL 1033373, at *13 (N.D. Ill. 2009) (St. Eve, J.) (analyzing applicability of a punitive damage waiver provision on motion for summary judgment before determining issues of liability); *Federated*, 2007 WL 2088581 at *6 (deciding a breach of contract claim, negligence claim, and the effect of a damages waiver in one summary judgment); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, No. 01-9389, 2004 WL 532717, at *5 (N.D. Ill. 2004) (Keys, J.) (considering a fraud and a damages waiver claim on a motion for summary judgment).

The parties do not dispute that the damages limitation provisions in the CSA and the Service Order apply to limit Exxon's potential recovery for ordinary negligence damages.[9] Exxon maintains, however, that the insurance caps do not limit its recovery for breach of the CSA's various warranty provisions. The parties' differing interpretations on this point stem from their readings of two sentences in Article 12.1(c) of the CSA and Article 11(c) of the Service Order. The first of those sentences states:

> Contractor shall compensate User for loss or damage to User's existing property which is in reasonable proximity to the Work Site which results from the negligence of Contractor and/or for any resulting consequential, special or indirect damages, or loss of anticipated profits sustained by User.

---

[9] Exxon contends, however, that the cap is inapplicable if Amex is found guilty of gross negligence and willful and wanton conduct. It is true that under the clear terms of Article 12 of the CSA, none of the damage limitation provisions apply to gross negligence. However, the Court finds Exxon's argument irrelevant because Exxon did not assert willful and wanton conduct or gross negligence on the part of Amex in its Second Amended Complaint, and Illinois law does not recognize gross negligence as a separate cause of action. *See Doe ex rel. Ortega-Piron v. Chi. Bd. Of Educ.*, 820 N.E.2d 418, 423 (Ill. 2004) ("To plead willful and wanton conduct, a plaintiff must allege either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the plaintiff."); *Merit Ins. Co. v. Colao*, 603 F.2d 654, 659 (7th Cir. 1979) ("Illinois does not recognize gross negligence as an independent ground for recovery.").

Exxon urges the Court to construe this sentence to mean that the damages limitation provisions apply only to negligence damages and not to any damages recoverable for breach of warranty. In support of its interpretation, Exxon points to the language in the CSA's General Warranty stating that it is to apply "[w]ithout limiting the rights that User may otherwise have at law or equity."

Amex, on the other hand, relies primarily on the next sentence in the damages limitation provisions, which states that:

> User shall release Contractor and hold Contractor free and harmless from liability to User for such loss or damage and/or for any resulting consequential, special or indirect damages, or loss of anticipated profits sustained by User exceeding the amounts so recovered, EVEN IF THE LOSS OR DAMAGE RESULTS FROM CONTRACTOR'S NEGLIGENCE.

The word "even" in the all-capital letter clause, Amex argues, would be incapable of stressing an extreme and rendered meaningless if the damages limitation provision only applied to actions sounding in negligence.

The Court finds the language of this provision sufficiently ambiguous to render summary judgment inappropriate. *See Curia*, 587 F.3d at 832 (district court's grant of summary judgment was "inappropriate" where the contract was "ambiguous"). The two sentences in dispute are in significant tension with one another. The first makes no mention of loss or damage that results from a breach of warranty—it clearly states that Amex will compensate Exxon for damage to property and resulting consequential damages that result from its *negligence*. Unlike the waiver at issue in *Hampton*, where the plaintiff agreed to release "any and all rights or claims" against Ford, the damage limitation provisions here contain no blanket statement stating that they apply to all claims. *See Hampton*, 561 F.3d at 715-16.

Turning to the second sentence, however, the phrase "even if" would be incapable of stressing an extreme and rendered meaningless under Exxon's interpretation. *See id.* (quoting *Coles-Moultrie*, 709 N.E.2d at 253) (courts must read the contract provisions such that "no part is rendered meaningless or surplusage unless absolutely necessary"). It is also unclear, from a practical standpoint, why the parties would intend to limit damages for negligence causes of action if Exxon could fully recover under a breach of warranty theory without having to prove any fault on the part of Amex.

Another possible reading of the all capital-letter clause places weight on the words "results from," such that if the damages claimed on a breach of warranty cause of action in fact resulted from Amex's negligence, those damages would be limited, but damages resulting from a breach that involved no negligence would not be limited. This reading would again have the incongruous result, however, of limiting damages when Amex was more at fault but allowing full recovery when no fault was involved.

Because the Court finds the damages limitation provisions ambiguous with respect to Exxon's breach of warranty claim, but unambiguous with respect to Exxon's negligence claim, Amex's Motion for Summary Judgment on its Fifteenth Affirmative Defense is granted in part and denied in part. Exxon's recovery on any damage award under Count II (negligence) of its Second Amended Complaint will be limited to the amount recoverable under Amex's valid and collectible insurance policies in place at the time of the pipe failure. However, it will be left to the jury to determine whether the damages limitation provisions apply to Exxon's recovery under Count I for breach of warranty.

## IV.  ISCO's Motion for Summary Judgment

Amex's Third-Party Complaint against ISCO asserts that ISCO was negligent in violation of the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/1 *et seq* ("Tortfeasor Contribution Act").  The Tortfeasor Contribution Act provides that:

> (a) . . . [W]here 2 or more persons are subject to liability in tort arising out of the same injury to person or property . . . there is a right of contribution among them, even though judgment has not been entered against any or all of them. (b) The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is liable to make contribution beyond his own pro rata share of the common liability.

ISCO asserts two separate grounds for summary judgment: (1) that Amex has failed to show that any negligence on the part of ISCO was a proximate cause of Exxon's damages; and (2) that Amex is not entitled to recover contribution for any economic loss alleged by Exxon.

### A. Proximate Cause

First, with respect to proximate causation, ISCO argues that all testimony by Amex's expert Biery and Amex's employee Daly concerning ISCO's role in causing Exxon's damages is inadmissible, such that Amex cannot establish that ISCO proximately caused any harm to Exxon. As explained above, "to establish a valid claim for negligence in the state of Illinois, a party must demonstrate that the defendant owed him a duty, that the defendant breached this duty, and that he suffered an injury that was proximately caused by the defendant's breach." *Lewis*, 561 F.3d at 702. Thus, if ISCO can show that Amex has "not produced evidence sufficient to create a triable issue of fact on any one of these elements, summary judgment is appropriate." *See id.*  Under Illinois law, "[t]he term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause." *Beretta*, 821 N.E.2d at 1127.  In deciding whether a plaintiff has established cause in fact, the Court

asks "whether the injury would have occurred absent the defendant's conduct." *Id.* "The second requirement, legal cause, is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Id.* (internal citation omitted). Amex relies upon the testimony of its expert Biery and its pipefitter Daly to argue that there is genuine issue of material fact as to whether ISCO's training and recommendations both caused in fact and legally caused the pipe's failure.

This Court in its November 12, 2009 order sustained in part ISCO's Motion to Bar Biery's Testimony pursuant to the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (*See* R. 309 at p. 12). More specifically, the Court barred Biery's opinions regarding ISCO's responsibility for the inadequacies and deficiencies of the training of Amex bonding operators, the deficiencies of the Bonding Procedure Specification, and the qualification of Amex bonding operators. (*See* R. 309 at pp. 9-10.) The Court then found admissible Biery's testimony comparing ISCO's pipe wall-thickness and pressure capacity recommendations, bonding procedure specifications, and qualification and training of bonding operators, to ASME B31.3 standards. (*See* R. 309 at p. 11.) Biery's testimony comparing ISCO's recommendations and training to ASME B31.3 standards goes only, however, to a potential breach of ISCO's duty of care; the Court struck as inadmissible his testimony regarding causation.

Amex must not only establish a genuine issue of material fact as to a breach of a duty of care, but must "present evidence sufficient to create a triable issue of fact" as to whether that ISCO's mistakes proximately caused the injury suffered by Exxon. *See Lewis*, 561 F.3d at 702. As explained in Section I(A) and II(B) above, the parties have not set forth any facts or testimony showing that the wall-thickness, pressure capacity, bonding procedure specifications or qualification

of bonding officers addressed in Biery's report proximately caused the pipe burst. Instead, the only affirmative, admissible evidence with respect to both legal and actual causation in this case is Perrault's testimony that the failure was caused by heating the pipe under pressure during the welding process. As explained above, the testimony by ISCO's expert Voldstadt (in response to a hypothetical question) that heating the pipe under pressure would not result in cold fusion, without presenting any affirmative causal theory, is insufficient to create a genuine issue of material fact as to the cause of the pipe failure. *See Keri*, 458 F.3d at 628.

The testimony of Amex pipefitter Daly does, however, directly implicate ISCO in causing the pipe to be heated under pressure. Daly testified that he heated the HDPE pipe under pressure when performing welds after receiving four to five days of training from ISCO field representative Holman. Daly also read the ISCO Heat Fusion Manual as part of his training. Daly contends that Holman trained him to heat the pipe under pressure in contravention of the Heat Fusion Manual. Without identifying any of Daly's specific statements that it deems inadmissible, ISCO claims that Daly's general testimony regarding the HDPE fusion processes, training and qualification constitutes impermissible opinion testimony by a lay witness, in contravention of Federal Rule of Evidence 701. *See* Fed. R. Evid. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inference in limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").[10]

---

[10] Although ISCO's memorandum of law in support of its Motion for Summary Judgment argues at length that Daly is not qualified and was not disclosed as an expert witness, Amex does not claim that Daly is an expert pursuant to Federal Rule of Evidence 702. Instead, it argues that his testimony constitutes admissible testimony by a lay witness.

The Court finds Daly's testimony about what he was told by ISCO employee Holman during his training to be "rationally based on the perception of the witness." Fed. R. Evid. 701; *see also United States v. Estrada*, 39 F.3d 772, 773 (7th Cir. 1994) (finding testimony rationally based in an individual's perception under Federal Rule of Civil Procedure 701 where that individual "was a participant in the conversations with Estrada and testified as to his understanding of those communications"). Daly's subsequent inference that these instructions differed from the procedures he read in the Heat Fusion Manual constitutes an admissible inference that is rationally based in his perception and helpful to a clear understanding of his testimony. *See Estrada*, 39 F.3d at 773; *see also Gustovich v. AT&T Commc'ns., Inc.*, 972 F.2d 945, 849 (7th Cir. 1992) ("statements of lay witnesses are admissible only if based on personal knowledge or inferences grounded in observation or other first-hand personal experiences).

Although one of Holman's statements in his deposition contradicts Daly's testimony that Holman trained him to heat the pipe under pressure, Holman also contradicts himself in this regard. Holman states at one point that he instructed Amex pipefitters to heat the HDPE pipe *under pressure* until they noticed the "first indication of a melt" and then to reduce the pressure to zero, and later that he trained them to heat the pipe under *zero pressure* until a 7/16 to 9/16-inch bead formed. At most, then, Holman's testimony merely demonstrates a genuine issue of fact as to the instructions he gave during ISCO's training. Furthermore, Holman's testimony supports an inference that his training directly influenced the way that Daly and Pumnea performed welds. Holman spent four to five days training Daly and Pumnea and filed out ISCO Heat Fusion Evaluation Form 95 certifying that they had demonstrated proper heat fusion principles and techniques for HDPE pipe on a McElroy machine. The fact that Holman stressed idea of making a visual inspection of the pipe face

before fusing it to check for concavity might help mitigate ISCO's contributory negligence, but does not prove that Holman trained pipefitters correctly with respect to heating the pipe under pressure.

ISCO claims, however, that Daly's testimony does not suffice. It argues that expert testimony is necessary to create a genuine issue of material fact as to proximate causation in this case because it involves specialized knowledge outside of a jury's common understanding and experience. Although ISCO is correct that the proximate cause of the pipe failure is "not within the ken of the ordinary person" and must be established through expert testimony like the testimony Perrault offers in this case, Amex does not offer Daly's testimony to assert a causal theory. *See Goffman v. Gross*, 59 F.3d 668, 672 (7th Cir. 1995) (explaining that lay testimony as to the effects of secondhand smoke could not "by itself . . . establish the showing of medical causation necessary to sustain Goffman's claim" because "the effects of secondhand smoke are not within the ken of the ordinary person"); *United States v. Cravens*, 275 F.3d 637, 641 (7th Cir. 2001) ("Although a lay person may readily observe a drug or alcohol problem, the *causation* of a mental disease or defect is a more technical medical determination such that a court would find expert testimony particularly useful to its ultimate decision.") Indeed, Daly makes no conclusions with respect to why he believes the pipe failed or ISCO's ultimate liability. Instead, Daly's testimony consists of recounting his personal experience and drawing logical inferences from that experience—in other words, recalling what Holman told him, what the Heat Fusion Manual told him, and making an inference as to how those two things differed. As explained above, the testimony by Exxon's expert Perrault establishes that heating the pipe under pressure caused its failure. Daly's and Holman's testimony, then, serves to bridge the gap between this causal theory and ISCO's actions. Because one of two Amex pipefitters who welded the pipe contends that ISCO's employee Holman improperly instructed him

to heat the pipe under pressure, Amex has presented a sufficient question of material fact as to ISCO's contributory negligence.

### B. Applicability of the Moorman Doctrine

As a separate ground for summary judgment, ISCO argues Amex is not entitled to recover contribution from ISCO for any economic loss alleged by Exxon under the Moorman Doctrine. *See Moorman*, 435 N.E.2d at 455. As explained in Section II(A) *infra*, genuine issues of material fact regarding the applicability of the sudden or dangerous occurrence exception to the Moorman Doctrine preclude a finding of summary judgment on this issue.

For these reasons, the Court denies ISCO's Motion for Summary Judgment.

### V. Ambitech's Motion for Summary Judgment

Ambitech also moves for Summary Judgment on Amex's contribution claim pursuant to the Tortfeasor Contribution Act, 740 ILCS 100/1 *et seq*., claiming, like ISCO, that Amex has not produced evidence that any of Ambitech's acts, errors or omissions proximately caused the damages alleged in Exxon's Second Amended Complaint. Again, "to establish a valid claim for negligence in the state of Illinois, a party must demonstrate that the defendant owed him a duty, that the defendant breached this duty, and that he suffered an injury that was proximately caused by the defendant's breach." *Lewis*, 561 F.3d at 702; *see also Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1053 (Ill. 2006). If Ambitech can show that Amex has "not produced evidence sufficient to create a triable issue of fact on any one of these elements, summary judgment is appropriate." *See Lewis*, 561. F.3d at 702. "Whether a defendant breached [his or her] duty and whether the breach was the proximate cause of the plaintiff's injuries are factual matters for the jury to decide, provided there is a genuine issue of material fact regarding those issues." *Marshall*, 856 N.E.2d at 1053-54.

Ambitech argues that no evidence set forth by Amex demonstrates that any breach of its duty of care proximately caused the failure of the HDPE pipe on July 30, 2005. As discussed above, under Illinois law, "[t]he term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause." *Beretta*, 821 N.E.2d at 1127. In deciding whether a plaintiff has established cause in fact, the Court asks "whether the injury would have occurred absent the defendant's conduct." *Id.* "The second requirement, legal cause, is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Id.* (internal citation omitted). Amex contends that the testimony of its expert, Biery, creates genuine issue of material fact as to whether Ambitech's use of a thinner-walled pipe than required by ASME B31.3 standards and a lesser design temperature for HDPE pipe than for steel pipe was the cause in fact or legal cause of the pipe failure.

In this Court's November 12, 2009 order, it barred certain of Biery's conclusions pursuant to the standard set forth in *Daubert*, 509 U.S. 579. (*See* R. 309 at p. 12). With respect to Ambitech specifically, the Court barred Biery's testimony regarding the wall thickness contributing to the failure of the HDPE pipe, a thicker-walled pipe having a longer life, and Exxon's assessment of the accuracy of the wall-thickness calculation, finding these conclusions to be based on unreliable methodology. (*See* R. 309 at p. 12.) Although the Court found admissible Biery's testimony comparing the wall-thickness in Ambitech's piping design to ASME B31.3 standards (R. 309 at p. 12), no expert in this case has opined that the pipe would have failed but-for its inappropriate wall-thickness. *See Beretta*, 821 N.E.2d at 1127 (to establish causation, a party must show that the injury would not have happened but for the defendant's conduct). Indeed, no expert testimony in this case

contradicts Perrault's conclusion that the HDPE pipe joint failed due to excessive force applied during the heating cycle.

Furthermore, although Biery testified (and Ambitech did not challenge in its Motion to Bar his testimony) that Ambitech used a lesser design temperature for HDPE pipe than for steel lines, again no admissible testimony in this case posits that the lesser design temperature was a but-for or a legal cause of the pipe burst. *See id.* Biery did not explain why or how a lesser design temperature than that used for steel piping might have contributed to the pipe failure. Biery further admitted that he did not know the actual operating conditions of the pipe at the time of failure or have any information that would show that it was experiencing temperatures that exceeded its capacities. Indeed, Biery's only admissible testimony regarding causation accords with Perrault's testimony– that is, that the fusion of the pipe had a defect in it that grew due to operating stresses.

Thus, although Biery's testimony as to the inappropriate wall thickness and design temperature Biery may show a breach of Ambitech's duties owed to Amex, Amex fails to supply any admissible evidence providing the crucial link between these shortcomings and the pipe burst so as to establish cause in fact and legal causation. *See Lewis*, 561. F.3d at 702 (summary judgment appropriate where non-moving party has failed to supply evidence creating a genuine issue of material fact as to any one of the elements of its cause of action). For that reason, the Court grants Ambitech's Motion for Summary Judgment, finding that it may not be held liable under the Tortfeasor Contribution Act.[11] Ambitech's Motion for Summary Determination that its potential

_____

[11] The Court notes that the section of Amex's Reply Brief arguing that it "asserts a viable and well established cause of action against Ambitech for negligently failing to follow the required engineering codes in designing the pipeline at issue" is inappropriate at the summary judgment stage. (*See* R. 206 at p. 5.) Ambitech has not moved to dismiss Amex's cause of action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6); instead, Ambitech moves for summary judgment arguing that Amex has not demonstrated a triable issue of fact as to one of the essential elements of its case against Ambitech. Indeed, Ambitech does not dispute that Amex may assert a cause of action against it based on its failure to abide by the mandates of ASME B31.3. Nothing in this argument by Amex addresses the issue of proximate causation other than its cite to Biery's testimony addressed above.

contributory negligence is limited to the $928,000 in non-economic damages incurred by Exxon is, therefore, rendered moot.

## VI. Ambitech's Motion for Partial Summary Judgment

Ambitech also moves for Partial Summary Judgment on its affirmative defense based on the Illinois "borrowed-servant" doctrine. Ambitech argues that pursuant to this doctrine, any acts or omissions by Ambitech employees Gunn and Wenzel are attributable to Exxon. Although the Court has already granted Ambitech's Motion for Summary Judgment, the Court finds that even if Amex had established a genuine issue of material fact on the issue of proximate causation, Ambitech would be entitled to a partial summary judgment determination that the actions of Wenzel are attributable to Exxon under the borrowed servant doctrine.

The borrowed-servant doctrine "is a principle of agency law in which the first principal 'loans' his agent to a second principal, giving the second principal a heightened degree of control over the agent, along with the corresponding responsibility for the agent's acts or omissions." *See Williams v. Shell Oil Co.*, 18 F.3d 396, 400 (7th Cir. 1994); *see also Binz v. Brandt Const. Co., Inc.*, 301 F.3d 529, 533 (7th Cir. 2002) (under the borrowed-servant doctrine "an employee of one employer may be loaned to another employer, and thereby becomes the servant of the borrowing employer"). The borrowed-servant doctrine only applies in cases where an employee "is wholly free from the control of the first employer and wholly subject to the control of the second employer." *Williams*, 18 F.3d at 400 (citing *Richard v. Illinois Bell Tel. Co.*, 383 N.E.2d at 1249). The "dominant factor" for courts to consider in this analysis is "who has the right to control the manner in which the work is being completed." *See Id.* This determination requires an analysis of several factors, including: (1) the manner of direction and supervision of the employee's work; (2) the

manner of hiring; (3) the mode of payment; (4) the nature of the work; and (5) the right to fire or discharge the employee. *See Williams*, 18 F.3d at 400. Whether an employee qualifies under the borrowed-servant doctrine is "generally a question of fact"; however, "it may become a question of law where undisputed facts are susceptible to but a single inference." *See Binz*, 301 F.3d at 533; *see also M & M Elec. Co. v. Indus. Comm'n*, 311 N.E.2d 161, 163 (Ill. 1974).

A collection of undisputed facts show extensive supervision and direction by Exxon over Gunn's and Wenzel's work. Like in *Binz*, where there was "no dispute" over "who had the right to control the manner in which the construction project was being completed," 301 F.3d at 533, Gunn and Wenzel both testified that Exxon had full power to direct and control the details of their work and that they reported directly to Exxon employee Rossi with any questions or instructions related to the HDPE Project. Neither would seek information about the project from an Ambitech employee. Although Ambitech project director Bell asserts that Gunn and Wenzel also reported to him, he does not contest that they directly reported to Rossi. Indeed, pursuant to a proposal for Gunn's and Wenzel's services accepted by Exxon, they were classified as a Category II Employee working under Exxon's supervision. According to its Labor Billing Rules for Category II Employees, "Ambitech will bear no liability for work performed under Exxon's direct supervision and control." Finally, Gunn and Wenzel were assigned Exxon email addresses and were required to follow Exxon rules and procedures. These facts demonstrate, at the very least, "an implied acquiescence" by Gunn and Wenzel that supports an inference of Exxon's direction and control. *See Russell v. PPG Indus., Inc.* 953 F.2d 326, 332 (7th Cir. 1992) ("The relevant case law pertaining to loaned employees requires only an implied acquiescence by the employee in the relationship.") (internal citations omitted).

With respect to the manner of hiring, although Gunn and Wenzel were initially hired by Ambitech, in 2002 and 2000 respectively both began working full-time at the Refinery pursuant to a proposal for their services. They continued to work full-time with offices at the Refinery for a period of years. Although Exxon did not directly pay for either Gunn's or Wenzel's services, Exxon indirectly paid the salary of Wenzel at the time of the Project via Ambitech's "billing of her services." "The mere fact that [an] employee does not receive his wages from the [borrowing] employer will not defeat the finding of a loaned-employee situation." *A.J. Johnson Paving Co. v. Indust. Comm'n*, 412 N.E.2d 477, 480 (Ill. 1980). Instead, the fact that Exxon indirectly paid Wenzel's salary by billing for her services merely "mitigates in favor of a finding of control" by Exxon over her actions. *See Russell*, 953 F.2d at 330 (affirming district court's finding on summary judgment that plaintiff was a borrowed servant and finding that it "mitigate[d] in favor of a finding of control" where the plaintiff's general employer billed the alleged borrowing employer for the hours plaintiff worked).

Turning to the nature of the work and time spent by Gunn and Wenzel at the Refinery, Gunn never reported to the Ambitech offices during the course of the Project, and indeed, rarely reported to any Ambitech employee during that time. Wenzel similarly rarely reported to the Ambitech offices. During the project in question, both Gunn and Wenzel would report directly to their offices at the Joliet refinery in the morning and depart from there at the end of the day.

Finally, with respect to the right to terminate Gunn's and Wenzel's services, although Amex places significant weight upon the proposition that "a person cannot become an employee of the second employer unless the second employer has the power to discharge or fire the employee," *Mosely v. Nw. Steel & Wire Co.*, 76 Ill. App. 3d 710, 719 (Ill. App. Ct. 1979), subsequent Illinois

cases have held that "[c]ontrary to this assertion, the case law demonstrates that said power to discharge is but one of the factors to be considered in determining employer liability." *County of Tazewell v. Indus. Com'n*, 549 N.E.2d 805, 809 (Ill. App. Ct. 1989); *see also REO Movers, Inc. v. Indus. Comm'n*, 589 N.E.2d 704, 708 (Ill. App. Ct. 1992) ("[T]he power to discharge is but one of the factors to be considered in determining the employer's responsibility."). Indeed, it is sufficient for a finding of right to control as a matter of law that the alleged borrowing employer has "the right to ask [the principal employer] to remove an unsatisfactory worker." *See Cromer v. Joseph Behr & Sons, Inc.*, 42 F.3d 1391 (Table), 1994 WL 691041 at *2 (7th Cir. 1994) (affirming district court's finding that plaintiff was a "loaned employee" at the time of his injury); *see also Russel*, 953 F.2d at 331 ("Illinois law does not require [the borrowing employer] to have the power to terminate Russel's employment *altogether*; it requires only that PPG have the power to discharge Russel from his work with" the borrowing employer, such as through sending him back to his regular job). The parties do not dispute that Exxon could terminate Wenzel's services through Ambitech. Because, however, there is no evidence indicating that anyone but Ambitech could terminate Gunn, a trier of fact could infer that he was not, in fact, a borrowed servant. *See Binz*, 301 F.3d at 533 (whether an employee qualifies is a factual question unless the "undisputed facts are susceptible to but a single inference"). Thus, the Court cannot, as a matter of law, determine that Gunn was a borrowed servant. *See Russel*, 953 F.2d at 331.

Because only one reasonable inference can be drawn as to whether Wenzel was subject to the direction and control of Exxon, the Court finds that Ambitech is entitled to Partial Summary Judgment on its Borrowed Servant Affirmative Defense with respect to Wenzel. Thus, even if the Court had found a genuine issue of material fact with respect to proximate causation, any alleged

acts or omissions by Wenzel would be imputed to Exxon.[12]  *See Occidental Fire & Cas. Co. v. Int'l Ins. Co.*, 804 F.2d 983, 992 (7th Cir. 1986) ("The loaned-servant doctrine is not a theory of liability based upon indemnity where one employer may be liable for the employee's actions but may shift the payment of damages to the other employer; rather it is a complete defense to an assertion of liability.").  Because, however, the facts do not show that Exxon had a right to discharge Gunn from his duties with Exxon, Ambitech would not be entitled to partial summary judgment with respect to his actions.  *See Russel*, 953 F.2d at 331 (Illinois law requires that the borrowing employer have the ability to terminate the employee's work for that employer).

## CONCLUSION AND ORDER

The Court grants Exxon's Motion for Summary Judgment as to the breach of General Warranty component of Count I and as to Count II, and denies its Motion with respect to the Warranty of Competence component of Count I.  The Court grants Amex's Motion for Summary Judgment on the Warranty of Competence component of Count I and its Motion for Summary Judgment on its Fifteenth Affirmative Defense with respect to negligence.  The Court denies Amex's Motions for Summary Judgment as to the General Warranty component of Count I, Count II, and

---

[12] In arguing that Gunn and Wenzel were not borrowed servants, Exxon focuses almost exclusively on the language in the Engineering Services Agreement ("ESA") between Exxon and Ambitech.  The ESA provides: "Contractor will at all times act as an independent contractor, and nothing stated or implied in this Agreement shall be construed to make Contractor, nor shall Contractor in any way represent Contractor to be, an employee or agent of User, Exxon Oil Corporation, or any affiliated company of Exxon Oil Corporation.  While Contractor's Services shall meet with User's approval, User is interested in the results to be achieved and, accordingly, the detail, manner, and method of performing Services shall be the responsibility of and under the supervision and control of Contractor."  Although this language affirms that Ambitech is an independent contractor in performing its engineering services pursuant to specific contracts, the ESA does not address whether Gunn or Wenzel were employees loaned to Exxon under the Illinois borrowed servant doctrine.  Ambitech as a company may have had control over the "detail, manner, and method of performing" *its* contracted Services, but Gunn's and Wenzel's uncontradicted testimony establishes that it did not have control over their services.  Indeed, Gunn's and Wenzel's services began prior to the HDPE Project at issue in this litigation and were not performed in fulfillment of any specific contract.  Thus, the ESA is not relevant to the Court's determination of whether undisputed facts support the inference that Gunn and Wenzel were borrowed servants.

the breach of warranty component of its Fifteenth Affirmative Defense. The Court denies ISCO's Motion for Summary Judgment in its entirety. The Court grants Ambitech's Motion for Summary Judgment, rendering moot its Motion for Summary Determination regarding the applicability of the Moorman Doctrine. The Court further finds that even if it had denied Ambitech's Motion for Summary Judgment, Ambitech would be entitled to partial summary judgment on its Borrowed Servant Affirmative Defense as to its employee Wenzel.



Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 19, 2010