**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EXXONMOBIL OIL CORPORATION, | ) | |
| a New York Corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 07 CV 4278 |
| | ) | |
| AMEX CONSTRUCTION CO., INC., | ) | Honorable Judge Kendall |
| an Indiana Corporation | ) | |
| | ) | Magistrate Judge Soat-Brown |
| Defendant/Third-Party Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ISCO INDUSTRIES, LLC, a Kentucky Limited | ) | |
| Liability Company, and AMBITECH | ) | |
| ENGINEERING CORPORATION, | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**MOTION TO APPLY FED. R. CIV. P. RULE 61
AND ENTER JUDGMENT ON COUNT II (NEGLIGENCE)**

NOW COMES ExxonMobil, and for its present motion, states and moves as follows, viz:

1.     Fed. R. Civ. P. 61 provides, in pertinent part, as follows: "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." (Fed. R. Civ. P. 61)


2.     This Court correctly noted in its Memorandum Opinion and Order (CM/ECF #348), both ExxonMobil and Amex moved for summary judgment on Count II of ExxonMobil's complaint (negligence), but neither party designated their respective pleadings or responses as cross-motions. (CM/ECF #348, Pg. 35, note 7)

3.      ExxonMobil acknowledges that it should have so labeled and designated its pleadings. However, all of the issues, operative facts and testimony have been presented to this Court. Under these facts, the harmless error doctrine embodied in Rule 61 should be applied.

4.      The U.S. Supreme Court and fellow district courts have recognized that summary judgment is a procedure which conserves precious judicial resources and, as a result, may even be entered *sua sponte*, so long as the parties have had the opportunity to address the respective issues. *Celtox Corp. v. Catrett*, 477 U.S. 317, 326 (1986) "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence."

5.      Similarly, district courts have noted that judicial economy warrants summary judgment even in the absence of a cross-motion. *Dominici v. Board of Educ. of City of Chicago*, 881 F.Supp. 315 at 322, ( N.D.Ill.,1995): "However, in this case the issue has been fully briefed by both parties, and the Court simply lacks a cross-motion for summary judgment from the Plaintiffs. In this circumstance, the Court finds that judicial economy warrants the entry of judgment without further briefing." *Dayton Eelectric Man. V. APCOM, Inc*. 782 F. Supp. 389, 392, (N.D. Ill. 1992) "[I]t is most desirable that the court cut through mere outworn procedural niceties and make the same decision as would have been made had the defendant made a cross-motion for summary judgment" citing *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991).

6.      Pursuant to Fed. R. 61, Plaintiff now moves to hold as harmless the Plaintiff's failure to label its motion or response as a cross-motion, and to enter summary judgment for ExxonMobil on Count II (negligence) for the sum of $6,000,0000. Respectfully, such a result would result in no procedural or substantive harm, and would serve the interests of justice.

7.      In ExxonMobil's LR 56.1, and Amex's answer thereto, it was not disputed that the shutdown of the refinery was a sudden and dangerous event which caused damage to ExxonMobil property. (CM/ECF #232, Nos. 17-27 (Ex. "A")) The inability to cool Liquid Petroleum Gases (LPG's) was not only dangerous and emergent, but also resulted in the destruction of hydrocarbon in production, broken seals, the fouling of heat exchangers, the loss of chemicals, as well as other property damage. (CM/ECF # 348, Pg. 35: CM/ECF #232, Nos. 17-27 (Ex. "A").

8.      ExxonMobil suffered $14.9 million in damages, which damages have been established pursuant to Fed. R. Civ. P. 56 (d)(1)[1].  (CM/ECF #348, pg. 39: "Exxon further alleges, and Amex offers nothing to dispute, $14,913,656 in losses due to the emergency shut-down and costs associated with start-up").

9.      Amex has only $6 million in insurance. (CM/ECF #  21) However, pursuant to the parties' Continuing Services Agreement (CSA), recovery for negligence damages are capped at Amex's insurance, which provision this Court held enforceable. (CM/ECF # 348, pg. 40)[2] Respectfully, entry of judgment on Count II for such amount is warranted and reasonable, and will speed along the conclusion of this matter.

10.     The decision will speed along this case, and benefit Amex, because the Seventh Circuit has noted that coverage under a commercial general liability policy (CGL) policy follows the *Moorman* doctrine.  *Wausau Underwriters Insurance Co. v. United Plastics Group, Inc.* 512 F.3rd. 953, 957-958 (7th Cir. 2008), viz:

---

[1] "If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue…It should then issue an order specifying what facts — including items of damages or other relief — are not genuinely at issue. **The facts so specified must be treated as established in the action**." Fed. R. Civ. P. 56(d)(1) (emphasis added)

[2] Whether the recoverable damages under Count I (warranty) are "capped" remains at issue. Plaintiff had hoped an insurance tender would be made and a settlement consummated.  However, such was not the case. Whether the clarity currently sought will result in the carrier reconsidering its position remains an open question.

> "Suppose that because an auto repair shop replaces a car's defective carburetor with a pineapple, the car will not start. The repair shop's mistake would make the car seriously defective, but it would not cause any physical damage to the car, and so any damages awarded against the shop would not be covered by its GCL policy. (*citation omitted*) Not so with respect to damages that the jury awarded Microtherm in the Texas case because of physical damage that the defective water chambers caused to the heaters or to any other property. Tort liability for such consequential damages is limited by the principles of tort causation, but whatever liability the court imposed in a tort suit would, as consequential damages from tortiously inflicted property damage, be within the "because of property damage" coverage of the Comprehensive General Liability policy." *Wasuau*, 512 F.3d at 958).

10.     As this Court has already noted, the damage at issue was not to the component parts related to the HDPE, but to other property, viz: "Here, on the other hand, the resulting property damaged (hydrocarbons, heat exchangers, pump seals, and mechanical devices) were not component parts bargained for in the HDPE Project, and therefore damage to them could not have been foreseen as a direct consequence of any failure of the HDPE pipe." (CM/ECF # 348, Pg. 35) The damage to "other property" element, as well and the danger involved, has been established and there is no true factual dispute for a jury to determine on Count II (negligence).

11.     In sum, an extensive record and briefings have been placed before the Court. This comprehensive record demonstrates the applicability of the "dangerous and sudden" exception to the *Moorman* doctrine and significant damage to "other property". Under these facts, applying the harmless error doctrine is warranted.

12.     Both parties put forth their evidence and both sought summary judgment as to Count II (negligence). The elements of the *Moorman* exception have been established and the damages incurred are not in dispute. The established damages incurred are far beyond the $6m damage cap, and both parties should be held to their bargain with regards to negligence. ExxonMobil agreed to limit negligence damages to Amex's insurance, and Amex agreed to carry such insurance to compensate ExxonMobil.

13.     Plaintiff acknowledges it should have properly designated and labeled its pleadings. Fault for this oversight clearly lies at the feet of the Plaintiff. However, given the extensive briefings and record placed before the Court the relief sought herein is warranted. The time and attention of jury, and this Court, should not be expended to determine facts which are not actually in dispute, and which have already been established via Fed. R. Civ. P. 56(d)(1).

       **WHEREFORE**,  Plaintiff moves this Honorable Court to apply the harmless error doctrine and to enter judgment on Count II (negligence), in the amount of $6,000,000.00, and for all such other and further relief this Court deems proper, just and fit.

                                  **EXXONMOBIL OIL CORPORATION**,

                                  By:____/s/ Frank P. Andreano
                                  One of its Attorneys

Frank P. Andreano
ARDC No. 6202756
**BRUMUND, JACOBS, HAMMEL,**
**DAVIDSON & ANDREANO LLC**
58 East Clinton Street, Suite 200
Joliet, Illinois  60432
Telephone: (8l5) 723-0628
fandreano@brumund-jacobs.com

**Exhibit "A"**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EXXONMOBIL OIL CORPORATION, | ) | |
| A New York Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:  07 CV 4278 |
| | ) | |
| AMEX CONSTRUCTION CO., INC., | ) | Judge Kendall |
| An Indiana Corporation, | ) | Magistrate Judge Brown |
| | ) | |
| Defendant. | ) | |

**AMEX CONSTRUCTION COMPANY, INC.'S RESPONSE TO
EXXONMOBIL OIL CORPORATION'S STATEMENT OF UNDISPUTED MATERIAL
FACTS PURSUANT TO LR § 56.1(b)(3)(C)**

**NOW COMES** the Defendant, AMEX CONSTRUCTION COMPANY, INC., an Illinois

corporation, ("Amex"), by and through its attorneys, SMITHAMUNDSEN LLC, and, for its

Response to EXXONMOBIL OIL CORPORATION'S ("Exxon") LR 56.1 Statement of

Uncontested Facts in Support of its Motion for Summary Judgment, states as follows:

I.      **EXXON'S STATEMENT OF UNCONTESTED FACTS & AMEX'S RESPONSE
THERETO PURSUANT TO LR 56.1(b)(3)(A)(B).**

Amex submits to the Court that Exxon's LR 56.1 Statement of Uncontested Facts in

Support of its Motion for Summary Judgment does not conform to LR 56.1(a)(3) insofar as

it does not consist of *short* numbered paragraphs, and, therefore, Amex bears no fault for the

length of its Responses.

1)      **FACTS SUPPORTING JURISDICTION AND VENUE:**   The present suit is
based on diversity of citizenship. (Defendant's Am. Answers, Tab P, ¶ 17.) The
Plaintiff, ExxonMobil Oil Corporation (EMOC) is a New York Corporation with its

1

corporate headquarters located in the State of Texas. (Hene Dep., Tab 0,142:16-21; Defendant's Resp. to Req. for Admis., Tab Q, ¶ I, ¶ 4.) EMOC is the only party to this litigation whose corporate executive headquarters are located in the State of Texas. (Defendant's Resp. to Req. for Admis., Tab Q, ¶ 4.) The Amex Construction Co., Inc. (Amex) is an Illinois Corporation with its Corporate Headquarters located in the State of Indiana. (Defendant's Resp. for Admis., Tab Q, ¶ 3.) Third party defendant Ambitech Engineering is an Illinois Corporation with its executive headquarters located in the State of Illinois, and Third Party Defendant ISCO Industries, LLC is a Kentucky limited liability company with its executive headquarters located in the State of Kentucky. (Ambitech Answer to 3rd Party Compl., Tab R, ¶ 5; ISCO's Answer to 3rd Party Compl., Tab S, ¶ 4.) The amount in controversy in this litigation exceeds $75,000.00. (Defendant's Am. Answers, Tab P, 17)

**RESPONSE:** Amex admits the facts set forth in Paragraph 1 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

2) **DESCRIPTION OF THE PARTIES:** EMOC owns and operates a petroleum refinery in Joliet, Illinois (hereinafter "the Refinery"). (Hene Dep., Tab 0,142:16-21; Defendant's Am. Answers, Tab P, ¶¶ 5-6; 9.) Amex Construction (hereinafter "Amex") is a union industrial field piping company who provides process piping fabrication and related services to petrochemical plants, refineries and other industry settings, including the EMOC Joliet Refinery. (Defendant's Resp. to Req. for Admis., Tab Q, ¶ 6.) Ambitech Engineering (hereinafter "Ambitech") is an engineering firm that provides professional engineering services to EMOC and other clients. (Penteris Dep., Tab A, Ex. 6.) ISCO Systems Inc. (hereinafter "IS CO") is an authorized distributor of McElroy Manufacturing butt fusion equipment and provides materials, supplies and training to industry related to High Density Polyethylene (hereinafter "HDPE"), a type on non-metallic piping. (Perrault Dep., Tab L, 43: 12-21; ISCO's Answers to 3rd Party Compl., Tab S, ¶ 4.)

**RESPONSE:** Amex admits the facts set forth in Paragraph 2 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

3) **BACKGROUND FACTS:** In February of 2002, a portion of the Refinery's underground concrete water cooling line failed resulting in a shutdown of the refinery. (Wenzel Dep., Tab B, Ex. 79 at EMAC 1967.) After the cooling water line failure in 2002, the underground concrete line was patched and placed back into service. (Wenzel Dep., Tab B, Ex. 79 at EMAC 1970.) Plans were then undertaken to completely replace the underground cooling water return lines with new carbon steel piping. (Gunn Dep., Tab C, 19:5-8.) Ambitech was awarded the engineering contract for the project. (Gunn Dep., Tab C, 51:15 - 52:19; Penteris Dep., Tab **A**, Ex. 9.) Amex was awarded the installation contract. (Plaintiff's Am. Compl., Tab V, Ex. C, Ex. D; Defendant's Am. Answers, Tab P, ¶¶ 8, 9; Gunn Dep., Tab C, 55:8-10.) ISCO was hired by ExxonMobil to provide certain equipment and training to Amex. (Gunn Dep., Tab C, Ex. 31, Knapczyk Dep., Tab G, 35:6-8, 36:11-16, 37:22 - 38:2,38:1220, Ex. 80.) ISCO further provided the HDPE pipe at

issue. (Knapczyk Dep., Tab G, Ex. 80.)

**RESPONSE:** Amex admits the facts set forth in Paragraph 3 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

4) **COOLING WATER & REFINING:** Water is a critical ingredient to the refining of hydrocarbons. (Hene Dep., Tab 0, 42:15-20; Plaintiff's Ans. to Def.'s Interrogs., Tab **T**, No. 16; Penteris Dep., Tab **A**, 240:9 - 241: 14.) Hydrocarbons are refined into various oil based products (gasoline, diesel oil, heating oil, etc.) by the use of heat, pressure, catalyst, and the introduction of various chemicals and chemical processes. (Hene Dep., Tab 0, 55:8-22, 76:12-21, 96:17 - 97:5, Ex. 110 at No. 16; Plaintiff's Ans. to Def.'s Interrogs., Tab **T**, No. 16.) Crude slate is initially heated, acted upon by catalyst and chemicals and converted into vapor known as LPG's (Liquid Petroleum Gases). (Hene Dep., Tab 0,55:10-24.) LPG's are then cooled back to a liquid state and sent along to various processing units for further refining. (Hene Dep., Tab 0, 42: 15-20,94:4-16; Plaintiff's Ans. to Def.'s Interrogs., Tab T, No. 16; Penteris Dep., Tab A, 240:9 - 241:14.) Water is critical to this process because it is used to cool LPG back to a liquid state. (Hene Dep., Tab 0, 42:15-20, 55:10-22, 94:4-16; Plaintiff's Ans. to Def.'s Interrogs., Tab T, No. 16; Penteris Dep., Tab A, 240:9 241: 14.) Additionally, water is used to cool various generators and mechanical equipment necessary for refining of hydrocarbons. (Hene Dep., Tab 0, 94:4-16; Enlow Dep., Tab D, 26: 13-17; Plaintiff's Ans. to Def.'s Interrogs., Tab T, No. 16; Penteris Dep., Tab A, 240:9 - 241: 14.) After the water is used for cooling either product or machines, it becomes hot and needs to be cooled again for reuse. (Enlow Dep., Tab D, 26:13-17; Penteris Dep., Tab A, 240:9 - 241:14.) The Refinery has a main water cooling tower and series of heat exchangers which cool heated water on a closed loop system. (Enlow Dep., Tab D, 26: 13-17,27:4-8.)

**RESPONSE:** Amex admits the facts set forth in Paragraph 4 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

5) Water is drawn from the Des Plaines River which is adjacent to the Refinery, treated in the Refinery's water treatment plant, and then used in the various production facilities. (Elias Dep., Tab E, 37: 17-21; Plaintiff's Ans. to Def.'s Interrogs., Tab T, No. 16.) The water is then circulated back to the cooling tower and heat exchangers for cooling and reuse. (Enlow Dep., Tab D, 26:13-17, 27:4-8.) Water is continually being added to the system to account for evaporation. (Elias Dep., Tab E, 43: 13 - 44:5.)

**RESPONSE:** Amex admits the facts set forth in Paragraph 5 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

6) **AN "ON-LINE" PROJECT:** To keep the refinery on-line while the cooling water return line replacement project was being executed, a plan was devised involving a series of above-ground temporary switching pipes. (Penteris Dep., Tab A, 31:2-12, Ex. 6, Ex. 9.) These temporary pipes would carry return cooling water from the various

refinery process units back to the cooling tower and heat exchangers units while segments of the old pipe were being excavated and replaced. (Penteris Dep., Tab A, Ex. 6, Ex. 9.) As new underground carbon steel lines were brought online, the temporary switch-over lines would be removed. (Penteris Dep., Tab A, Ex. 6, Ex. 9.) The plans called for the temporary switching pipes to be in service for three to four months, depending on the progress of construction. (Gunn Dep., Tab C, 106:13-16.) The temporary switching pipes were to be made of HDPE. (Penteris Dep., Tab A, Ex. 6 at 4.)

**RESPONSE:**   Amex admits the facts set forth in Paragraph 1 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

7)   **HIGH DENSITY POLYETHYLENE AND BUTT FUSION:**   ExxonMobil retained Mr. James Perrault of McElroy Manufacturing, who issued a report about heat fusion and testified to the contents of his report. (Perrault Dep., Tab L, 77:5-9, Ex. 91.) He explained that the principle of heat fusion is to heat two different surfaces to a designated temperature, and then fuse them together by application of force. (Perrault Dep., Tab L, Ex. 91, Background.) The pressure causes flow of the melted materials, which causes mixing and thus fusion. (Perrault Dep., Tab L, Ex. 91, Background.) When polyethylene pipe is heated, the molecular structure is transformed from a crystalline state into an amorphous condition. (Perrault Dep., Tab L, Ex. 91, Background.) When fusion pressure is applied, the molecules from each pipe end mix. (Perrault Dep., Tab L, Ex. 91, Background.) As the joint cools, the molecules return to their crystalline form, the original interfaces are gone, and the two pipes have become one homogeneous pipe. (Perrault Dep., Tab L, Ex. 91, Background.) The end result is a fusion joint that is as strong or stronger than the pipe itself. (Perrault Dep., Tab L, Ex. 91, Background.)

**RESPONSE:**   Amex admits the facts set forth in Paragraph 1 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

8)   The manufacturer of the machine used to fuse the pipe at issue was manufactured by McElroy Manufacturing. (Perrault Dep., Tab L, 38:9 - 39:4.) ISCO is an authorized distributor of McElroy's equipment. (Perrault Dep., Tab L, 43: 12-21.) McElroy granted ISCO copyright permission to copy McElroy instruction manuals. (Perrault Dep., Tab L, 130:7-12.) McElroy does not generally train contractors directly, but runs a "train the trainer" program. (Perrault Dep., Tab L, 36:7-15, 130:16-25.) The ISCO trainers are trained directly by McElroy at such program. (Perrault Dep., Tab L , 130:7-25.) One of the basic parts of HDPE fusion is not to heat the pipe under pressure. (Perrault Dep., Tab L, 135:20 - 137:6.) If excessive pressure is applied during the heating phase, the pressure will force the melted material to migrate from the pipe surface. (Perrault Dep., Tab L, 62:2-18, 69:11-19, Ex. 91, Background.) This will result in a "cold fusion", a condition that substantially weakens the pipe by creating interior gasps where the two ends of the pipe are not fused. (Perrault Dep., Tab L, Ex. 91, Background.)

**RESPONSE:**   Amex admits the facts set forth in Paragraph 8 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

9)   **THE TRAINING OF AMEX:** Because Amex had no experience fusing HDPE piping, ISCO Systems ("ISCO") was retained to provide on-site training in hydraulic butt fusion.  (Hannon Dep, Tab F, 17:9-23.) ISCO also provided the HDPE pipe and the fusion machine for the project.  (Knapczyk Dep., Tab G, Ex. 80.) EMOC directly paid for the pipe, training and rental of the HDPE fusion machine. (Knapczyk Dep., Tab G, Ex. 80.) Amex selected which of its pipefitters would attend the HDPE fusing training.  (Hannon Dep., Tab F, 17:18-18:22.)

RESPONSE:  Amex admits the facts set forth in Paragraph 1 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

10)   The training consisted of one week of hands-on training on the McElroy fusion machine which would be used to fabricate the HDPE piping. (Daly Dep., Tab H, 21:3-12.) The Amex employees were provided with a "Heat Fusion Manual" which instructed them how to fuse the HDPE. (Pumnea Dep., Tab K, 35: 17-21,36:11-24, 54: 5-7; Moiser Dep., Tab I, Ex. 26.) The training referenced various portions of the Fusion Manual. (Pumnea Dep., Tab K, 35:17-21, 36:11-24.) Mr. Dave Holman of ISCO provided the training to Amex employees, and each pipefitter was provided with a weather resistant instruction manual containing instructions and graphic illustrations of HDPE fusion. (Mosier Dep., Tab I, Ex. 26; Holman Dep., Tab J, 95: 17; Daly Dep., Tab H, 27:2 - 28:3; Pumnea Dep., Tab K, 54:2-14.) The section of the instruction manual involving hydraulic butt fusion machine procedure is some 16 pages in length and contains multiple pictures and graphic depictions of the fusion process. (Pumnea Dep., Tab K, 54:2-14; Mosier Dep., Tab I, Ex. 26.) The fusion manual provided to Amex specifically states not to heat the pipe under pressure. (Mosier Dep., Tab I, Ex. 26 at EMAC 205.)

RESPONSE:  Amex admits the facts set forth in Paragraph 10 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.



11) **INSTALLATION AND HEATING UNDER PRESSURE:**  The Amex pipefitters would pre-fuse portions of the HDPE pipe in advance of its actual installation in one portion of the refinery.  (Daly Dep., Tab H, 198:2-16.)  Then, they would transport the pre-fused piping joints to the actual location where it would be used.  (Daly Dep., Tab H, 198:11-199:2.)  They would place the piping into place and then fuse the remaining unfused segments.  (Daly Dep., Tab H, 198:19-199:24.)  The failed piping joint was placed into the Interconnecting Pipeway (ICP) at the refinery before the final segments were fused by Amex.  (Daly Dep., Tab H, 200:22 – 202:22; Penteris Dep., Tab A, Ex. 14.)

**RESPONSE:**  Amex admits the facts set forth in Paragraph 11 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

12) After the failure of the HDPE pipe at issue, one of the Amex pipefitters primarily responsible for fusing the HDPE, Mr. Patrick Daly Jr., stated that he did not follow the fusion manual provided by ISCO. (Daly Dep., Tab H, 58:20 - 59:24.) Mr. Daly stated that he heated the HDPE pipe under pressure at the Refinery, believing it to be a proper fusion technique. (Daly Dep., Tab H, 122:1-9.) After learning of the HDPE failure at the Refinery, and while working on a job for the Chicago Water Reclamation District, Mr. Daly re-read the fusion manual and discovered that heating under pressure was an improper fusion technique. (Daly Dep., Tab H, 58:20 - 59:24.) Mr. Daly indicated that this was the first time he learned that heating under pressure was improper. (Daly Dep., Tab H, 58:20 - 59:24.)

RESPONSE:  Amex denies the facts set forth in Paragraph 12 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment. Amex submits to the Court that Paragraph 12 mischaracterizes the testimony of deponent, Patrick Daly Jr., by inaccurately portraying his adherence to the fusion manual provided  by ISCO, alleging that Mr. Daly asserted that heating under pressure was improper and representing that this was the first time Mr. Daly learned that heating under pressure was improper.  (See the deposition transcript of Patrick Daly Jr., as attached to Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment as Tab H, pp. 58:20 – 24; 59:1 – 59:24.)

13) **POST FAILURE ANALYSIS:**  Post failure analysis of the HDPE piping joint at issue showed that it was fused under pressure, which is an improper fusion technique. (Perrault Dep. Tab L, 62:9-12, 69: 11-19, Ex. 91.) Had the HDPE pipe at issue been properly fused, it would not have failed. (Biery Dep., Tab M, 38:7-16.)

RESPONSE:  Amex denies the facts set forth in Paragraph 13 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment. Amex submits to the Court that Paragraph 13 mischaracterizes the testimony of deponent, Nicholas Biery, Ph.D., by omitting a significant factual assumption and inaccurately representing the deponent's degree of certainty. (See the deposition of Nicholas Biery Ph.D., as attached to Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment as Tab M, 38:7-16.)

14) **THE HYDRO TEST AND PLACED INTO SERVICE:**  Prior to being placed in service, the pipe was subject to hydrotesting, which consists of filling the pipe with water to 1. 5 times operating pressure and checking for leaks. (Pumnea Dep., Tab K, 47: 17 - 48:23.) After the HDPE piping passed the hydrotest, EMOC employees signed-off on the pipe and it was placed into service. (Punmea Dep., Tab K, 50:3 -51:4.) The pipe was placed in service by EMOC on June 2, 2005. (Defendant's Resp. to Req. for Admis., Tab Q, ¶ 15.)

RESPONSE:  Amex admits the facts set forth in Paragraph 14 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

15) **JULY 30, 2005 – THE  DAY OF THE FAILURE:**  The crude flow meters at the Refinery show that the shutdown happened at approximately 8:20 PM on July 30, 2005. (Hene Dep., Tab O, 148:20 - 149:1.) On the date of failure, Mr. Lonnie McCullom was the night superintendent for EMOC, which meant that he was in charge of the refinery after refinery management left the grounds. (McCollum Dep., Tab N, 18:10 - 19:7.) Mr. McCullom had worked at the refinery since 1979, and his shift on that night started at 6pm and was to end at 6am. (McCollum Dep., Tab N, 9:10-14,19:8-11.) While working in the refinery control room a worker reported to Mr. McCullom that he had spotted a leak in the HDPE piping line. (McCollum Dep., Tab N, 55:22 - 56:10.) Mr. McCullom went immediately to the site of the leak, where he noticed a small amount of water on the ground and a small stream of water coming from the pipe. (McCollum Dep., Tab N, 59:15 - 60:18.) After several minutes, the pipe came "unzipped" while he was watching it. (McCollum Dep., Tab N, 61:10-14.) The pipe completely decoupled and all the water in the pipe came out, flooding the area. (McCollum Dep., Tab N, 61:15 - 62:2.) Mr. McCollum immediately returned to the control room and began contacting the various refinery units and ordering an emergency shutdown of the refining units. (McCollum Dep., Tab N, 62:3 - 14.)

RESPONSE:  Amex denies the facts set forth in Paragraph 15 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment. Amex submits to the Court that Paragraph 15 mischaracterizes the testimony of deponent, Lonnie McCollum, by alleging that Mr. McCollum went "immediately to the site of the leak" and "immediately returned to the control room". (See the deposition of Lonnie McCollum, as attached to Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment as Tab N, pp. 59:15 – 24; 60:1 – 18, 62:3 –14.)   Further, Amex submits that Paragraph 15 mischaracterizes the testimony of deponent, Lonnie McCollum, in stating that the area was flooded.   (See the deposition transcript of Lonnie McCollum, as attached to Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment as Tab N, pp. 61:15 – 24; 62:1 – 2.)

16) **THE FLARE AND SHUTDOWN:** Mr. McCullom ordered the shutdown because a failure of the cooling water system will cause certain unit equipment to overheat to excessive temperatures. (McCollum Dep., Tab N, 155:14 - 156:5.) Once water supply is lost, the effected refinery units must be shutdown for safety reasons. (Penteris Dep., Tab A, 240:9 - 241:14; Hene Dep., Tab O, 42:9-20, 57: 1-15.) Without water to cool machines and LPG, vapor pressure will rise to critical limits, risking explosion or atmospheric release. (Penteris Dep., Tab A, 240:9 - 241: 14; Hene Dep., Tab 0, 55: 10 -56: 12.) To prevent catastrophic failure, the refinery "flared" (burned) all of the hydrocarbon in production by sending material into the flare line. (Hene Dep., Tab 0,56:13 - 57:15.) The refinery will flare automatically when Pressure Safety Valves (PSV's) reach a critical pressure, or the operators can open control valves sending production material into the flare line. (Hene Dep., Tab 0, 56:13-24.) Without releasing pressure via manual valve operation or PSV's, pressure will rise to critical limits, risking explosion or atmospheric release. (Penteris Dep., Tab A, 240:9 - 241:14.) Mr. McCollum ordered the emergency shutdown based on what he

observed as the 36-inch line unzipped. (McCollum Dep., Tab N, 155:14-156:5.)

**RESPONSE:**  Amex admits the facts set forth in Paragraph 14 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

17) **DAMAGES SUFFERED:**  EMOC claims $14,913,656.00 in losses due to the shutdown and costs associated with the start-up, viz:

| | |
|---|---|
| $ 10,390,000 | LOST MARGIN |
| $ 650,000 | FLARE LOSS |
| $ 28,000 | BROKEN SEALS |
| $ 8,740 | COOLING WATER CHEMICALS |
| $ 1,959,516 | REDUCED PREHEAT-TEMP/LOSS OF PROD. CAPABILITY/FOULED EXCHANGERS |
| $ 18,000 | FCC CATALYST LOSS |
| $ 122,000 | ADDITIONAL FUEL COSTS |
| $ 1,400,000 | DISTRESSED CRUDE SALES |
| $ 1,037,400 | DISTRESSED GAS AND DIESEL PURCHASES |

**$14,913656**   **TOTAL LOSSES** (Hene Dep., Tab O, Ex. 112)

**RESPONSE:**  Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 17 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

18) **TIME TO RE-START.**  The Refinery didn't actually start back on line until August 7, 2005. (Hene Dep., Tab 0, 126:23 - 127:8.) The Refinery attempted to start-up two days after the shutdown, but a heater broke due to metal embrittlement and some tubes cracked. (Hene Dep., Tab 0, 125:22 - 126:22, 127:9-13.) The Refinery then made other equipment changes and repairs unrelated to the event. (Hene Dep., Tab 0, 127:16-19.) For the purposes of the present litigation, EMOC has assigned two days worth of lost margin to the emergency shutdown. (Hene Dep., Tab 0, Ex. 112.) This is because it took a half day for the repairs and one and a half days for startup. (Hene Dep., Tab 0, 46:11-18,50:3-7.)

**RESPONSE:**  Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 18 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

19) **LOST MARGIN: $10,390,000.00.**  Mr. Cliff Hene, the Refinery's optimization manager, testified to the losses the Refinery suffered. (Hene Dep., Tab O, 17:20 - 18: 1.) As the optimization manager, his job is to monitor the production of crude slate into refined product, evaluate the type of refined product needed to meet contractual obligations, and then to communicate and coordinate with the refinery's various production units to assure the proper type and amount of product is being produced.

(Hene Dep., Tab O, 25:8-23.) Mr. Hene has worked for EMOC since 1991. (Hene Dep., Tab O, 18:2-7.) Mr. Hene explained that there are approximately 30 different types of crude slate which the refinery purchases. (Hene Dep., Tab O, 21:24 - 22:6.) Each crude slate is different and has certain amount of molecules, some make diesel, some make gasoline and others make an asphalt-type material. (Hene Dep., Tab O, 21:10-23.) The refinery employs real-time optimization, which is a computer based model to assist in making economic decisions. (Hene Dep., Tab 0, 19:23 - 20:7.) At the time of the shutdown, and based on the type of crude slate and profit being realized at the time, EMOC suffered a margin loss of $10,390,000.00. (Hene Dep., Tab 0, 34:3-12, 38:18 - 39:3, 53:8-18.) This represents the inability to process 233,700 barrels of crude per day for 2 days, at a loss of $26.08 per barrel, for a loss of $10,390,000.00. (Hene Dep., Tab 0, 34:3-12, 53:8-18.) The barrels per day figure was based upon the flow rate prior to the failure. (Hene Dep., Tab 0, 38: 1822.) The per barrel profit was calculated using a Process Industry Modeling System (PIMS). (Hene Dep., Tab 0, 48:7-23.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 19 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

20) **FLARE LOSS: $650,000.00.** The Refinery suffered a loss of $650,000.00 due to the flare of the product in production at the time of the shutdown. (Hene Dep., Tab 0, 63: 11-17, Ex. 112 at 1.) To prevent catastrophic failure, the refinery "flared" (burned) all the hydrocarbon in production by sending material into the flare line. (Hene Dep., Tab 0, 56: 15 - 57: 15.) Flaring is a safety procedure necessary when cooling water is lost. (Penteris Dep., Tab A, 240:9 - 241:14; McCollum Dep., Tab N, 155:14 - 156:5.) It prevents explosions or catastrophic failures due to the inability to cool LPG's and machines. (Penteris Dep., Tab A, 240:9 - 241:14; Hene Dep., Tab 0, 42:15-20,56:15 - 57:15,94:4-16.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 20 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

21) **BROKEN SEALS: $28,000.00** The Refinery suffered 4 broken seal pumps as a result of the failure at a cost of $7,000.00 per seal. (Hene Dep., Tab 0, 64: 13-18, Ex. 112 at 1.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 21 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

22) **COOLING WATER CHEMICALS: $8,740.00.** Chemicals are placed into the cooling water system to prevent equipment fouling. (Hene Dep., Tab O, 68:8-18.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident

alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 22 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

23) **REDUCED PREHEAT-TEMPORARY LOSS OF FULL PRODUCTION CAPACITY: $1,959,516.00.** The fouling of heat exchangers temporarily reduces the amount of crude which can be processed. (Hene Dep., Tab 0, 69:13 - 71:8.) By August 22, 2005, the units were back running at pre-shutdown levels. (Hene Dep., Tab 0, 73: 18-22.) The amount of the loss production ability was $1,959,516. (Hene Dep., Tab 0, 69: 13-22, Ex. 112 at 1.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 23 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

24) **FCC CATALYST Loss: $18,000.** Catalyst is a sand like material that is used during the refining process. (Hene Dep., Tab 0, 76: 14-21.) During an emergency shutdown catalyst is lost and needs to be replaced. (Hene Dep., Tab 0, 77:7-13.) The shutdown resulted in a loss of 10 tons of catalyst, at a price of $18,000.00. (Hene Dep., Tab 0, 78:6-9, Ex. 112 at 2.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 24 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

25) **ADDITIONAL FUEL COSTS: $122,000.** During operations the Refinery produces its own fuel. (Hene Dep., Tab 0, 79:15-21.) During shutdown the refinery still needs fuel to generate steam to get equipment ready, and to operate boilers, and meet other energy needs. (Hene Dep., Tab 0, 80:6-19.) The Refinery purchased fuel from NIGas to meet needs. (Hene Dep., Tab 0, 81:23 - 82:6.) The Refinery purchased $122,000 to meet needs. (Hene Dep., Tab 0, 79:7-11, Ex. 112 at 2.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 25 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

26) **DISTRESSED CRUDE SALES: $1,400,000.** When the refinery went down, Mr. Hene made the decision to sell incoming crude at a discount. (Hene Dep., Tab 0, 121: 17 122: 1, 123: 17-20.) Crude slate comes into the refinery via pipeline. (Hene Dep., Tab 0,84:22 - 85:2,119:13-21.) The Refinery has limited storage capacity and Mr. Hene didn't know how long the shutdown would last. (Hene Dep., Tab 0, 123:5-16, 125:212.) Crude slate is a commodity and some slates are easier to sell than others. (Hene Dep., Tab 0, 122:21 - 123:4.) When potential purchasers discover a seller who needs to sell, it can adversely effect the price realized. (Hene Dep., Tab 0, 85:3-5.) Mr. Hene sold

200,000 barrels of incoming crude slate as a result of the shutdown. (Hene Dep., Tab 0,121:13-16.) EMOC lost $1,400,000.00 from the distressed sale of crude slate. (Hene Dep., Tab 0, Ex. 112 at 2.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 26 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

27) **DISTRESSED GAS & DIESEL PURCHASES: $ 1,037,400.00.** The refinery needed to meet contractual obligations for gasoline and diesel. (Hene Dep., Tab 0, 25:8-23.) Mr. Hene attributed a portion of the 720,000 barrels of gasoline purchased and the 520,000 barrels of diesel to the shutdown. (Hene Dep., Tab 0, 87: 10 - 88: 15, Ex. 112 at 2.) As noted earlier, the Refinery didn't actually start back on line until August 7, 2005. (Hene Dep., Tab 0, 126:23 - 127:8.) The Refinery attempted to start-up two days after the shutdown, but a heater broke due to metal embrittlement and some tubes cracked. (Hene Dep., Tab 0, 125:22 - 126:22, 127:9-13.) The Refinery then made other equipment changes and repairs unrelated to the event. (Hene Dep., Tab 0, 127:16-19.) For the purposes of the present litigation, EMOC has assigned two days worth of distressed gas and diesel purchases to the emergency shutdown. (Hene Dep., Tab 0, Ex. 112.)

**RESPONSE:** Amex admits that certain losses were sustained as a result of the incident alleged in Plaintiff's Second Amended Complaint, but denies the nature and extent of the damages as alleged in Paragraph 27 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

28) **THE CONTINUING SERVICES AGREEMENT:** After the plans for the replacement of the cooling water lines at issue were completed by Ambitech and approved by EMOC engineers, EMOC looked to Amex to perform the piping fabrication. (Gunn Dep., Tab C, 56:3-11.) Amex was a core contractor at the Joliet Refinery who had provided ongoing services at the Refinery for many years. (Gunn Dep., Tab C, 56:3-11.) Amex had also previously executed a Continuing Services Agreement ("CSA") with ExxonMobil Global Services, the procurement are of the Exxon Mobil Corporation. (Penteris Dep., Tab A, 54:10 - 55:21, Ex. 5.) The CSA allowed the Refinery to issue work orders directly to Amex on a pre-approved and ongoing contractual basis. (Penteris Dep., Tab A, 54:23 - 55:21, Ex. 5.)

**RESPONSE:** Amex admits the facts set forth in Paragraph 28 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

29) The CSA at issue was executed by Amex on May 29, 2003, and with all exhibits, pricing sheets, drug policy statements, and related matters counts some 100 pages in length. (Defendant's Am. Answers, Tab P, ¶ 5; Plaintiff's Suppl. Req. for Admis., Tab U, ¶ 1.) The CSA contains the terms and conditions of all work to be performed at the refinery. (Defendant's Am. Answers, Tab P, ¶ 5.) The CSA provides that all work orders form a

separate contract and that each work order shall "incorporate the provisions of this Agreement." (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 1, No. 15; Defendant's Am. Answers, Tab P, ¶5.) The CSA also provides that the contractor will carry out all work in accordance with all engineering "[G]uides, specifications, standards and procedures". (Plaintiff's Suppl. Req. for Admis., Tab U, ¶ 1.)

**RESPONSE:** Amex denies the facts set forth in Paragraph 29 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment. Amex submits to the Court that the Continuing Service Agreement ("CSA") does not state that "all work orders form a separate contract." (See Plaintiff's Am. Compl., Tab V, Ex. A, Art. 1, No. 15, as attached to Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.) Amex further submits to the Court that the CSA does not contain the "terms and conditions of all work to be performed at the refinery." (See Service Order at Exhibit A to Paragraph 33 of Amex's Statement of Additional Facts.)   Additionally, Amex submits to the Court that Paragraph 1 of Plaintiff's Supplemental Request for Admission, attached to Exxon's LR 56.1 Statement of Uncontested Facts at Tab U, does not indicate that the CSA  provides that the contractor will carry out all work in accordance with all engineering "[G]uides, specifications, standards and procedures.

30)   The CSA contains warranties of competence, workmanship, and that all work will be performed in accord with manufacturer specifications and good operational practice, viz:
ARTICLE 1   DEFINITIONS

5.)      "Competence" means the expertise, experience, capability and specialized knowledge to perform Services in a good and workmanlike manner and within all accepted standards for the industry. (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 1, No.5; Defendant's Am. Answers, Tab P, ¶5.)

11.)      "Services" means the services described in Exhibit A and each applicable Work Order. (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 1, No. 11; Defendant's Am. Answers, Tab P, ¶5.)

ARTICLE 4: WORK ORDERS

4.2      Nature of and Incorporation of Terms

Each accepted Work Order shall constitute a legal contract between User and Contractor separate and distinct from either any other Work Order or this Agreement. Each Work Order shall, nonetheless, be deemed to incorporate the provisions of this Agreement. (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 4, No. 4.2; Defendant's Am. Answers, Tab P, ¶5.)

ARTICLE 10:         CONTRACTOR'S WARRANTIES

10.1 Contractor's Representations and Warranties

Contractor represents and warrants that it:

(a) has the Competence to perform the Services;
\*\*\*\*\*\*\*\*\*

(c) shall maintain and use all tools and equipment in accordance with manufacturer's specifications and recommendations and good engineering and operational practices;
\*\*\*\*\*\*\*\*\*

(f) shall perform all Services in good faith, promptly, with due diligence and Competence;

(g) fully comprehends the requirements and contingencies prior to performing Services; (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 10, No. 10.1; Defendant's Am. Answers, Tab P, ¶5.)

10.3 Contractor's Warranty

Without limiting the rights that User may otherwise have at law or equity and in addition to the other warranties granted, Contractor guarantees and warrants that all Services performed and any materials and equipment provided in connection with the Services shall be free from defect or deficiency for <u>one ( 1 ) year</u> from the date of completion or acceptance of the Services, whichever occurs last .... (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 10, No. 10.3. ; Defendant's Am. Answers, Tab P, ¶5.)

**RESPONSE:** Amex admits the facts set forth in Paragraph 30 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

31) The CSA also provides for limited negligence damages, as well as the warranties provided above, viz:

ARTICLE 1:DEFINITIONS

16.) "Work Site" means the area of any physical site where Services are actually performed by Contractor and/or its subcontractors provided (l) such site( s) is owned or controlled by User and (2) User makes the area available to Contractor to perform Services and related activities." (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 1, No. 16; Defendant's Am. Answers, Tab P, ¶5.)

ARTICLE 12: DISTRIBUTION OF RISK, RELEASE AND INDEMNITY

12.1 Contractor's Responsibilities

(c) Contractor shall compensate User for loss or damage to User's existing property which is in reasonable proximity to the Work Site which results from the negligence of Contractor and/or for any resulting consequential, special or

indirect damages, or loss of anticipated profits sustained by User; however, Contractor's responsibility shall not exceed the amount recoverable by Contractor or its Subcontractors under the valid and collectable insurance carried by Contractor and Subcontractors, or the amount which would have been recoverable under than insurance if all conditions, requirements, and warranties imposed on the insured by the insurer are being or had been met. User shall release Contractor and hold Contractor free and harmless from liability to User for such loss or damage and/or for any resulting consequential, special or indirect damages, or loss of anticipated profits sustained by User exceeding the amounts so recovered, EVEN IF THE LOSS OR DAMAGE RESULTS FROM CONTRACTOR'S NEGLIGENCE: however, Contractor's responsibility shall include the value of any deductible or self-insured retention applicable to that insurance." (emphasis original) (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 12, No. l2.l(c); Defendant's Am. Answers, Tab P, ¶5.)

12.6 Meaning of "Negligence"

The term "negligence" in this Agreement shall include active or passive negligence. (Plaintiff's Am. Compl., Tab V, Ex. A, Art. 12, No. 12.6; Defendant's Am. Answers, Tab P, ¶5.)

**RESPONSE:**  Amex admits that the provisions of the CSA set forth in Paragraph 31 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment are correct, but denies Exxon's interpretation thereof.

32)  Plaintiff sent Amex a FRCP 36 Request to Admit on April 14, 2009 seeking an admission or denial of the following statement: "21. The HDPE pipe at issue was not constructed in a manner that rendered it fit for its intended purpose." Amex objected to this request, among others. (Defendant's Resp. to Req. for Admis., Tab Q, ¶ 21.). Magistrate Judge Soat Brown ordered that Amex answer this specific request by May 29, 2009. (Ct. Order, Tab W.) To date, Amex has either failed or made a decision not to answer this Request. By operation of law, Amex now admits that "[t]he HDPE pipe at issue was not constructed in a manner that rendered it fit for its intended purpose."

**RESPONSE:**  Amex denies the facts set forth in Paragraph 32 of Exxon's LR 56.1 Statement of Uncontested Facts in Support of its Motion for Summary Judgment. Amex Answered Exxon's Request to Admit denying Exxon's Request to Admit No. 21.  (See Service Order at Exhibit A to Paragraph ___ of Amex's Statement of Additional Facts.

## II.   AMEX'S STATEMENT OF ADDITIONAL FACTS PURSUANT TO LR 56.1(b)(3)(C)

33)  See Service Order attached hereto as Exhibit A.

34)  See deposition transcript of Patrick Daly attached hereto as Exhibit B.

35)  Pat Daly, one of the Amex operators, testified that the training he received from Mr.
Holman deviated from the fusion process as outlined in the Training Manual.  The trainer
told him to heat the pipe under fusion pressure until 9/16 inch bead size was reached, and
then let the pipe "heat soak" on the heater, under zero pressure, four-and-a-half minutes
before pushing the pipes together.  Daly followed his training rather than the Fusion
Manual because he figured that the trainer knew what he was talking about.  (See
deposition testimony of Patrick Daly at Exhibit B to paragraph 34 Amex's Statement of
Additional Facts, pp. 31-35.)

36)  Mr. Daly testified that he knew that the training he received from Mr. Holman was not
exactly the same as the process outlined in the Fusion Manual, but he followed this
training because in his experience, manuals do not always apply in the real world.  (See
deposition testimony of Patrick Daly at Exhibit B to paragraph 34 of Amex's Statement
of Additional Facts, pp. 155-156.)

37)  See deposition transcript of David Holman attached hereto as Exhibit C.

38)  David Holman testified that that he issued certificates of training to Tom Pumnea, Jr. and
Patrick L. Daly, Jr., among others, indicating that they had attended a heat fusion
demonstration and had demonstrated proper heat fusion principles and fundamentals of
high density polyethylene pipe and fittings.  The fusion procedures covered included butt
fusion while using the McElroy 1648 machine.  (See deposition testimony of David
Holman at Exhibit C to paragraph 37 of Amex's Statement of Additional Facts;  pp. 6:
23-24; 17:1-8; 167: 12-24; and 168: 1-15.

39)  See Certificates of Training attached hereto as Exhibit D.

40)  The certificates of training were only given to people he actually observed doing weld
fusion and Pat Daly and Tom Pumnea did that on at least five to six welds each on 36
inch pipe (See deposition testimony of David Holman at Exhibit C to paragraph 37 of
Amex's Statement of Additional Facts, pp. 85: 15-24; 86: 1-16.)

41)  Dave Holman testified that he has to feel confident that the people that he trained
understood what they were doing in terms of butt fusion or heat fusion of 36-inch DR17
pipe.   (See deposition testimony of David Holman at Exhibit C to paragraph 37 of
Amex's Statement of Additional Facts, p. 94: 8-24.)

42)  To the best of David Holman's recollection, Tom Pumnea and Patrick Daley welded at
least five to six welds each on their own, with him watching over their shoulder.  (See
deposition testimony of David Holman at Exhibit C to paragraph 37 of Amex's Statement
of Additional Facts, p. 153: 8-16.)

43)  Tom Pumnea and Patrick Daly were two gentlemen that he recommended to the
superintendent [of Amex] to run the machine because they showed the most interest and

picked up the quickest before he left the jobsite.  (See deposition testimony of David Holman at Exhibit C to paragraph 37 of Amex's Statement of Additional Facts, p. 154: 9-14.)

44)   Dave Holman told Amex's superintendent that the two best people to run the machine were Daly and Pumnea based on watching how they reacted and their interest in doing it. When he observed them doing the five welds themselves, they followed all procedures perfectly.  They didn't deviate from the procedures he taught them.  (See deposition testimony of David Holman at Exhibit C to paragraph 37 of Amex's Statement of Additional Facts, p. 158: 5-19.)

45)   Dave Holman felt that training Pumnea and Daly on the 1648 machine and performing five welds themselves with him present was sufficient for them to be able to do the job. (See deposition testimony of David Holman at Exhibit C to paragraph 37 of Amex's Statement of Additional Facts, p. 160: 14-19.)

46)   See ISCO Heat Fusion Evaluation Form attached hereto as Exhibit E.

47)   David Holman filled out ISCO 95 on February 10, 2005.  (See deposition testimony of David Holman at Exhibit C to paragraph 37 of Amex's Statement of Additional Facts, p. 182: 19-21.)

48)   This ISCO Heat Fusion Evaluation Form would not have been executed by him unless Mr. Holman had a belief that the level of understanding that is required to use the [fusion] machine had been attained at least by Mr. Pumnea and Mr. Daly.  (See deposition testimony of David Holman at Exhibit C to paragraph 37 of Amex's Statement of Additional Facts, pp. 182: 23-24; 183: 1-3.)

49)   See Exxon's Amended Answers to Amex's Request to Admit attached hereto as Exhibit F.

50)   Exxon knew that the Amex employees needed training to heat fuse the high density polyethylene pipe installed and/or fabricated by Amex on the project.  (See Exxon's Amended Answers to Amex's Request to Admit at Exhibit F to paragraph 49 of Amex's Statement of Additional Facts, paragraph 43.)

51)   Exxon hired ISCO to train Amex's employees in the proper heat fusion procedures for the high density polyethylene pipe installed and/or fabricated by Amex on the project.  (See Exxon's Amended Answers to Amex's Request to Admit at Exhibit f at paragraph 49 of Amex's Statement of Additional Facts, paragraph 44.)

52)   Exxon identified ISCO as having knowledge, experience and expertise in the proper heat fusion procedures for high density polyethylene pipe used by Amex on the project.  (See Exxon's Amended Answers to Amex's Request to Admit at Exhibit F at paragraph 49 of Amex's Statement of Additional Facts, paragraph 45.)

53) ISCO held itself out to Exxon as having knowledge, experience and expertise in the proper heat fusion procedures for high density polyethylene pipe used by Amex on the project.  (See Exxon's Amended Answers to Amex's Request to Admit at Exhibit F at paragraph 49 of Amex's Statement of Additional Facts, paragraph 46.)

54) Exxon compensated ISCO to train Amex's employees in the proper heat fusion procedures for high density polyethylene pipe before Amex was allowed to begin installation and/or fabrication of the high density polyethylene piping on the project. (See Exxon's Amended Answers to Amex's Request to Admit at Exhibit F at paragraph 49 of Amex's Statement of Additional Facts, paragraph 47.)

55) ISCO certified that Tom Pumnea, Jr., and Patrick L. Daly, Jr. attended a heat fusion demonstration and demonstrated proper heat fusion principles and fundamentals of high density polyethylene pipe and fittings.  Fusion procedures covered included butt fusion while using a McElroy 1648 machine.  (See Exxon's Amended Answers to Amex's Request to Admit at Exhibit F at paragraph 49 of Amex's Statement of Additional Facts, paragraph 53.)

56) ISCO determined which high density polyethylene pipe fusion/bonding machine would be used by Amex's employees in installing and/or fabricating the high density polyethylene piping on the project.  (See Exxon's Amended Answers to Amex's Request to Admit at Exhibit E at paragraph 49 of Amex's Statement of Additional Facts, paragraph 49.)

57) See deposition transcript of John McKinney attached hereto as Exhibit G.

58) John McKinney testified that the Amex welders, specifically Tom Pumnea and Patrick Daly, Jr. were qualified and competent to perform the butt fusion of the HDPE pipe on this project.  (See Deposition Testimony of John McKinney at Exhibit G at paragraph 57 of Amex's Statement of Additional Facts, pp. 82:  15-20; 84:  4-8.)

59) See deposition transcript of Frank Volgstadt attached hereto as Exhibit H.

60) Mr. Volgstadt testified that while the procedure followed by Pat Daly was not the procedure in the ISCO Fusion Manual, and that if Mr. Holman taught Mr. Daly and Mr. Pumnea that procedure, he would be wrong, he disagrees that the consequences of using that procedure would result in a defective cold fusion, stating:  "No, it would not, absolutely not.  Absolutely not."  (See Deposition Testimony of Frank Volgstadt at Exhibit H at paragraph 59 of Amex's Statement of Additional Facts, p. 81:  2-22.)

61) See Amex's Answer to Exxon's Request to Admit No. 21 attached hereto as  Exhibit I.

Respectfully submitted,

SmithAmundsen LLC

/s/David A. Johnson
Attorney for Defendant, Amex Construction
Co., Inc.

SmithAmundsen LLC
150 North Michigan Avenue, Suite 3300
Chicago, Illinois  60601
(312) 894-3200
ARDC No. 06199089